**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 13-CV-80385-MIDDLEBROOKS/Brannon

| | |
|---|---|
| _____ | : |
| SUN LIFE ASSURANCE COMPANY | : |
| OF CANADA, | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| IMPERIAL HOLDINGS, INC., | : |
| IMPERIAL PREMIUM FINANCE, | : |
| LLC, IMPERIAL LIFE FINANCING | : |
| II, LLC, IMPERIAL LIFE | : |
| SETTLEMENTS, LLC, IMPERIAL PFC | : |
| FINANCING, LLC, IMPERIAL PFC | : |
| FINANCING II, LLC, OLIPP, LLC, | : |
| PSC FINANCIAL, LLC, | : |
| | : |
| Defendants. | : |
| _____ | : |

## AMENDED CIVIL ACTION COMPLAINT

### I.
### INTRODUCTION

Plaintiff, Sun Life Assurance Company of Canada ("Sun Life"), by and through its

attorneys, Drinker Biddle & Reath LLP, hereby files this amended civil action complaint,

pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), against Imperial Holdings, Inc.,

Imperial Premium Finance, LLC, Imperial Life Financing II, LLC, Imperial Life Settlements,

LLC, Imperial PFC Financing, LLC, Imperial PFC Financing II, LLC, OLIPP I, LLC, and PSC

Financial, LLC, and requests a trial by jury of all issues so triable, and in support thereof, avers

as follows:

1.      This is an action for civil racketeering, conspiracy to commit civil racketeering,

fraud, conspiracy to commit fraud, tortious interference with contractual relations, equitable accounting, and declaratory judgment arising from a scheme to wager on human life.

2.     A secondary market for life insurance has emerged in which individual policy owners are permitted to sell their life insurance policies to third parties.  In these transactions, the purchaser of the policy will pay the premium for the policy and will ultimately collect the death benefit when the insured dies.

3.     The secondary sale of life insurance is generally legal, provided that the policy in its inception was intended for legitimate purposes and not as a mere wager on the life of the insured.

4.     Imperial Holdings, Inc. ("Imperial Holdings") is an entity that acquired life insurance policies in the secondary market, either for its own account or to sell to other secondary market investors.  Because the demand for life insurance policies outstripped the supply, Imperial Holdings devised a scheme to manufacture and acquire life insurance policies. Imperial Holdings' scheme not only violated applicable law but disregarded Sun Life's prohibition on using life insurance for the purpose of wagering.  In order to accomplish its scheme, agents of Imperial Holdings submitted life insurance applications to Sun Life that misrepresented the purpose of the policies, the source of the premiums, and the entities for which the policies were intended.  Moreover, Imperial Holdings required its agents to share commissions with Imperial Holdings, allowing Imperial Holdings to acquire the policies far more cheaply than legitimate consumers.

5.     Imperial Holdings managed and controlled a network of insurance producers and trustees to carry out its scheme.  At the direction of Imperial Holdings, producers who were appointed to sell life insurance products for Sun Life solicited senior citizens to serve as the

object of the intended wagering transactions.  Imperial Holdings and its agents created irrevocable life insurance trusts to serve as the ostensible owners of the policies.  The producers, the nominal insureds, and the trustees of the irrevocable trusts would then submit applications for life insurance, falsely claiming that the policies were intended for estate planning and that the source of the premium would be the insureds' own funds.  In reality, Imperial Holdings supplied the money for the premium under a purported "loan" transaction, in part using commissions that it received from producers involved in the scheme.  Imperial Holdings would later acquire record ownership of the policies by foreclosing on the loans.  This scheme allowed Imperial to manufacture and obtain hundreds, perhaps thousands, of illicit wagering policies.

6.      As a result of Imperial Holdings' scheme, Sun Life issued at least 28 policies with an aggregate face value of over $126 million.  Sun Life's injuries from Imperial Holdings' scheme include the payment of commissions to producers working on behalf of Imperial Holdings, administrative and underwriting costs, lost profits, reinsurance costs, and legal fees.

**II.**
**PARTIES**

7.      Plaintiff Sun Life is a life insurance company organized and existing under the laws of Canada, with its principal place of business at One Sun Life Executive Park, Wellesley Hills, Massachusetts.  Sun Life is a citizen of the Commonwealth of Massachusetts.

8.      Defendant Imperial Holdings, Inc., is a company organized and existing under the law of Florida, is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial Holdings, Inc., is the sole defendant in Sun Life's civil racketeering, conspiracy to commit civil racketeering, fraud, conspiracy to commit fraud, and tortious interference with contractual relations claims.

9.      Defendant Imperial Premium Finance, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial Premium Finance, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

10.     Defendant Imperial Life Financing II, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial Life Financing II, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

11.     Defendant Imperial Life Settlements, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   Imperial Life Settlements, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

12.     Defendant Imperial PFC Financing, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial PFC Financing, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

13.     Defendant Imperial PFC Financing II, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   Imperial

PFC Financing II, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

14.     Defendant OLIPP I, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   OLIPP I, LLC, as the owner of certain policies at issue in this case, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

15.     Defendant PSC Financial, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  PSC Financial, LLC, as the owner of certain policies at issue, is a defendant in Sun Life's equitable accounting and declaratory judgment claims.

### III.
### JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.  In particular, Sun Life's claims arise under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court also has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff, a citizen of Massachusetts, and all Defendants, citizens of Florida, and because the amount in controversy exceeds $75,000.

17.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Sun Life's claims occurred in the Southern District of Florida.

**IV.**
**CAUSES OF ACTION**

**COUNT ONE – RICO**
**VIOLATIONS OF 18 U.S.C. §§ 1962(a) and (c)**
**AGAINST IMPERIAL HOLDINGS, INC.**

**A.**     **Insurable Interest and Assignment**

18.     The fundamental purpose of life insurance is to provide financial protection for the living in the event of a death. The owner of a life insurance policy, therefore, must have an "insurable interest" in the life of the insured at the inception of a life insurance policy.

19.     Insurable interest is both a legal concept and a term of art in the life insurance industry. It refers to an interest in the continuation of the life of the insured. Generally, an insurable interest exists if the policy owner has a family relationship with the insured or derives a pecuniary benefit from the insured such that the policy owner would suffer a financial loss if the insured died.

20.     If the policy owner does not have an insurable interest in the life of the insured at inception, a moral hazard arises because the policy owner has a "sinister counter interest in having the life [of the insured] come to an end." *Grigsby v. Russell*, 222 U.S. 149, 155, 32 S.Ct. 58 (1911). Further, if the policy owner will suffer no loss and only stands to benefit upon the insured's death, the policy is nothing more than a wagering contract. Life insurance policies issued under those circumstances generally violate anti-wagering laws. A life insurance policy that lacks an insurable interest at inception is an illegal contract and is void *ab initio*.

21.     While there must be an insurable interest at inception, lawfully issued life insurance policies are generally assignable to third parties. As a result, a third party who could not himself take out a life insurance policy due to a lack of insurable interest may, in certain circumstances, later acquire a legitimately procured policy.

22.     A transfer or assignment of a life insurance policy is only proper, however, if the policy, in its inception, was intended for the legitimate purpose of providing financial protection to a party with an insurable interest in the insured and not as a cover for a wager.  If the assignment or transfer is actually a cover for an illegal wagering contract, the policy is void *ab initio*.

**B.     Secondary Market For Life Insurance**

23.     In recent years, a secondary market for life insurance has emerged.  If a life insurance policy is no longer needed, the policy owner may sell the policy to a third party who will pay the subsequent premium and collect the death benefit upon the insured's death.

24.     The demand for salable life insurance policies has grown much faster than the supply.  As a result, a practice has emerged where life insurance policies are procured solely to serve as a commodity traded in the secondary market.  This illicit offspring of the secondary market is often referred to as stranger originated life insurance, or STOLI.

25.     STOLI policies generally constitute illegal wagering contracts because such policies, from their inception, are intended for persons or entities who have no familial or financial interest in the insured, but merely seek to gamble on the insured's life.

26.     As the rise of STOLI became apparent, Sun Life took aggressive action to detect and prevent this misuse of life insurance.  Sun Life's efforts included reviewing and revising its application and other administrative forms, modifying its underwriting process, and communicating with producers regarding Sun Life's prohibition on STOLI.

27.     Sun Life will not knowingly issue a policy that is intended from inception as a wagering policy.  Sun Life, therefore, prohibits producers appointed to sell its policies from engaging in transactions where the policy is intended as a wager rather than for legitimate financial protection.

C.    <u>Imperial's Life Wagering Enterprise</u>

28.    As Sun Life (and other life insurers) increased their efforts to prevent STOLI,
purveyors of STOLI developed new schemes to evade these efforts.  One variety of these
schemes was the use of a phony premium financing transaction employed by Imperial Holdings.
In order to perpetrate its scheme, Imperial Holdings managed and controlled an association-in-
fact enterprise, involving Imperial Holdings, insurance producers, insureds, trustees, the Bank of
Utah, and an entity known as the Family Insurance Trust (the "Life Wagering Enterprise").
Imperial Holdings managed and controlled the Life Wagering Enterprise as follows:

(i)    **Selecting a Suitable Wager**

29.    Imperial Holdings utilized a variety of insurance producers who were appointed
to sell life insurance products for Sun Life and other insurers.

30.    The insurance producers who procured the Sun Life policies at issue in this
action included Todd Bernstein, Brock Diediker, Donny Fein, Lynn Freiheit, Robert M.
Friedman, Gabriel Giordano, Samuel Katz, Bradley Kurit, Leon Lowenthal, Bruce J. Mactas,
Michael Marom, Jonathan Moulton, Scott Neubauer, Arlene Orkin, David Orkin, Spiros G.
Pappas,  Suzane Rubio, and Todd Weishaus.  Upon information and belief, additional producers
will be revealed through discovery.

31.    With a legitimate life insurance transaction, an insurance producer meets with a
potential insured to perform an assessment of the individual's needs and to select a product
appropriate for that consumer.  Whether an insured needed or wanted an insurance policy,
however, was utterly immaterial to Imperial Holdings' scheme.  In fact, Imperial Holdings
sought individuals who did not want or need life insurance.

32.    The producers solicited senior citizens through advertisements in periodicals,
seminars, flyers, and personal solicitation at senior care centers, hospitals, and clubs frequented

by senior citizens.

33.      The producers advised the seniors that a life insurance policy could be taken out without any risk or cost whatsoever to the senior.  They promised that if the senior qualified, the senior would receive compensation for his or her participation.

34.      After identifying a senior willing to participate in the scheme, the producer would meet with the senior to obtain his or her signature on a HIPAA authorization form.  The producer then gathered the senior's medical records and obtained a life expectancy report.  The producer would also submit the medical records to a series of life insurers as part of a trial application.  Once an insurer provided an indication as to whether the senior was insurable and, if so, on what terms, the producer then prepared an illustration indicating the cost of premiums for the policy.

35.      Once Imperial Holdings reviewed the life expectancy reports, illustrations, and other pertinent documents, Imperial Holdings would then determine whether the senior's life represented a worthy gamble.  Imperial Holdings then advised the producer as to whether it was interested in funding the purchase of the policy through its sham loan transaction.

**(ii)      Applications for Insurance**

36.      In order to procure a life insurance policy, the producer would then assist in the preparation of an irrevocable life insurance trust that would serve as the ostensible owner of the policy.  While the use of an irrevocable life insurance trust is a common estate planning tool, the trusts used in Imperial Holdings' scheme were cookie-cutter trusts used to give the appearance of legitimacy.  The trustees of the trusts were seldom selected by the insureds – *i.e.*, the purported grantors of the trusts – but were instead under the direction and control of Imperial Holdings and its agents.

37.      The trustees who were selected by Imperial Holdings included Brenda Barrera,

Melvin Berner, Joel Bernstein, William Brown, Bruce Thomas Dern, Stewart Dickler, Ira
Einhorn, Sidney Geller, Lynn Freiheit, Bennam Fuhrman, Lynn Kimpling, Harvey Klein, Lee
Margolis, Monroe Mitchel, Lori Pratt, Darryl S. Rogers, Moshe Schecter, Michael Schrimsher,
Cheryl Schwartz, Kenneth A. Shaprio, Bud Solk, Larry J. Spilkin, Irene Talansky, Virgil
Thomas, Marianne Victor, and Dorothy Wasser.  Upon information and belief, additional
trustees will be revealed through discovery.

38.     At all times, Imperial Holdings managed and controlled the trustees, providing
instructions regarding the application for and maintenance of the policies.  Imperial Holdings
also provided the trustees with form documents to be executed both prior to the issuance of the
policy and while the policy was in force.  By way of example, Imperial Holdings provided the
trustees with cookie-cutter trust agreements and form letters requesting policy information from
Sun Life.

39.     The insurance producer, the insured, and the trustee would then complete an
application for life insurance.

40.     Because Sun Life sought to prohibit STOLI, Sun Life's application included
questions designed to ferret out potentially illegitimate transactions.  Sun Life asked, among
other things, whether the sought-after policy was being purchased for the purpose of assignment
or sale to a third party, whether the insured had the financial means to pay the premiums for the
policy, and whether premiums would be financed, paid by the policyholder, or paid by a third
party.

41.     In accordance with Imperial Holdings' scheme, the producers, insureds and
trustees, acting as agents of Imperial Holdings, lied about the purpose of the policy, the financial
means of the insured, and the source of the premium.  False statements in the Sun Life

applications presently known are identified in paragraphs 83-107, which are incorporated herein by reference.

### (iii)    Funding of Policies

42.    Once an insurer approves an application, the approval is communicated to the producer, who then collects the initial premium in order to place the policy in force.

43.    With policies procured under Imperial Holdings' scheme, Imperial Holdings or its agents would advance funds to the trustee to make the first premium payment.  Subsequent premium payments were advanced under the guise of a phony loan, where the loan proceeds were deposited into an account at the Bank of Utah in the name of the "Family Insurance Trust." The Family Insurance Trust made subsequent premium payments, concealing from the insurer that Imperial Holdings was the true source of funds.

44.    Insurance producers are compensated in the form of commissions paid by the issuing insurer.  Although commission structures vary, commissions for the policies involved in Imperial Holdings' scheme often equaled the amount of first year target premium.

45.    Under Imperial Holdings' scheme, producers were required to remit a significant portion of their commissions to Imperial Holdings as fees in connection with the phony "loan" transaction, allowing Imperial Holdings to use commissions to fund "loan" transactions. Imperial Holdings' receipt of commissions typically represented 50% of the principal balance of the phony loan, allowing Imperial Holdings to maintain the Life Wagering Enterprise.

46.    Florida and other jurisdictions regulate the sharing of commissions and generally prohibit commission rebating.  *See* Fla. Stat. §§ 626.572, 626.9541(h).  In its application documents, Sun Life requires producers to state whether they are sharing commissions with another producer.  Producers involved in Imperial Holdings' scheme fraudulently concealed from Sun Life the commission sharing/rebating arrangement.  Fraudulent statements and

omissions relating to commission sharing/rebating presently known are identified in paragraphs 83-107, which are incorporated herein by reference.

47.     By requiring producers to remit commissions and fraudulently concealing this arrangement, Imperial Holdings was able to acquire funds to maintain the Life Wagering Enterprise.  Imperial Holdings was also able to acquire life insurance policies at a fraction of the cost incurred by legitimate consumers.

**(iv)     Acquisition of the Policies**

48.     Although Imperial Holdings or its agents advanced the premium for the policies, Imperial Holdings structured the advance as a loan transaction.  In other words, the insured and Imperial Holdings entered into a so-called "loan" agreement whereby Imperial Holdings agreed to lend monies that would be used to pay the premiums for two years, and the insured agreed to repay the loan upon maturity.  However, unlike a true loan that is intended to be repaid, the "loans" under Imperial Holdings' scheme were designed to result in a default.

49.     Under a typical Imperial Holdings' loan, the insured would be required to repay the entire loan amount with interest.  The interest rate generally ranged between 11% and 16%.  In addition to repaying the principal and interest, the insured (or trustee if it was the "borrower") would be required to pay Imperial Holdings a loan origination fee of 10% of the principal.  Thus, repayment of a $500,000 loan after two years, for example, could cost the insured as much as $720,000 (*i.e.*, $500,000 in principal + $160,000 for two years of interest at 16% + $50,000 loan origination fee).

50.     Under Imperial Holdings' loan agreements, however, the insured could avoid all of his or her repayment obligations simply by signing over the policy to Imperial Holdings.

51.     Imperial Holdings acquired its portfolio of policies, including all of the policies issued by Sun Life, in this manner.  Few, if any, insureds actually repaid the premium loans.  By

design, the loans were not intended to facilitate the procurement of life insurance policies for individuals who needed them.  To the contrary, the structure of the transaction was intended to produce a default so that Imperial Holdings could acquire the policies.

**D.**     **Procurement of Sun Life Policies**

52.     Imperial Holdings acquired numerous Sun Life policies in the manner described above.  By way of example, producer Scott Neubauer solicited insured Robert Good and set up the Robert Good Irrevocable Trust with Virgil Thomas as the Trustee.

53.     On November 25, 2009, Neubauer submitted to Sun Life via U.S. mail and/or interstate wires an application for a $4 million insurance policy on the life of Good, a 72 year old Florida resident.  According to the insurance application, the intended owner and beneficiary of the policy were to be the Robert Good Irrevocable Trust.

54.     The application asked the applicants to identify who would pay the premium on the policy.  In response, Neubauer, Good, and Thomas indicated that the source of the premium would be the insured or the trust.  However, Good had no intention of using his own funds for the premium because Imperial Holdings was the intended source.

55.     In addition to the application, Neubauer also submitted to Sun Life via U.S. mail and/or interstate wires a Personal Financial Questionnaire wherein Good attested to his financial condition and represented his net worth as being $4,895,000.  The financial information, including Good's stated net worth, was intentionally false.  Good's net worth was only a fraction of what was represented.

56.     Neubauer also directed the submission of an inspection report prepared by Worldwide Inspection Services to Sun Life via U.S. mail and/or interstate wires.  This report stated that the policy was being taken out for "personal estate planning," that Good's net worth was $4,895,000, that Good had not engaged in any discussions about assigning the policy, and

that the policy premiums would not be financed.  All of these statements were false.

57.     As part of the application process, Neubauer also submitted to Sun Life via U.S. mail and/or interstate wires a letter he prepared stating that Good's need for life insurance arose out of his desire to address future estate taxes.  Neubauer also confirmed Good's financial condition, including his net worth of $4,895,000.  Each of these statements was false.

58.     Based on the application and supporting materials, Sun Life approved the issuance of a policy in the amount of $4 million and transmitted it to Neubauer for delivery to the trust.  Imperial Holdings then advanced funds to Thomas in order to make the initial premium payment.  On January 14, 2010, Sun Life received a check for $138,480 to place the policy in force.

59.     At various times within two years of the policy's issuance, Thomas submitted via U.S. mail and/or interstate wires requests for policy information using a form letter supplied to him by Imperial Holdings.  Imperial Holdings would prepare these information requests and send them to Thomas for his signature with instructions for him to submit them to Sun Life.  The purpose of these requests was to obtain information about the policy for Imperial Holdings, whose interest in the policy remained hidden.

60.     On January 12, 2012, Imperial Holdings, through its agent, sent Sun Life a premium check in the amount of $16,250 from the account of the Family Insurance Trust at the Bank of Utah.  On June 13, 2012, Imperial Holdings through its agents submitted to Sun Life a premium check in the amount of $21,926.39 from an account at the Bank of Utah.

61.     The source of all of the premium payments for the policy was Imperial Holdings through a premium finance "loan" that was not only undisclosed but was directly contrary to the statements in the insurance application.

62.     The reason for sending premium payments from the Bank of Utah and Family Insurance Trust was to prevent Sun Life from learning the true source of the funds, to hide the fact that the insurance producers had lied during the application process regarding the source of the premiums, and to further conceal Imperial Holdings' scheme.

63.     In accordance with Imperial Holdings' scheme, Good defaulted on his loan obligation and assigned the policy to Imperial Holdings.

64.     On May 1, 2012, approximately 27 months following the issuance of the policy, and after the expiration of the contestable period, Imperial Holdings submitted to Sun Life via U.S. Mail and/or interstate wires a policy ownership and beneficiary change request form, revealing for the first time Imperial Holdings' interest in the policy.  Imperial Holdings purposely delayed disclosing its interest in the policy in order to make it appear that the ownership and beneficiary change was part of a legitimate secondary market transaction.

65.     By way of further example, Sun Life has interviewed multiple insureds, including Ronald Spohn and Elizabeth Geller.  Policies on the lives of Spohn and Geller were procured in a similar fashion.

66.     Spohn, for example, was referred by a friend to insurance producers Scott Neubauer and Mark Neubauer for the purposes of engaging in a life insurance transaction. Spohn was told that he would never have to pay any of the premiums in connection with the policy, and that the policy would be sold to an investment bank after two years for a profit. Spohn's policy was not resold in the secondary market and Spohn never received any compensation.  Instead, after approximately two years, Imperial Holdings acquired the policy by foreclosing on the phony loan.  Spohn never contributed any of his own funds towards the payment of premiums and could not have afforded the premiums.  Rather, Imperial Holdings

supplied the funds for the policy.

67.     The Geller policy was procured in a similar fashion.  Geller attended a seminar at a restaurant in Boca Raton, Florida, conducted by insurance producer named Arlene Orkin. Similar to the Spohn transaction and consistent with Imperial Holdings' scheme, a trust was established in Geller's name by Orkin, without any meaningful involvement from Geller. Further, Geller never contributed any of her own funds towards the payment of premiums, and approximately two years after the policy was issued, she relinquished all rights in the policy to Imperial Holdings.

68.     In both the Spohn and Geller policy transactions, as with the Good policy transaction, Imperial Holdings funneled premiums through the Bank of Utah and the Family Insurance Trust, both of which made premium payments to Sun Life at Imperial Holdings' direction.

69.     Sun Life issued several policies under similar circumstances and based on similar misrepresentations as those made in connection with the Good, Spohn, and Geller policies.  These policies include each of the following:

| Policy No. | Insured | Face Amt. | Producer(s) | Trustee(s) | Date of Application |
|---|---|---|---|---|---|
| 020144710 | Talansky | $2.5 Mil. | Fein | Talansky | 2/27/2007 |
| 030014043 | Rogers | $10 Mil. | Bernstein | Rogers, Spilkin | 3/23/2009 |
| 030018011 | Berg | $7.5 Mil. | Mactas | Schwartz | 4/10/2009 |
| 030023427 | Wasser | $5 Mil. | Weishaus | Wasser | 1/4/2010 |
| 030020848 | Korn | $8 Mil. | Kurit | Schrimsher | 8/25/2009 |
| 030026302 | Berner | $1.8 Mil. | Friedman | Berner | 12/3/2009 |
| 030006941 | Degraw | $3 Mil. | Diediker | Degraw | 6/23/2008 |
| 030008864 | Pastore | $1.5 Mil. | Giordano | Barrera | 7/28/2008 |
| 030028237 | Solk | $10 Mil. | Bernstein | Solk | 12/11/2009 |
| 030021781 | Dickler | $6 Mil. | Marom | Dickler | 10/27/2009 |
| 030018935 | Granby | $4 Mil. | Katz | Kimpling | 11/24/2009 |
| 030019434 | Blakeslee | $8 Mil. | Kurit | Schrimsher | 7/30/2009 |
| 030025817 | Good | $4 Mil. | Neubauer | Thomas | 11/25/2009 |
| 030027091 | Mitchel | $2.6 Mil. | D. Orkin | Mitchel | 11/4/2009 |

| 030027019 | Parnes | $8 Mil. | Lowenthal | Schecter | 11/17/2009 |
| 030023575 | Victor | $1 Mil. | Marom | Victor | 11/10/2009 |
| 030025891 | Blitshtein | $8.5 Mil. | Lowenthal | Einhorn | 11/10/2009 |
| 030021304 | Fuhrman | $5 Mil. | A. Orkin | Fuhrman | 9/4/2009 |
| 030029685 | Deberry | $5 Mil. | Freiheit | Freiheit | 4/26/2009 |
| 030030997 | Geller | $5 Mil. | A. Orkin | Geller | 7/28/2010 |
| 020127596 | Eckstein | $0.9 Mil. | Moulton | Brown | 1/20/2006 |
| 020158522 | Von Nordheim | $3 Mil. | Pappas | Pratt | 3/26/2008 |
| 030028404 | Miller | $3.5 Mil. | Katz | Margolis | 12/31/2009 |
| 030002852 | Sachs | $2.5 Mil. | Bernstein | Shapiro | 9/18/2006 |
| 030027864 | Bernstein | $3 Mil. | Bernstein | Bernstein | 12/2/2009 |
| 030027988 | Spohn | $3 Mil. | Neubauer | Dern | 12/10/2009 |
| 030027007 | Klein | $2 Mil. | A. Orkin, Marom | Klein | 11/6/2009 |
| 020116779 | Baker | $1.7 Mil. | Rubio, Moulton | Brown | 8/22/2005 |

70.     The procurement of the above-referenced policies bear the following common characteristics:

(a)     Imperial Holdings, though its agents, submitted to Sun Life via U.S. mail and/or interstate wires documents containing fraudulent misrepresentations concerning the true purpose of the policy, the source of premiums, and, in many instances, the insured's net worth.  False statements relating to each of these policies that are presently known are identified paragraphs 83-107 and are incorporated by reference.

(b)     Imperial Holdings and the producers materially misrepresented or omitted their commission sharing/rebating arrangements in the application process for each of the policies.  False statements presently known regarding misrepresented or omitted sharing/rebating arrangements are identified in paragraphs 83-107 and are incorporated by reference.

(c)     Imperial Holdings, through its agents, used sham life insurance trusts to conceal Imperial Holdings' interests in the policy and the true source of the premiums.

(d)     Imperial Holdings used phony loan transaction as the mechanism by which Imperial Holdings funded and acquired the policies.

(e)     Imperial Holdings fronted premium payments for the policies and, through its agents, sent those payments to Sun Life via U.S. mail and/or interstate wire. Imperial Holdings funneled premium payments through the account of the Family Insurance Trust at the Bank of Utah and, through its agents, sent those payments to Sun Life via U.S. mail and/or interstate wire.

(f)     Imperial Holdings provided trustees with form trust documents.

(g)     Imperial Holdings instructed trustees for the sham trusts to submit requests for policy information using forms generated by Imperial Holdings.

(h)     Imperial Holdings acquired record ownership of the policies through defaults of the purported "loan" transactions.

(i)     Imperial Holdings submitted to Sun Life via U.S. mail and/or interstate wires ownership and beneficiary change requests approximately 24-27 months following the issuance of the policy to make it appear that Imperial Holdings acquired its interest in an arm's length secondary market transaction.

**E.**     **Government Investigation and Non-Prosecution Agreement**

71.     On September 27, 2011, agents from the Federal Bureau of Investigation, as well as officers from the Boca Raton Police Department, raided the offices of Imperial Holdings in connection with a criminal investigation conducted by the United States Attorney's Office for the District of New Hampshire concerning Imperial Holdings' premium finance business.

72.     On April 30, 2012, Imperial Holdings entered into a Non-Prosecution Agreement ("NPA") with the United States Attorney's Office for the District of New Hampshire.  The NPA is attached as Exhibit 1.

73.      Under the NPA , the United States Attorney's Office for the District of New Hampshire agreed not to criminally prosecute Imperial Holdings or any of its present or former subsidiaries or affiliates for any crimes "related to the Company's involvement in making or agreeing to make, or aiding and abetting the making of, misrepresentations on life insurance applications in connection with its premium finance business from 2006 through 2011 … and potential securities fraud claims related to the premium finance business."  Exh. 1, at 1.

74.      As part of the NPA, Imperial Holdings made a series of admissions concerning its premium finance business.  Among other things, Imperial Holdings  admitted that (i) it utilized life insurance producers who made misrepresentations on life insurance applications concerning the source of funds for policies in order to procure policies that the insurer would not have issued if it had known of Imperial Holdings' involvement; (ii) Imperial Holdings facilitated and/or made misrepresentations regarding premium financing on life insurance applications for elderly individuals, and (iii) Imperial Holdings failed to appropriately tailor controls to prevent fraudulent practices in its premium finance business, including misrepresentations made to insurers by producers and insureds.

75.      As part of the NPA, Imperial Holdings agreed to pay a monetary penalty of $8 million in equal amounts to the Federal Bureau of Investigation, the United States Secret Service, and the United States Postal Service Consumer Fraud Fund.

76.      In addition, in order to avoid criminal prosecution, Imperial Holdings agreed to terminate its premium finance business.

**F.      RICO Elements**

77.      Imperial Holdings is civilly liable under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. § 1962(a) and (c).

      **(i)**     **Person**

78.     Imperial Holdings is a person for RICO purposes.  *See* 18 U.S.C. § 1961(3).

      **(ii)**    **Enterprise**

79.     Imperial Holdings is associated with an association-in-fact enterprise for purposes of RICO, which is referred to herein as the "Life Wagering Enterprise."  The Life Wagering Enterprise was organized, managed, controlled, operated and conducted by Imperial Holdings and was made up of a network of producers (including those individuals specifically identified in paragraph 30), trustees (including those individuals specifically identified in paragraph 37), insureds (including those individuals specifically identified in paragraph 69), the Bank of Utah, and the Family Insurance Trust, each of which had separate identities apart from the Life Wagering Enterprise and the pattern of racketeering activity discussed herein.  The Life Wagering Enterprise was an ongoing organization with a framework for making decisions, functioned as a continuing unit and had ascertainable structures and systems of authority guiding its operations, separate and apart from the pattern of racketeering in which the enterprise engaged.  The ongoing purpose of the Life Wagering Enterprise, which had an ascertainable structure of authority and control starting with Imperial Holdings, was to induce Sun Life and other insurers to issue life insurance policies for the purpose of illegally wagering on the lives of the named insureds and to maintain those ill-gotten policies through the payment of a death benefit.

      **(iii)**    **Engaged in or Affecting Interstate Commence**

80.     The Life Wagering Enterprise (which included various insureds, agents, and trustees from across the country) was engaged in and/or affected interstate commerce by submitting to Sun Life (headquartered in Massachusetts) and other insurers fraudulent applications and other documents supporting such applications and by engaging in various

financial transactions in furtherance of its scheme to illegally procure life insurance policies through a system of fraud, misrepresentations, illegal rebating, and deceit.  The Life Wagering Enterprise was organized, managed, controlled, operated and conducted by Imperial Holdings, a Florida corporation, which funneled premium payments through the Bank of Utah and the Family Insurance Trust, both operating out of Utah.

        **(iv)**    **Pattern of Racketeering Activity**

81.      Imperial Holdings participated in the operation, management, and conduct of the Life Wagering Enterprise's affairs though a pattern of racketeering activity that was conducted in accordance with the scheme designed by Imperial Holdings.  The pattern of racketeering began in or around 2006 and continued at least until Imperial Holdings was raided by the FBI on September 27, 2011.

82.      Imperial Holdings' pattern of racketeering activity, included but is not limited to, the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, including the following:

83.      On or about December 16, 2009, Imperial Holdings caused an application for life insurance on the life of **Donna Solk** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Donna Solk as the insured, Bud Solk as the trustee of the Donna Solk Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Todd Bernstein.  The application contained the following false statements:

        (a)    The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

       (b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

       (c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

       (d)     The applicants falsely stated that the policy was intended for income replacement.

84.     On or about December 31, 2009, Imperial Holdings caused an application for life insurance on the life of **Helene Miller** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Helene Miller as the insured, Lee Margolis as the trustee of The Helene Miller Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Samuel Katz.  The application contained the following false statements:

       (a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

       (b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

       (c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

       (d)     Samuel Katz, acting as producer for the Helene Miller policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion

of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

85.     On or about November 25, 2009, Imperial Holdings caused an application for life insurance on the life of **Robert Good** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Robert Good as the insured, Virgil Thomas as the trustee of the Robert Good Irrevocable Trust, which would serve as the purported owner, and producer Scott Neubauer.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

(c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

(d)     Scott Neubauer, acting as producer for the Robert Good policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

86.     On or about November 6, 2009, Imperial Holdings caused an application for life insurance on the life of **Esta Klein** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Esta Klein as the insured, Harvey Klein

- 23 -

as the trustee of the Esta Klein Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Arlene Orkin.  The application contained the following false statements:

> (a)      The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;
>
> (b)      The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;
>
> (c)      The applicants falsely stated that the purpose of the policy was for estate liquidity;
>
> (d)      The applicants falsely stated that the policy was intended for survivorship income; and
>
> (e)      Arlene Orkin, acting as producer for the Esta Klein policy, falsely stated that she would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that she remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

87.      On or about November 4, 2009, Imperial Holdings caused an application for life insurance on the life of **Evelyn Mitchel** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Evelyn Mitchel as the insured, Monroe Mitchel as the trustee of the Evelyn Mitchel Insurance Trust Agreement, which would serve as the purported owner, and producer David Orkin.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

(c)     The applicants falsely stated that the purpose of the policy was for estate liquidity; and

(d)     The applicants falsely stated that the policy was intended for survivorship income.

88.     On or about December 10, 2009, Imperial Holdings caused an application for life insurance on the life of **Sheila Bernstein** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Sheila Bernstein as the insured, Joel Bernstein as the trustee of the Sheila Bernstein Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Todd Bernstein.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

(c)     The applicants falsely stated that the purpose of the policy was for estate planning.

89.     On or about August 22, 2005, Imperial Holdings caused an application for life

insurance on the life of **Jerry Baker** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Jerry Baker as the insured, William Brown as the trustee of the Baker Family Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Suzanne Rubio.  The application contained the following false statements:

      (a)    The applicants falsely stated that the purpose of the policy was for estate planning.

90.    On or about July 28, 2008, Imperial Holdings caused an application for life insurance on the life of **Diane Pastore** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Diane Pastore as the insured, Brenda Barrera as the trustee of The Diane Pastore Family Insurance Trust, which would serve as the purported owner, and producer Gabriel Giordano.  The application contained the following false statements:

      (a)    The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

      (b)    The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

      (c)    The applicants falsely stated that the purpose of the policy was for estate planning.

91.    On or about December 3, 2009, Imperial Holdings caused an application for life insurance on the life of **Sandra Berner** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Sandra Berner as the insured,

Melvin Berner as the trustee of The Sandra Berner Irrevocable Insurance Trust, which would serve as the purported owner, and producer Robert Friedman.  The application contained the following false statements:

> (a)    The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

> (b)    The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

> (c)    The applicants falsely stated that the purpose of the policy was to preserve the insured's family legacy.

92.    On or about November 24, 2009, Imperial Holdings caused an application for life insurance on the life of **Gary Granby** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Gary Granby as the insured, Lynn Kimpling as the trustee of The Gary W. Granby 2009 Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Samuel Katz.  The application contained the following false statements:

> (a)    The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

> (b)    The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

> (c)    The applicants falsely stated that the purpose of the policy was for estate planning; and

      (d)     Samuel Katz, acting as producer for the Gary Granby policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

93.     On or about April 10, 2009, Imperial Holdings caused an application for life insurance on the life of **Carole Berg** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Carole Berg as the insured, Cheryl Schwartz as the trustee of the Jacob H. Berg Irrevocable Trust No. One, Bank of America N.A., Trustee which would serve as the purported owner, and producer Bruce Mactas.  The application contained the following false statements:

      (a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

      (b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

      (c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

      (d)     Bruce Mactas, acting as producer for the Carole Berg policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

94.     On or about July 30, 2009, Imperial Holdings caused an application for life insurance on the life of **Evelyn Blakeslee** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Evelyn Blakeslee as the insured, Michael Schrimsher as the trustee of the Blakeslee Irrevocable Trust, which would serve as the purported owner, and producer Bradley Kurit.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

(c)     The applicants falsely stated that the purpose of the policy was for estate planning.

95.     On or about February 27, 2007, Imperial Holdings caused an application for life insurance on the life of **Kalman Talansky** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Kalman Talansky as the insured, Irene Talansky as the trustee of the Kalman Talansky Irrevocable Trust, which would serve as the purported owner, and producer Donny Fein.  The application contained the following false statements:

(a)     The applicants falsely stated that the purpose of the policy was for estate planning.

96.     On or about March 23, 2009, Imperial Holdings caused an application for life insurance on the life of **Stephen Rogers** and other related documents to be submitted to Sun Life

via U.S. Mail and/or e-mail.  That application was signed by Stephen Rogers as the insured,

Darryl Rogers and Larry Spilkin as the trustees of the Stephen D. Rogers and Leslie L. Rogers

2008-I Irrevocable Trust, which would serve as the purported owner, and producer Todd

Bernstein.  The application contained the following false statements:

>     (a)     The applicants falsely stated that the policy was not being purchased for
>     the purpose of assigning it to a third party
>
>     (b)     The applicants falsely stated that the policy would not within the next
>     three years be used for a purpose other than what was disclosed on the
>     application; and
>
>     (c)     Todd Bernstein, acting as producer for the Stephen Rogers policy, falsely
>     stated that he would receive one hundred percent of the commissions on the
>     policy when in fact Imperial Holdings required that he remit a substantial portion
>     of these commissions to Imperial Holdings as a condition of obtaining a premium
>     finance loan.

97.     On or about March 26, 2008, Imperial Holdings caused an application for life

insurance on the life of **Manfred Von Nordheim** and other related documents to be submitted to

Sun Life via U.S. Mail and/or e-mail.  That application was signed by Manfred Von Nordheim as

the insured, Lori Pratt as the trustee of the Manfred Von Nordheim Trust, which would serve as

the purported owner, and producer Spiros Pappas.  The application contained the following false

statements:

>     (a)     The applicants falsely stated that the policy was not being purchased for
>     the purpose of assigning it to a third party;

> (b)      The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;
>
> (c)      The applicants falsely stated that the purpose of the policy was for estate planning; and
>
> (d)      The applicants falsely stated that the policy was intended for income replacement.

98.      On or about November 10, 2009, Imperial Holdings caused an application for life insurance on the life of **George Victor** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by George Victor as the insured, Marianne Victor as the trustee of the George Victor Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Michael Marom.  The application contained the following false statements:

> (a)      The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;
>
> (b)      The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;
>
> (c)      The applicants falsely stated that the purpose of the policy was for estate liquidity;
>
> (d)      The applicants falsely stated that the policy was intended for survivorship income; and

(e)     Michael Marom, acting as producer for the George Victor policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

99.     On or about November 10, 2009, Imperial Holdings caused an application for life insurance on the life of **Polya Blitishtein** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Polya Blitishtein as the insured, Ira Einhorn as the trustee of the Polya Blitishtein Family Trust 2009, which would serve as the purported owner, and producer Leon Lowenthal.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

(c)     The applicants falsely stated that the purpose of the policy was for estate planning.

100.     On or about November 17, 2009, Imperial Holdings caused an application for life insurance on the life of **Hannah Parnes** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Hannah Parnes as the insured, Moshe Schecter as the trustee of The Hannah Parnes Trust, which would serve as the purported owner, and producer Leon Lowenthal.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

(c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

(d)     Leon Lowenthal, acting as producer for the Hannah Parnes policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

101.     On or about August 25, 2009, Imperial Holdings caused an application for life insurance on the life of **Joan Korn** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Joan Korn as the insured, Michael Schrimsher as the trustee of the Joan Korn Irrevocable Trust DTD, which would serve as the purported owner, and producer Bradley Kurit.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

(c)     The applicants falsely stated that the purpose of the policy was for estate planning.

102.     On or about August 28, 2009, Imperial Holdings caused an application for life insurance on the life of **Martin Wasser** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Martin Wasser as the insured, Dorothy Wasser as the trustee of the Martin Wasser Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Todd Weishaus.  The application contained the following false statements:

(a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

(c)     The applicants falsely stated that the purpose of the policy was for estate planning;

(d)     The applicants falsely stated that the policy was intended for income replacement; and

(e)     Todd Weishaus, acting as producer for the Martin Wasser policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

103.     On or about December 10, 2009, Imperial Holdings caused an application for life

insurance on the life of **Ronald Spohn** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Ronald Spohn as the insured, Bruce Dern as the trustee of the Ronald Spohn 2009 Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Scott Neubauer.  The application contained the following false statements:

> (a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

> (b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

> (c)     The applicants falsely stated that the purpose of the policy was for estate planning; and

> (d)      Scott Neubauer, acting as producer for the Ronald Spohn policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

104.     On or about January 20, 2006, Imperial Holdings caused an application for life insurance on the life of **Lucy Eckstein** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Lucy Eckstein as the insured, William Brown as the trustee of the Lucy Eckstein Family Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Jonathan Moulton.  The application contained the following false statements:

       (a)     The applicants falsely stated that the purpose of the policy was for estate planning.

105.    On or about July 28, 2010, Imperial Holdings caused an application for life insurance on the life of **Elizabeth Geller** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Elizabeth Geller as the insured, Sidney Geller as the trustee of the Elizabeth Geller Irrevocable Trust, which would serve as the purported owner, and producer Arlene Orkin.  The application contained the following false statements:

       (a)     The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

       (b)     The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

       (c)     The applicants falsely stated that the purpose of the policy was for estate liquidity; and

       (d)     The applicants falsely stated that the policy was intended for survivorship income.

106.    On or about April 26, 2010, Imperial Holdings caused an application for life insurance on the life of **James DeBerry** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by James DeBerry as the insured, Lynn Freiheit as the trustee of the The DeBerry Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Richard Bearden.  The application contained the following false statements:

(a)      The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)      The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application; and

(c)      The applicants falsely stated that the purpose of the policy was for estate planning.

107.      On or about October 27, 2009, Imperial Holdings caused an application for life insurance on the life of **Dale Dickler** and other related documents to be submitted to Sun Life via U.S. Mail and/or e-mail.  That application was signed by Dale Dickler as the insured, Stewart Dickler as the trustee of the Dale Dickler Irrevocable Life Insurance Trust, which would serve as the purported owner, and producer Michael Marom.  The application contained the following false statements:

(a)      The applicants falsely stated that the policy was not being purchased for the purpose of assigning it to a third party;

(b)      The applicants falsely stated that the policy would not within the next three years be used for a purpose other than what was disclosed on the application;

(c)      The applicants falsely stated that the purpose of the policy was for estate liquidity;

(d)      The applicants falsely stated that the policy was intended for survivorship income; and

(e)      Michael Marom, acting as producer for the Dale Dickler policy, falsely stated that he would receive one hundred percent of the commissions on the policy when in fact Imperial Holdings required that he remit a substantial portion of these commissions to Imperial Holdings as a condition of obtaining a premium finance loan.

**(v)      § 1962(a) Violations**

108.      In violation of 18 U.S.C. § 1962(a), Imperial Holdings managed, controlled, and participated in the conduct of the Life Wagering Enterprise through a pattern of racketeering activity.  Imperial Holdings received income derived from this pattern of racketeering activity because its conduct resulted in the issuance of the policies and, in turn, generated commissions that were unlawfully rebated to Imperial Holdings.

109.      The Agency Fees represented a large portion of Imperial Holdings' operating income and enabled Imperial Holdings, through the investment of such income into the Life Wagering Enterprise, to pay the premiums on the policies it had illegally procured and to manufacture new ones.  Additionally, upon information and belief, Imperial received death benefits on other policies issued by Sun Life and/or other insurers that Sun Life does not yet know about.

**(vi)      § 1962(c) Violations**

110.      In violation of 18 U.S.C. § 1962(c), Imperial Holdings managed, controlled, and participated in the conduct of the Life Wagering Enterprise through the pattern of racketeering activity described above.

**(vii)      Sun Life's Damages**

111.      As a result of Imperial Holdings' wrongful conduct, Sun Life was fraudulently induced to issue at least 26 life insurance policies with an aggregate face amount of over $126

million.

112.     Sun Life has suffered injuries, for purposes of 18 U.S.C. § 1964(c), to its

business or property as follows:

(a)     Sun Life has paid commissions on policies that should not have been

issued because they were either unlawful, violated Sun Life's directives,

or both;

(b)     Sun Life has incurred lost profits;

(c)     Sun Life has incurred internal administrative costs due to the procurement

of the policies;

(d)     Sun Life has incurred substantial attorneys' fees and costs; and

(e)     To the extent that any policy cannot be declared void *ab initio*, Sun Life's

damages include the cost of any future death benefit with respect to such

policy.

### COUNT TWO – RICO CONSPIRACY
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### AGAINST IMPERIAL HOLDINGS, INC.

113.     Imperial Holdings and its network of producers, insureds, trustees, the Bank of

Utah, and the Family Insurance Trust, unlawfully and willfully combined, conspired and agreed

to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly or indirectly, in the

conduct of the affairs of an enterprise through a pattern of racketeering activity, all in violation

of l8 U.S.C. § 1962(c).

114.     Part of the conspiracy was that Imperial Holdings and its network of producers,

insureds, trustees, the Bank of Utah, and the Family Insurance Trust each committed and agreed

to commit two or more illegal racketeering acts, including mail fraud in violation of 18 U.S.C.

§ 1341, and wire fraud in violation of 18 U.S.C. § 1343, and conducted and agreed to conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

115.    In furtherance of the conspiracy and to effect the objects thereof, Imperial Holdings and its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust each committed and caused to be committed a series of overt acts, as described above, which constitute a pattern of racketeering activity.

116.    Imperial Holdings and its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust conspired with one another and others to violate 18 U.S.C. § 1962(c) and thereby violated 18 U.S.C. § 1962(d).

117.    In violation of 18 U.S.C. § 1962(d), Imperial Holdings conspired with its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust, which each had separate identities apart from the Life Wagering Enterprise, to become associated with an association-in-fact enterprise for purposes of RICO.

118.    Imperial Holdings conspired with its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust to engage in and/or affect interstate commerce by submitting to Sun Life and other insurers fraudulent applications and other documents supporting such applications.

119.    Imperial Holdings conspired with its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust to conduct, manage, control and participate in the conduct of the enterprise's affairs though a pattern of racketeering activity as set forth in detail above.

120.    Imperial Holdings conspired with its network of producers, insureds, trustees, the

Bank of Utah, and the Family Insurance Trust to violate 18 U.S.C. § 1962(c) in the manner described herein.  The conspiracy, the object of which was to fraudulently procure life insurance policies in order to illegal wager on the lives of strangers, commenced in or around 2005 and continues through today.

121.    Imperial Holdings conspired with its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust to commit the predicate acts described in paragraphs 81-107.  Overt acts taken in furtherance of the conspiracy include, but are not limited to, the commission of these predicate acts and the procurement of the policies at issues.

122.    The conspirators acted in furtherance of a common plan, scheme or design intended to benefit themselves and profit from the scheme at the expense of Sun Life, and each did so with knowledge of the others' acts in furtherance of the conspiracy.

123.    As described in paragraphs 111-112, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the illegal policies; and Sun Life has incurred substantial attorneys' fees and costs.

## COUNT THREE – FRAUD
### AGAINST IMPERIAL HOLDINGS, INC.

124.    Imperial Holdings and its network of producers, insureds, trustees, the Bank of Utah, and the Family Insurance Trust, engaged in a scheme to procure life insurance policies in order to wager on the lives of strangers.

125.    Imperial Holdings was well aware of the legal prohibition on wagering policies. Imperial Holdings was also aware that Sun Life prohibited STOLI and would not knowingly

issue a policy that was intended as a mere wager in the secondary market.

126.     Therefore, in order to procure policies for Imperial Holdings' account, producers, trustees, and insureds routinely lied in policy applications regarding the purpose of the policies and the source of premium.  In many instances, the insured was financially ineligible to obtain a life insurance policy due to insufficient net worth or income, but the producers, trustees, and insureds lied about the insured's financial circumstances in order to procure the policy.  Misrepresentations were made with respect to each of the 28 Sun Life policies at issue here.  Misrepresentations presently known concerning the 28 Sun Life insurance policies are identified in paragraphs 83-107, which are incorporated by reference.  The allegations set forth above in paragraphs 52-68, regarding the Good, Spohn, and Geller policies, are also incorporated by reference.

127.     The producers, trustees, and insureds acted at the direction of and for the benefit of Imperial Holdings.  Indeed, these fraudulent acts were vital to Imperial Holdings' scheme to manufacture life insurance policies in violation of applicable insurance law and contrary to Sun Life's standards.  These fraudulent acts were also necessary for Imperial Holdings to obtain monies through its commission sharing/rebating scheme.  Thus, all of the fraudulent acts of the producers, trustees, and insureds are fully imputable to Imperial Holdings.

128.     The misrepresentations were made with the intention that Sun Life would rely on the misrepresentations and thus issue the policies.

129.     These misrepresentations were material to Sun Life's decision to issue and/or keep in force the Sun Life policies.  Indeed, Sun Life would not have issued any of the policies had it known the true facts surrounding their procurement.

130.     As described in paragraphs 111-112, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

131.     Sun Life is also entitled to an award of punitive damages based on Imperial's wanton, malicious, deliberate and/or grossly negligent conduct described herein.

## COUNT FOUR – CIVIL CONSPIRACY TO COMMIT FRAUD
### AGAINST IMPERIAL HOLDINGS, INC.

132.     Imperial, its producers, insureds, trustees, the Bank of Utah, the Family Insurance Trust conspired to induce Sun Life to issue at least 28 policies for the purpose of illegally wagering on the lives of the named insureds.

133.     The conspirators perpetrated this fraud by, among other things, collaborating to submit fraudulent applications and other documents and information to Sun Life in connection with the policies.  This conduct included all of the following:

- The producers solicited the insureds to participate in the scheme;

- The producers, insureds, and trustees submitted false application documents, as described in paragraphs 83-107, which are incorporated herein by reference;

- Imperial and its producers established and used sham insurance trusts;

- Imperial funneled premium payments through the Family Insurance Trust account at the Bank of Utah;

- Imperial used phony "loan" agreements to facilitate its acquisition of the policies; and

- All of the conspirators knowingly concealed from Sun Life that the policies were intended for wagering, among other things.

134. The conspirators acted in furtherance of a common plan, scheme or design intended to benefit themselves and profit from the scheme at the expense of Sun Life, and each did so with knowledge of the others' acts in furtherance of the conspiracy.

135. As described in paragraphs 111-112, Sun Life has incurred substantial damages as a result of this wrongful conduct. Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

## COUNT FIVE – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST IMPERIAL HOLDINGS, INC.

136. Each of the producers who sold the 28 Sun Life insurance policies at issue here had a valid, binding and enforceable contract with Sun Life. These contracts required that the producers comply with all applicable laws and standards of professional conduct and prohibited the producers from using sales concepts not approved by Sun Life.

137. The use of fraudulent statements in the applications for life insurance as described above constituted a breach of the producer contracts. Similarly, the sale of life insurance policies solely for the purpose of wagering on human life constituted a violation of the producers' contracts.

138. Imperial Holdings knew of the existence of these producer contracts and knew of that the producers were in breach of the producer contracts by selling the 28 Sun Life policies at issue. Indeed, Imperial Holdings itself, and through its network of producers, insureds and trustees, the Bank of Utah, and the Family Insurance Trust, actively assisted producers with the

submission of applications and related documents seeking to obtain the Sun Life policies, which contained knowingly false representations pertaining to the true purpose and nature of the policies, the source of premiums and, in many cases, the financial condition of the insured. Imperial further assisted producers by establishing a sham trust and a common trust through which premiums were funneled – *i.e.*, the Family Insurance Trust – in order to conceal from Sun Life the true nature of the policies and Imperial's interest in them.

139.     The actions of Imperial Holdings in connection with the procurement of these wagering policies and in the establishment of the sham trusts, among other things, constituted a knowing, intentional and unjustified interference with the producers' contractual relationships with Sun Life, and a knowing, intentional and unjustified inducement of the producers to breach their respective contracts with Sun Life.

140.     As described in paragraphs 111-112, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the illegal policies; and Sun Life has incurred substantial attorneys' fees and costs.

141.     Sun Life is also entitled to an award of punitive damages based on Imperial's wanton, malicious, deliberate and/or grossly negligent conduct described herein.

## COUNT SIX – EQUITABLE ACCOUNTING
### AGAINST ALL DEFENDANTS

142.     The Imperial scheme was well-concealed.  It was designed by Imperial to procure millions of dollars in life insurance from insurance companies through fraud.  Through the scheme, Imperial, its producers, insureds, trustees, the Bank of Utah, and the Family

Insurance Trust collaborated and conspired to circumvent anti-rebating and insurable interest laws and to wager on human life.  They went to great lengths to deceive insurance companies by submitting false information in support of the life insurance applications.  They also funneled premium payments through sham life insurance trusts bearing the names of the insureds, as well as through a common trust account at the Bank of Utah, *i.e.*, the Family Insurance Trust. Further, they used phony "loan" agreements to facilitate the acquisition of the policies.

143.     Due to Imperial's substantial efforts to conceal its scheme, Sun Life has been unable to identify all of the policies involved in the scheme and unable to assess the full scope of its damages.  As such, Sun Life is presently without an adequate remedy at law.

144.     Sun Life is entitled to know the identity of all policies procured through Imperial's scheme in order to assess fully its damages.  Accordingly, Sun Life is entitled to the equitable remedy of an accounting.

**COUNT SEVEN – DECLARATORY JUDGMENT**
**28 U.S.C. § 2201**
**AGAINST ALL DEFENDANTS**

145.     The Sun Life policies were issued in accordance with a scheme initiated and carried out by Imperial, the producers, the insureds, the trustees, the Bank of Utah, and the Family Insurance Trust.

146.     The purpose of each of these policies was to gamble upon the lives of the insureds.  As such, the policies should be declared void *ab initio*.

**RELIEF REQUESTED**

A.     An award of compensatory damages as warranted under law, including, but not limited to, damages under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964;

B.     An award of punitive damages as warranted under law;

C.      An award of Sun Life's attorneys' fees and costs, as determined by the Court and associated with seeking this judgment;

D.      An award directing the Defendants to provide Sun Life with a full and complete accounting of all policies procured through the Imperial scheme;

E.      A judgment against all Defendants declaring each policy procured through the Imperial scheme void or voidable due to a lack of insurable interest at its inception; and

F.      A judgment declaring that the Defendants and/or any others who promoted and/or funded the policies are estopped or otherwise precluded from seeking a return of any of the premiums paid on these policies due to their fraudulent conduct in procuring the policies (or, in the alternative, a declaration that Sun Life is entitled to offset any return of premiums by the costs and expenses it incurred, including any and all commissions it paid to Imperial and its associates – *i.e.*, its damages as a result placing these policies in force).


Dated:  June 13, 2013                    PETT FURMAN, PL
                                         Attorneys for Plaintiff
                                         2101 N.W. Corporate Blvd., Suite 316
                                         Boca Raton, FL 33431
                                         (561) 994-4311
                                         (561) 982-8985 (fax)


                                         By:_____s/Wendy L. Furman
                                              Wendy L. Furman
                                              Fla. Bar No. 0085146
                                              wfurman@pettfurman.com

*Of Counsel*
John Bloor, Esq. *(Admitted Pro Hac Vice)*
Stephen C. Baker *(Admitted Pro Hac Vice)*
Jason P. Gosselin *(Admitted Pro Hac Vice)*
Thomas S. Downie *(Admitted Pro Hac Vice)*
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
John.bloor@dbr.com
Stephen.Baker@dbr.com
Jason.Gosselin@dbr.com
thomas.downie@dbr.com

## CERTIFICATE OF SERVICE

I certify that on June 13, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

George E. Schultz, Jr., Esq.
Jesus E. Cuza, Esq.
J. Raul Cosio, Esq.
Holland & Knight LLP
701 Brickell Ave.
Suite 3000
Miami, FL 33131
buddy.schulz@hklaw.com
jesus.cuza@hklaw.com
raul.cosio@hklaw.com

s/Wendy L. Furman
Wendy L. Furman