**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 13-CV-80385-BRANNON
(Consolidated with 13-cv-80730)

| | |
|---|---|
| SUN LIFE ASSURANCE COMPANY OF CANADA, <br><br> Plaintiff, <br><br> v. <br><br> IMPERIAL HOLDINGS, INC., IMPERIAL PREMIUM FINANCE, LLC, IMPERIAL LIFE FINANCING II, LLC, IMPERIAL LIFE SETTLEMENTS, LLC, IMPERIAL PFC FINANCING, LLC, IMPERIAL PFC FINANCING II, LLC, OLIPP I, LLC, and PSC FINANCIAL, LLC, <br><br> Defendant. | **SECOND AMENDED CIVIL ACTION COMPLAINT** |

Plaintiff, Sun Life Assurance Company of Canada ("Sun Life"), by and through its

attorneys, Drinker Biddle & Reath LLP, hereby files this civil action complaint against Imperial

Holdings, Inc. ("Imperial"), Imperial Premium Finance, LLC, Imperial Life Financing II, LLC,

Imperial Life Settlements, LLC, Imperial PFC Financing, LLC, Imperial PFC Financing II, LLC,

OLIPP I, LLC, and PSC Financial, LLC.  In support thereof, Sun Life avers as follows:

# I.
# INTRODUCTION

1.      This is an action for civil racketeering, conspiracy to commit civil racketeering,

fraud, aiding and abetting fraud, conspiracy to commit fraud, tortious interference with

contractual relations, and declaratory judgment.  Each of Sun Life's claims arises from a

scheme developed, orchestrated, and directed by Imperial to originate and acquire life insurance

policies on the lives of complete strangers.  Imperial's scheme not only contravenes the law and

public policy against wagering, but it flouts Sun Life's efforts to avoid these improper

transactions and severely harms Sun Life's financial interests.

2.      A secondary market for life insurance has emerged in which life insurance policy owners sell their policies to third parties.  After purchasing a policy from the original owner, the buyer will make the ongoing premium payments and collect the death benefit when the insured dies.  The secondary sale of life insurance is generally legal, provided that the policy was at its inception intended for a legitimate purpose and not as a cover for a wagering contract.

3.      In recent years, certain secondary market investors and promoters have developed schemes to originate life insurance for their own benefit.  A life insurance policy that is intended from the outset as a wager is often referred to as stranger originated life insurance, or STOLI.  The use of life insurance as a pure wager has long been disfavored, and such wagering policies are generally deemed void *ab initio*.

4.      Sun Life strongly opposes STOLI, not only because it violates the law and public policy against wagering on human life, but also because it harms Sun Life's financial interests in two principal ways.  First, unlike traditional consumers, for whom Sun Life's insurance products were designed, STOLI investors typically pay the bare minimum necessary to keep policies in force.  This deprives Sun Life of anticipated revenue sources that help make it feasible to offer affordable insurance to traditional consumers.  Second, investors selectively terminate policies within their portfolios, keeping policies in force where the insured has a reduced life expectancy while allowing coverage to lapse for policies where the insured has an extended life expectancy.  Selective termination based on perceived mortality rather than the policy owner's need for insurance distorts Sun Life's loss ratios and, over time, threatens Sun Life's ability to evaluate and price mortality risk in the affected blocks of business and to otherwise make affordable insurance available to traditional customers.

5.      In 2006, Sun Life advised the producer community and other secondary market participants that Sun Life did not wish to issue policies intended solely or primarily for the secondary market.  Sun Life also implemented procedures to determine whether applicants were seeking policies intended for the secondary market rather than for their own use.  Among other things, Sun Life amended its application forms to include questions regarding the source of funding for the policy and whether the policy owner intended to use premium financing (which was commonly used in the context of STOLI policies).

6.      Despite these efforts, certain secondary market participants engaged in fraud to continue originating STOLI policies.  Imperial was one such entity.  Although Imperial has since exited the premium financing business after being raided by the FBI and entering into a non-prosecution agreement with federal criminal authorities, Imperial procured numerous Sun Life policies for its own benefit through systematic fraud.

7.      Imperial described itself as a specialty finance company that focused on premium loans for life insurance policies.  Imperial claimed that it issued loans only where a policy was already in force, but in reality, Imperial originated policies and funded them from inception.

8.      At Imperial's direction, insurance producers provided Imperial with medical records and life expectancy reports for potential insureds.  Imperial evaluated the potential insureds, and if they met Imperial's satisfaction, Imperial then directed the insurance producers to submit formal applications to the life insurers.  Among other things, Imperial directed the insurance producers in selecting the life insurer, the specific life insurance product, the face amount of the policy, and how ownership of the policy should be structured.

9.      Imperial and the insurance producers knew that Sun Life would not issue policies

that were premium financed.  Indeed, Imperial required and understood that the producers would not disclose Imperial's involvement in procuring the policies or that the policies would be premium financed by Imperial through a premium loan.  Imperial has admitted that it knew insurance producers would simply lie about the intent to use premium financing if necessary to procure a policy.

10.      Imperial was involved, in this way, in the procurement and acquisition of numerous Sun Life policies with aggregate face value in the hundreds of millions of dollars. Consistent with its scheme, Imperial minimally funded its block of Sun Life policies and selectively terminated policies based on anticipated mortality rates, which caused Sun Life to incur substantial losses.

11.      Regardless of whether STOLI may be permissible in a particular jurisdiction, Sun Life determined that it did not wish to participate in the STOLI market and actively attempted to avoid the market.  However, as set forth in detail below, Imperial thwarted these efforts through widespread and systematic fraud and, enriching itself at Sun Life's expense.

## II.
## PARTIES

12.      Plaintiff Sun Life is a life insurance company organized and existing under the laws of Canada, with its principal place of business at One Sun Life Executive Park, Wellesley Hills, Massachusetts.  Sun Life is a citizen of the Commonwealth of Massachusetts.

13.      Defendant Imperial Holdings, Inc., is a company organized and existing under the law of Florida, is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial is a defendant to all of Sun Life's claims.

14.      Defendant Imperial Premium Finance, LLC, is a subsidiary or affiliate of

Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial Premium Finance, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

15.     Defendant Imperial Life Financing II, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial Life Financing II, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

16.     Defendant Imperial Life Settlements, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   Imperial Life Settlements, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

17.     Defendant Imperial PFC Financing, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  Imperial PFC Financing, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

18.     Defendant Imperial PFC Financing II, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   Imperial PFC Financing II, LLC, as the owner of certain policies at issue in this case, is a defendant to

Sun Life's declaratory judgment claim.

19.     Defendant OLIPP I, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.   OLIPP I, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

20.     Defendant PSC Financial, LLC, is a subsidiary or affiliate of Imperial Holdings, Inc., is headquartered at 701 Park of Commerce Blvd, Suite 301, Boca Raton, Florida 33487, and is a citizen of Florida for the purposes of diversity jurisdiction.  PSC Financial, LLC, as the owner of certain policies at issue in this case, is a defendant to Sun Life's declaratory judgment claim.

## III.
## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.  In particular, Sun Life's claims arise under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  This Court also has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff, a citizen of Massachusetts, and all Defendants, citizens of Florida, and because the amount in controversy exceeds $75,000.

22.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Sun Life's claims occurred in the Southern District of Florida.

**IV.**
**CAUSES OF ACTION**

**COUNT ONE – RICO**
**VIOLATIONS OF 18 U.S.C. §§ 1962(a) and (c)**
**AGAINST IMPERIAL HOLDINGS, INC.**

**A.      Insurable Interest and Assignment**

23.      The fundamental purpose of life insurance is to provide financial protection for the living in the event of a death.  The owner of a life insurance policy, therefore, must have an "insurable interest" in the life of the insured at the inception of a life insurance policy.

24.      Insurable interest is both a legal concept and a term of art in the life insurance industry.  It refers to an interest in the continued life of another, such as the relationship between blood relatives or where an individual derives a pecuniary benefit from another.

25.      If a policy owner does not have an insurable interest in the life of the insured at inception, a moral hazard arises because the policy owner has a "sinister counter-interest in having the life [of the insured] come to an end."  *Grigsby v. Russell*, 222 U.S. 149, 155, 32 S.Ct. 58 (1911).  Further, if the policy owner will suffer no loss and only stands to benefit upon the insured's death, the policy is nothing more than a wagering contract.  Life insurance policies issued under those circumstances generally violate anti-wagering laws.

26.      While there must be an insurable interest at inception, lawfully issued life insurance policies are generally assignable to third parties.  As a result, a third party who could not himself take out a life insurance policy due to a lack of insurable interest may, in certain circumstances, later acquire a legitimately procured policy.

27.      A transfer or assignment of a life insurance policy is only proper, however, if the policy, in its inception, was intended for the legitimate purpose of providing financial protection to a party with an insurable interest in the insured and not as a cover for a wager.  If the

- 7 -

assignment or transfer is actually a cover for an illegal wagering contract, the policy may be void *ab initio*.

**B.**    <u>**Secondary Market for Life Insurance**</u>

     28.     In recent years, a secondary market for life insurance has emerged. If a life insurance policy is no longer needed, the policy owner may sell the policy to a third party who will pay the subsequent premium and collect the death benefit upon the insured's death.

     29.     As the life insurance secondary market matured, the demand for salable life insurance policies grew much faster than the supply. As a result, certain secondary market investors attempted to originate policies using transaction structures designed to conceal the involvement of secondary market participants. For example, one such structure involves the use of premium financing. Rather than directly providing funds for premium payments, a "lender" will instead provide funds under the guise of a loan. However, the loans are made on a non-recourse basis, which means that the "borrower" has no obligation to repay the loan. At the end of the loan term, the borrower defaults, allowing the lender to seize the life insurance policy, which serves as the only collateral for the loan.

     30.     As STOLI became more prevalent, Sun Life took aggressive action to detect and prevent these types of transactions. Among other things, Sun Life clearly advised the producer community that it did not wish to issue STOLI policies and that it would not accept applications for policies unless they were supported by a valid insurable interest. Moreover, Sun Life amended its life insurance applications to include questions concerning the purpose of the policy, the source of premium, and potential use of premium financing.

     31.     Sun Life took these actions not only because STOLI violates the law and public policy against wagering, but also because it threatens Sun Life's financial interests. As noted above, secondary market investors minimally fund and selectively terminate STOLI policies,

which deprives Sun Life of anticipated revenue and grossly distorts Sun Life's loss ratios.

32.     Despite Sun Life's efforts to avoid STOLI and premium financing, Imperial originated and now controls numerous Sun Life policies.  Imperial was able to acquire these policies by implementing a scheme that involved widespread fraud on the part of Imperial's agents.

**C.     General Features of Imperial's Life Wagering Enterprise**

33.     Imperial directed, managed, and controlled an association-in-fact enterprise consisting of Imperial, insurance producers, insureds, original trustees, and the Bank of Utah. Imperial, the insurance producers, the Bank of Utah, and the Family Insurance Trust (a trust utilized by Imperial to make premium payments on various different policies) were each willing participants who profited significantly from the activities of the enterprise.  However, the enterprise also consisted of other participants, including the senior citizens who served as insureds, as well as their family members and acquaintances who served as original trustees. These other participants in the enterprise were often exploited for Imperial's benefit.

**(i)     Insurance Producers**

34.     At the core of Imperial's scheme was a network of insurance producers.  Some insurance producers were direct employees of Imperial.  Others were not directly employed by Imperial but nevertheless acted on Imperial's behalf and at Imperial's direction.

35.     Imperial has acknowledged in its SEC statements that the majority of its premium finance business was generated by its "top ten agents and brokers," and that "[t]he loss of any of our top-referring agents and brokers could have a material adverse effect on our business, financial condition and results of operations."  Imperial Holdings, Inc., Form S-1 Registration Statement Under Securities Act of 1933 at 15.  Moreover, contrary to the position it has advanced in this litigation, Imperial has also acknowledged that the agents and brokers

who served as referral sources for its premium finance business were Imperial's actual agents. *See id.* ("**our** top ten agents and brokers referred to us approximately 47.3% and 56.7%, respectively, of our premium finance business") (emphasis added).  In fact, so aligned were Imperial and its insurance producers that at least some insureds and trustees believed that the insurance producers were employees of Imperial.  *See*, e.g., Dep. Trustee Bruce Dern at 41:7-14 ("I was even mixed up thinking that Imperial was the -- Mark Neubauer [an insurance producer] worked for Imperial ….  I never knew the difference between the two.").

36.     Imperial actively solicited insurance producers to recruit senior citizens in order to originate life insurance policies that would be funded by Imperial.  For example, on August 27, 2009, one of Imperial's national sales managers wrote to a group of producers as follows:

> Gentlemen – we expect to have our first LARGE funding allocation as early as next Friday, worst case scenario the following Friday.  We will then be funding as many deals as our staff can handle every Friday for quite some time unless we change the day in which we fund.  There is a lot of money to spend, so please get the word out. . . .

Indeed most of the Sun Life policies at issue in this case were applied for and issued in the months immediately following Imperial's call for insurance producers to submit as much business as Imperial's staff could handle.

37.     The insurance producers who procured the Sun Life policies at issue in this action include Todd Bernstein, Brock Diediker, Donny Fein, Lynn Freiheit, Robert M. Friedman, Gabriel Giordano, Samuel Katz, Bradley Kurit, Leon Lowenthal, Bruce J. Mactas, Michael Marom, Jonathan Moulton, Scott Neubauer, Arlene Orkin, David Orkin, Spiros G. Pappas,  Suzane Rubio, and Todd Weishaus.

38.     Incentivized by Imperial, these producers solicited senior citizens through advertisements in periodicals, seminars, flyers, and personal solicitation at senior care centers,

hospitals, restaurants, and clubs frequented by senior citizens.  The insurance producers advised the seniors that a life insurance policy could be taken out without any risk or cost whatsoever to the senior.

39.     After identifying a senior willing to participate in the scheme, the producer would meet with the senior to obtain his or her signature on a HIPAA authorization form.  The producer then gathered the senior's medical records and obtained a life expectancy report.  The producer would then submit all of these documents to Imperial, and Imperial would then determine whether the proposed senior was suitable for Imperial's purposes.

40.     If the proposed insured met Imperial's criteria, Imperial would direct the producer to move forward with a formal application for life insurance.  Not only did Imperial direct the producer whether or not to move forward with a formal application, Imperial also typically directed the producer in selecting the insurer, the insurance product, and the face amount of the policy.

41.     Imperial instructed its insurance producers to conduct as much business as possible via phone calls and text messages and not e-mail in order to conceal Imperial's pre-application and pre-issuance direction and control of the insurance producer's actions.

42.     In the applications, as discussed in detail below, the insurance producers denied any intention to use premium financing, despite the fact that they were only moving forward with the application at Imperial's direction and despite the fact that they knew full well that Imperial had already agreed to fund a "loan" to pay the premium.

43.     Imperial knew that the applications would contain lies about premium financing and the source of premium.  It was known throughout the industry that Sun Life would not issue a policy financed under a program life Imperial's.  Moreover, Imperial employed insurance

producers who received communications directly from Sun Life setting forth Sun Life's opposition to STOLI and premium financing. For the same reason, Imperial knew that Sun Life's application form specifically asked whether premium financing would be used to fund the policy.

44.     Thus, for every Imperial loan, it was a central premise and an Imperial requirement that Sun Life would be misled concerning Imperial's involvement and the intention to use premium financing. Both Imperial and the insurance producers knew about these lies, and Imperial required the lies because otherwise the policies would not be issued.

45.     Imperial compensated the insurance producers for originating life insurance policies on Imperial's behalf. When a life insurance policy is placed in force, the life insurer will pay the producer a commission based on the first year target premium. Unbeknownst to Sun Life, Imperial's agreement to fund life insurance policies required the producer to remit his or her commission to Imperial. Imperial then paid the producer a small portion of the commission, but Imperial retained control over how much the insurance producer would receive. Typically, Imperial paid the producer between 10% and 50% of the commissions.

**(ii)     Bank of Utah as Trustee**

46.     Under Imperial's scheme, an irrevocable life insurance trust served as the ownership vehicle for each policy. Because it was customary for insurers to request a copy or portions of any trust agreement that would own a policy, Imperial or the producer would provide a form trust agreement. At the producer's direction, the insured would select an individual who would purport to serve as a trustee of the irrevocable life insurance trust.

47.     While the trust may have appeared to be an arm's length trust agreement benefitting the insured, after the policy was issued Imperial immediately replaced the trust

agreement with its own amended and restated trust agreement.  The amended agreement would change the terms of the original trust, name Bank of Utah as the co-trustee, and virtually eliminate any discretion on the part of the original trustee to manage the trust assets.

48.      Under the façade of a loan, Imperial would then provide funds to the Bank of Utah to make all premium payments.  The loan proceeds were deposited into an account at the Bank of Utah in the name of the "Family Insurance Trust."  This allowed Imperial to make the premium payments through Bank of Utah while concealing Imperial's involvement.

49.      Throughout the life of the loan, Imperial controlled all aspects of the policy by directing the original trustee or the Bank of Utah.  For example, if Imperial needed information from the insurer, Imperial would prepare a letter in the name of the original trustee and submit it to the insurer.  This allowed Imperial to obtain information for its own purposes without revealing its involvement.  Similarly, Imperial would make all decisions with respect to the payment of premiums and would direct Bank of Utah accordingly.

50.      Imperial acquired title to the policies at the end of the two-year loan term when the trust defaulted on the loan.  Unlike a legitimate loan, where the borrower actually intends to repay the loan and avoid default, Imperial's loans were structured to ensure a default after two years.  For example, the interest rate for an Imperial loan was as high as 16%.  In addition to repaying the principal and interest, the borrower would be required to pay Imperial a loan origination fee of 10% of the principal.  Thus, repayment of a $500,000 loan after two years could cost the insured as much as $720,000 (i.e., $500,000 in principal + $160,000 for two years of interest at 16% + $50,000 loan origination fee).

51.      Under Imperial's loan agreements, however, the insured could avoid all of his or her repayment obligations simply by surrendering the policy to Imperial.

52.     Once the borrower defaulted on the loan, Imperial would take title to the policy and then submit a policy ownership change request formally changing the owner to an Imperial entity.

53.     Imperial acquired its portfolio of policies, including all of the policies issued by Sun Life, in this manner.  By design, the loans were not intended to facilitate the procurement of life insurance policies for individuals who needed them.  To the contrary, the structure of the transaction was intended to produce a default so that Imperial could acquire the policies.

**D.     Fraud Committed by Imperial's Agents**

54.     Imperial acquired all of the Sun Life policies at issue in this case in the manner described above.  In each case, the insurance producers committed multiple acts of mail and wire fraud.  The insurance producers' acts are attributable to Imperial because Imperial acknowledged that the agent would act for Imperial, the insurance producer followed Imperial's directives, and Imperial directed the day-to-day activities of insurance producers who should have served as independent agents acting for the benefit of their purported clients.  This is not intended to be an exhaustive list of Sun Life policies originated, maintained, and controlled by Imperial, nor is in intended to be an exhaustive list of the fraudulent statements made in furtherance of Imperial's scheme.  Upon information and belief, Imperial procured at least sixty-three life insurance policies from Sun Life in accordance with the scheme described herein, most of which Imperial has decided to selectively lapse based on its own mortality analyses.

**Robert Good**

55.     On November 25, 2009, insurance producers Justin Eriksen and Scott Neubauer submitted an application for a $4 million policy of life insurance on the life of Robert Good.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

56.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than a year prior to the submission of the application.

57.     In early 2008, Neubauer went to Mr. Good's country club and solicited Mr. Good's participation in Imperial's scheme.  On April 18, 2008, Eriksen provided Imperial with Good's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million policies to be issued on the life of Mr. Good by at least three insurers in addition to Sun Life.

58.     On May 5, 2008, Eriksen advised Imperial that Neubauer was ready to submit a formal application to the insurer or insurers selected by Imperial as soon as Imperial approved the deal.

59.     On May 9, 2008, Imperial provided an Indication of Interest for a $10 million policy to be issued by another insurer.  The Indication of Interest stated that Imperial would receive 75% of the target commission.  On May 28, 2008, Imperial sent Eriksen a list of several active and approved cases, including policies on the life of Mr. Good, and instructed Eriksen to "get closing!!!!" which meant that Eriksen and Neubauer were to take the steps necessary to procure the policies under consideration.

60.     On October 16, 2009, Eriksen advised Imperial that Sun Life's underwriters would give Mr. Good a "preferred" rating on a life insurance policy.  One of Imperial's national sales managers, Kevin Carraher, then instructed his Imperial colleagues to take the steps necessary to approve a loan for a Sun Life policy.

61.     On or around November 25, 2009, Imperial instructed Neubauer to move

forward with the Sun Life policy.  Neubauer thereafter completed a life insurance application for $4 million on the life of Robert Good and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Robert Good Irrevocable Trust.

62.     The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Neubauer responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Neubauer also stated in the application that the source of the premium would be Mr. Good or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked whether Good had any other existing life insurance policies in force.  Neubauer denied any other insurance, despite the fact that Imperial had already approved loans on multiple other policies for Mr. Good.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  Neubauer stated that he would receive 100% of the commission, despite the fact that Neubauer planned to relinquish at least 50% of his commission to Imperial as a requirement of the deal.

63.     Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these

material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

64.     After Sun Life approved the policy, the broker general agency contacted Neubauer and asked when the initial premium payment would be submitted in order to place the policy in force.  Neubauer's associate advised that "[w]e need to get the official go ahead from Kevin [Carraher of Imperial] before we put this thing in force."

65.     Carraher ultimately provided "the official go ahead" for the transaction.  Once Carraher confirmed that Imperial would provide the necessary funding, Sun Life received a check for $138,480 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

66.     Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on September 14, 2011, Imperial directed Virgil Thomas to sign a form requesting the "date the policy will enter grace," an annual statement, and other information related to the policy's performance as of that date.  All of this information helped Imperial determine the minimum amount of premium needed to keep the policy in force.

67.     Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

68.     The fraudulent statements identified above are fully attributable to Imperial because Eriksen and Neubauer acted as Imperial's agents.  In particular, by instructing Eriksen and Neubauer to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Eriksen and Neubauer, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Elizabeth Geller

69.     On July 28, 2010, insurance producers Arlene Orkin and Michael Marom submitted an application for a $5 million policy of life insurance on the life of Elizabeth Geller. The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

70.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

71.     In early 2010, Ms. Geller attended a seminar held by Orkin at the Capital Grille in Boca Raton, Florida.  The purpose of the seminar was to solicit elderly individuals, including Ms. Geller, to participate as insureds in Imperial's scheme.

72.     On February 26, 2010, Marom asked Imperial whether it was interested in a $5 million policy on Ms. Geller.  Marom advised Imperial that he and Orkin were ready to submit a formal application to the carrier selected by Imperial as soon as Imperial approved the deal. At the time, Imperial was considering several multi-million dollar policies to be issued by at least two other insurers in addition to Sun Life.  Marom and Orkin also provided Imperial with Ms. Geller's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.

73.     On July 28, 2010, Imperial instructed Marom and Orkin to move forward with the Sun Life policy.  Marom and Orkin thereafter completed a life insurance application for $5 million on the life of Ms. Geller and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Elizabeth Geller Irrevocable Trust.

74.     The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the next five years?"  Marom and Orkin responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Marom and Orkin also stated in the application that the source of the premium would be Ms. Geller or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Marom and Orkin stated that Orkin would receive 100% of the commission.  This was a false statement

because Imperial required Orkin to relinquish at least 70% of her commission to Imperial as a requirement of the deal.

75.     Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

76.     Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $97,700 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

77.     Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on September 14, 2011, Imperial directed Sidney Geller to sign a form requesting the when the policy will enter grace and instructed him to make sure he sent any grace notices from Sun Life to Imperial "as soon as possible."  Knowing when the policy went into grace allowed Imperial to make the minimum amount of premium needed to keep the policy in force without risking the policy would lapse.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

78.     Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

79.     The fraudulent statements identified above are fully attributable to Imperial because Marom and Orkin acted as Imperial's agents.  In particular, by instructing Marom and Orkin to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Marom and Orkin, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Terry DeGraw

80.     On July 16, 2008, insurance producers Gabriel Giordano, Brock Diediker, and Jay Sullivan submitted an application for a $3 million policy of life insurance on the life of Terry DeGraw.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

81.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began prior to the issuance of the policy.

82.     In 2007, Sullivan visited a service station frequented by Mr. DeGraw and solicited his participation in Imperial's scheme.  The insurance producers then began the process of collecting the information required by Imperial to decide whether it was interested in pursuing a policy on Mr. DeGraw's life.  These documents included Mr. DeGraw's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.

83.     On or around July 16, 2008, Imperial instructed the insurance producers to move forward with the Sun Life policy.  The insurance producers thereafter completed a life insurance application for $5 million on the life of Mr. DeGraw and submitted it to Sun Life, one of at least two carriers that Imperial expressed an interest in proceeding with, and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Terry DeGraw Family Insurance Trust.

84.     The application contained multiple material misrepresentations.

•     Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"  The insurance producers responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

•     The insurance producers also stated in the application that the source of the premium would be Mr. DeGraw or the trust.  The actual source of the premium would be Imperial.

•     Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, the insurance producers stated that Diediker would receive 100% of the commission.  This was a false

statement because Imperial required Diediker to relinquish at least 55% of his commission to Imperial as a requirement of the deal.

85.     Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

86.     While the application was approved by Sun Life shortly thereafter, Imperial took advantage of the policy's free-look period to determine whether it wanted to proceed with the Sun Life policy.  During this time, Imperial ordered additional life expectancy reports using DeGraw's updated medical records.

87.     Imperial required that the insurance producers amend the application to purchase a different Sun Life insurance product and to change the amount and frequency of the premium payments.  On August 13, 2008, Imperial issued a formal Indication of Interest for a $3 million Sun Life policy, as revised per Imperial's instructions.  The Indication of Interest stated that Imperial would receive 55% of the target commission.

88.     Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $72,285 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

89.     Although Imperial effectively managed the assets of the irrevocable life

insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on May 14, 2010, Imperial directed Mark DeGraw to sign a form requesting a "Zero Premium Illustration" from Sun Life and reminded him that it was "**_imperative_**" that he send any notices from Sun Life to Imperial. (Emphasis in original).

90.     Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

91.     The fraudulent statements identified above are fully attributable to Imperial because the insurance producers acted as Imperial's agents.  In particular, by the instructing insurance producers to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Esta Klein

92.     On November 6, 2009, insurance producers Arlene Orkin and Michael Marom submitted an application for a $2 million policy of life insurance on the life of Esta Klein.  The

application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

93.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

94.     In mid-2009, Ms. Klein's husband, Harvey Klein, attended a seminar held by Orkin at Ruth's Chris Steak House in Boca Raton, Florida.  The purpose of the seminar was to solicit elderly individuals, including the Kleins, to participate as insureds in Imperial's scheme.

95.     In July, 2009, Marom informed Imperial that he and Orkin could secure a standard rating for Ms. Klein with Sun Life and asked Imperial whether it was interested in a multi-million dollar policy on her life.  On July 30, 2009, Imperial directed Marom to submit complete medical records and a HIPPA medical record disclosure authorization, so that it could price the policy and determine whether it was interested in originating such a policy.  Marom forwarded the requested documents the next day.

96.     On August 5, 2009, Imperial informed Marom that it was not interested in a Sun Life policy on Ms. Klein at standard rating.  Imperial stated that it would price the policy with other carriers to determine whether an alternative placement would work.

97.     On August 7, 2009, Imperial informed Marom that it would move forward with the Sun Life policy if Marom and Orkin could secure a preferred rating.  Imperial also instructed Marom which specific Sun Life product to obtain.

98.     Marom and Orkin were unable to secure a preferred rating with Sun Life. Throughout August, September, and October, Marom and Orkin sought offers from at least five

other insurers.  Imperial, however, insisted that Marom and Orkin move forward with Sun Life and attempt to obtain a preferred rating.

99.     On or around November 6, 2009, Imperial instructed Marom and Orkin to move forward with the Sun Life policy.  Marom and Orkin thereafter completed a life insurance application for $2 million on the life of Ms. Klein and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Esta Klein Irrevocable Life Insurance Trust.

100.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Marom and Orkin responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Marom and Orkin also stated in the application that the source of the premium would be Ms. Klein or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Marom and Orkin stated that Orkin would receive 100% of the commission.  This was a false statement because Imperial required Orkin to relinquish at least 85% of her commission to Imperial as a requirement of the deal.

101.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed,

it was thus understood and required by Imperial that the application would contain these
material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and
application containing the fraudulent statements before the policy went in force, but proceeded
with the loan transaction anyway.

102.    Sun Life did not approve the application at a preferred rating.  On December 3,
2009, Marom informed Imperial he could not obtain a preferred rating for Ms. Klein from Sun
Life and asked whether the deal would work at a standard rating.  Later that day, Imperial told
Marom to close the application and to not get a standard policy.

103.    On December 15, 2009, however, Marom informed Imperial that Sun Life had
reconsidered its rating and was willing to issue at preferred.  On January 6, 2010, Marom
reminded Imperial that he had secured the preferred rating and was waiting on Imperial's
approval to move forward with the placement of Ms. Klein's policy.  Imperial responded later
that day that the Klein policy would take a little longer for formal approval because Imperial
was obtaining updated life expectancy reports.

104.    On January 22, 2010, Imperial gave its final approval to move forward with the
Sun Life policy at preferred rating.  Along with that e-mail, Imperial provided a formal
Indication of Interest for the Sun Life policy.  The Indication of Interest stated that Imperial
would receive 85% of the target commission.

105.    Once Imperial confirmed that it would provide the necessary funding, Sun Life
received a check for $43,820 to place the policy in force.  Imperial served as the source of funds
for all of the premium payments for the policy and directed Bank of Utah to make renewal
premium payments in subsequent years.

106.    Although Imperial effectively managed the assets of the irrevocable life

insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on August 30, 2011, Imperial directed Harvey Klein to sign a form requesting information on how the policy would perform based on the current premium schedule, in addition to requesting the current account value of the policy.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

107.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

108.    The fraudulent statements identified above are fully attributable to Imperial because Marom and Orkin acted as Imperial's agents.  In particular, by instructing Marom and Orkin to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Marom and Orkin, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**Dale Dickler**

109.    On October 27, 2009, insurance producers Michael Marom and Arlene Orkin submitted an application for a $6 million policy of life insurance on the life of Dale Dickler. The application stated that the policy was needed for estate liquidity and for survivorship income, it denied that the policy was being purchased for the purpose of being assigned or sold, and it denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

110.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months before the submission of the application.

111.    In April 2009, Marom and Orkin solicited Ms. Dickler's participation in Imperial's scheme.  On September 18, 2009, Orkin and Marom provided Imperial with Ms. Dickler's medical records and medical record disclosure authorizations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least two insurers in addition to Sun Life.

112.    On October 1, 2009, Orkin and Marom asked Imperial which carrier they should select for Ms. Dickler.

113.    On October 19, 2009, Imperial instructed Marom and Orkin to continue to submit applications to other carriers.  On October 20, 2009, Orkin updated Imperial on the progress of the pending applications and underwriting for various policies on the life of Ms. Dickler.  In her communication to Imperial, Orkin expressed concern that Sun Life was "nit picking on trusts and financials."

114.    On October 29, 2009, Imperial instructed Marom and Orkin to "move forward with Sun Life Universal Protector (2009 v2) AKA LP6 Preferred for Dale Dickler."  Marom and Orkin completed a life insurance application for $6 million on the life of Dale Dickler and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Dale Dickler Irrevocable Life Insurance Trust.

115.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"  Marom responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Marom also stated in the application that the source of the premium would be Ms. Dickler or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Marom stated that he would receive 100% of the commission.  This was a false statement because Imperial required Marom to relinquish at least 50% of his commission to Imperial as a requirement of the deal.

116.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded

with the loan transaction anyway.

117.    Once Imperial confirmed with Marom and Orkin that it would provide the necessary funding, Sun Life received a check for $140,340 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

118.    Per Imperial's request, Marom and Orkin sent Imperial a verification of coverage on December 22, 2009, which confirmed that the policy had been put in force.

119.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Stewart Dickler for his signature or to Marom and Orkin with instructions to submit the requests to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.  Imperial made such a request on April 17, 2012.

120.    Imperial also sent requests through Marom and Orkin.  For example, on December 8, 2011, Imperial directed Orkin to request information from Sun Life because it "recently made a premium payment on this policy and need[ed] current documents."

121.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

122.    The fraudulent statements identified above are fully attributable to Imperial because Marom and Orkin acted as Imperial's agents.  In particular, by instructing Marom and

Orkin to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Orkin and Marom, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Joan Korn

123.    On August 25, 2009, insurance producers Peter Blatt and Bradley Kurit submitted an application for an $8 million policy of life insurance on the life of Joan Korn.  The application stated that the policy was needed for estate planning purposes.  Sun Life subsequently approved and issued the policy.  An amendment to the application signed on October 29, 2009, after the policy was issued, denied any intent to use premium financing.

124.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than six months prior to the submission of the application.

125.    In March 2008, Blatt met with Ms. Korn and solicited Ms. Korn's participation in Imperial's scheme.  On or around January 28, 2009, Blatt provided Imperial with Ms. Korn's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  In the same communication, Blatt asked Imperial whether Ms. Korn looked "viable" as a prospect for Imperial's program.  Subsequent to the January 28,

2009, communication, Imperial considered several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life.

126.    On July 7, 2009, Blatt advised Imperial that Sun Life's underwriters would give Ms. Korn a "preferred" rating on a life insurance policy.

127.    In response, Imperial informed Blatt on July 8, 2009 to "move forward" with applying for a policy from Sun Life.  Imperial confirmed that the policy "looks viable" on September 15, 2009.

128.    On or around August 25, 2009, Imperial instructed Kurit to move forward with the Sun Life policy. Kurit thereafter completed a life insurance application for $8 million on the life of Joan Korn and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Joan Korn Irrevocable Trust Dated 11/24/2008.

129.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Initially, Kurit did not answer.  However, in an amendment to the application signed on October 29, 2009, Kurit changed the response to "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Kurit also stated in the application that the source of the premium would be Ms. Korn or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Kurit stated that he would receive 100% of the commission.  This was a false statement because Imperial

required Kurit to relinquish more than 50% of his commission to Imperial as a

requirement of the deal.

130.    Imperial was aware that Sun Life's application asked questions regarding the

source of premium and the intent to use financing.  Imperial was also aware that Sun Life would

not issue a policy where premium would be financed under a program like Imperial's.  Indeed,

it was thus understood and required by Imperial that the application would contain these

material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and

application containing the fraudulent statements before the policy went in force, but proceeded

with the loan transaction anyway.

131.    Once Imperial confirmed that it would provide the necessary funding, Sun Life

received a check for $18,000 to place the policy in force.  Sun Life received an additional wire

of $176,881 on December 18, 2009.  Imperial served as the source of funds for all of the

premium payments for the policy and directed Bank of Utah to make renewal premium

payments in subsequent years.

132.    Although Imperial effectively managed the assets of the irrevocable life

insurance trust through Bank of Utah, Imperial continued to direct the original trustee with

respect to routine policy correspondence in order to conceal Imperial's involvement.  For

example, Imperial prepared certain information requests and sent them to Michael Schrimsher

for his signature with instructions for him to submit them to Sun Life.  The purpose of making

these requests through the trustee was to obtain information about the policy while keeping

Imperial's involvement hidden.  For example, on November 28, 2011, and December 19, 2011,

Imperial sent Schrimsher two separate forms for his signature to be sent to Sun Life.

133.     Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

134.     The fraudulent statements identified above are fully attributable to Imperial because Blatt and Kurit acted as Imperial's agents.  In particular, by instructing Blatt and Kurit to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Blatt and Kurit, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**June Fuhrman**

135.     On July 2, 2009, insurance producer Arlene Orkin submitted an application for a $5 million policy of life insurance on the life of June Fuhrman.  The application stated that the policy was needed for estate liquidity and survivorship income.  An amendment to the application signed on September 14, 2009, denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

136.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's

involvement in the origination of this policy began more than a year prior to the submission of the application.

137.    In early 2008, Ms. Fuhrman attended a seminar run by Orkin at Ruth's Steak House.  At the seminar, Orkin solicited Ms. Fuhrman's participation in Imperial's scheme.  On July 1, 2008, Orkin provided Imperial with Ms. Fuhrman's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life.

138.    On February 27, 2009, Imperial requested that its own contract department create a trust for Ms. Fuhrman and insert William Brown as the trustee.  Imperial recruited Brown to serve as the trustee on several insurance policies in its program, even though he had no relationship to the insureds.

139.    On June 23, 2009, Imperial instructed Orkin to "[p]lease move forward with Sun Life UL Protector LP6 product STD for June Fuhrman."  Imperial later learned from Orkin that it could obtain a policy with a preferred rating on the life of June Fuhrman.  As are result, Imperial directed Orkin on August 4, 2009, to "[p]lease move forward with the Sun Life LP6, Preferred offer for June Fuhrman."

140.    On August 27, 2009, Imperial provided an Indication of Interest for a $5 million policy to be issued by Sun Life.  The Indication of Interest stated that Imperial would receive $110,880 of the total target commission.

141.    On or around September 14, 2009, Imperial instructed Orkin to move forward with the Sun Life policy.  Orkin thereafter completed a life insurance application for $5 million on the life of June Fuhrman and submitted it to Sun Life via U.S. mail and/or interstate wire.

According to the application, the owner and beneficiary of the policy would be the June Fuhrman Irrevocable Trust.

142.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Orkin responded "no" in an amendment to the application, despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Orkin also stated in the application that the source of the premium would be Ms. Fuhrman or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, Orkin stated that she would receive 100% of the commission. This was a false statement because Imperial required Orkin to relinquish at least 60% of her commission to Imperial as a requirement of the deal.

143.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

144.    Once Imperial confirmed that it would provide the necessary funding, Sun Life

received a check for $60,000 to place the policy in force.  Imperial served as the source of funds

for all of the premium payments for the policy and directed Bank of Utah to make renewal

premium payments in subsequent years.  Imperial confirmed this information in an October 5,

2009 letter to Ms. Orkin, which stated, "Imperial shall advance funds to the [Fuhrman] Trust for

the payment of premiums on the policy."

145.    Although Imperial effectively managed the assets of the irrevocable life

insurance trust through Bank of Utah, Imperial continued to direct the original trustee with

respect to routine policy correspondence in order to conceal Imperial's involvement.  For

example, on September 1, 2011, Imperial directed Benham Fuhrman to sign a form that would

confirm whether Sun Life received Imperial's recent payment on the policy.  The purpose of

making these requests through the trustee was to obtain information about the policy while

keeping Imperial's involvement hidden.

146.    Approximately two years after policy issuance, and after the expiration of the

contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to

the policy.  Imperial then submitted a policy ownership and beneficiary change request form to

Sun Life.  This is the first time that Imperial revealed its interest in the policy.

147.    The fraudulent statements identified above are fully attributable to Imperial

because Orkin acted as Imperial's agent.  In particular, by instructing Orkin to move forward

with the Sun Life policy, Imperial acknowledged that she would act for Imperial's benefit.

Orkin, in turn, followed Imperial's instructions.  Although the insurance producers were

obligated ethically and legally to act in the best interests of the insured, Imperial controlled all

aspects of Orkin's daily activities (i.e., the selection of Sun Life as insurer, the specific

insurance product to apply for, the face value of the policy, and the ownership structure, among

other things).  Orkin willingly complied to ensure that Imperial would fund the transaction and to ensure that she would be paid.

### Gary Granby

148.    On November 24, 2009, insurance producers Sam Katz, Marc Frolich, and Mark Brown submitted an application for a $4 million policy of life insurance on the life of Gary Granby.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

149.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than a year prior to the submission of the application.

150.    In early 2009, Brown solicited Mr. Granby's participation in Imperial's scheme. On May 20, 2009, Katz provided Imperial with Mr. Granby's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least two insurers in addition to Sun Life.

151.    On May 20, 2009, Katz advised Imperial that Sun Life and another insurer's underwriters would give Mr. Granby a "preferred" rating on a life insurance policy.

152.    On or around November 24, 2009, Imperial instructed Katz to move forward with the Sun Life policy.  Katz thereafter completed a life insurance application for $4 million on the life of Gary Granby and submitted it to Sun Life via U.S. mail and/or interstate wire. According to the application, the owner and beneficiary of the policy would be a trust, later

identified as the Gary W. Granby 2009 Irrevocable Life Insurance Trust.

153.    The application contained multiple material misrepresentations.

  •    Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Katz responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

  •    Katz also stated in the application that the source of the premium would be Mr. Granby or the trust.  The actual source of the premium would be Imperial.

  •    Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Katz stated that he would receive 100% of the commission.  This was a false statement because Imperial required Katz to relinquish at least 55% of his commission to Imperial as a requirement of the deal.

154.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

155.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $138,480 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make

renewal premium payments in subsequent years.

156.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Lynn Kimpling and Gary Granby for their signature with instructions for them to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.  For example, on July 14, 2011, Imperial asked Kimpling and Granby to sign a request for information that would provide detailed information on the policy so that Imperial could attempt to sell it.

157.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

158.    The fraudulent statements identified above are fully attributable to Imperial because Katz, Frolich, and Brown acted as Imperial's agents.  In particular, by telling them to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Katz, Frolich, and Brown, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance

producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Evelyn Mitchel

159.    On November 4, 2009, insurance producers David Orkin, Arlene Orkin, and Michael Marom submitted an application to Sun Life for a $2.6 million policy of life insurance on the life of Evelyn Mitchel.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

160.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

161.    In March 2009, Ms. Mitchel and her husband, Monroe Mitchel, attended a seminar put on by Marom and Arlene Orkin at a restaurant in Broward County, Florida.  The purpose of the seminar was to solicit elderly individuals, including the Mitchels, to participate as insureds in Imperial's scheme.

162.    On August 13, 2009, the insurance producers provided Imperial with Ms. Mitchel's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least two insurers in addition to Sun Life.  The insurance producers were prepared to submit a formal application as soon as Imperial approved the deal and selected an insurer.

163.    On August 17, 2009, Imperial instructed the insurance producers to move forward with policies from Sun Life and one other insurer.  Imperial declined to move forward with the third insurer.

164.    On October 7, 2009, Imperial informed the insurance producers that it had thirty-seven deals in place through them that were waiting on the issuance of policies.  Two of these were the previously approved Ms. Mitchel policies.  On October 15, 2009, Imperial again directed the insurance producers to move forward with the Sun Life policy on the life of Ms. Mitchel.  Additionally, on October 26, 2009, Imperial informed the insurance producers that it had "reviewed all of the below cases with several models and chose the best carriers" and directed them to "have these apps submitted as soon as possible."  Included on that list was the Sun Life policy.

165.    On or around November 4, 2009, Imperial instructed the insurance producers to move forward with the Sun Life policy.  The insurance producers thereafter completed a life insurance application for $2.6 million on the life of Ms. Mitchel and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Evelyn Mitchel Insurance Trust Agreement.

166.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"  The insurance producers responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- The insurance producers also stated in the application that the source of the premium would be Ms. Mitchel or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, the insurance producers stated that David Orkin would receive 100% of the commission. This was a false statement because Imperial required David Orkin to relinquish at least 90% of his commission to Imperial as a requirement of the deal.

167.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

168.    On January 22, 2010, Imperial gave its final approval to move forward with the Sun Life policy. Along with that e-mail, Imperial provided a formal Indication of Interest for the Sun Life policy. The Indication of Interest stated that Imperial would receive 70% of the target commission.

169.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $63,986 to place the policy in force. Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

170.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on February 8, 2012, Imperial directed Monroe Mitchel to sign a form requesting when the policy would enter grace if Imperial decided not to make any further premium payments and to confirm Sun Life received Imperial's $4,000 premium payment on January 13, 2012.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

171.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

172.    The fraudulent statements identified above are fully attributable to Imperial because the insurance producers acted as Imperial's agents.  In particular, by instructing the insurance producers to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**George Victor**

173.    On November 10, 2009, insurance producers Ronald Rechter and Michael Marom submitted an application to Sun Life for a $1.5 million policy of life insurance (later amended to $1 million) on the life of George Victor.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

174.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

175.    On November 28, 2008, Rechter solicited Mr. Victor to participate as an insured in Imperial's scheme.  On February 19, 2009, Rechter provided Imperial with Mr. Victor's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least four insurers in addition to Sun Life.  Rechter and Marom were prepared to submit a formal application as soon as Imperial approved the deal and selected an insurer.

176.    On August 7, 2009, Imperial instructed Marom to move forward with the Sun Life policy and directed Marom as to the specific Sun Life insurance product for which to apply.

177.    On August 25, 2009, Imperial informed Marom that it had thirty-seven deals in place through Marom that were waiting on the issuance of policies, one of which was the Victor Sun Life policy that Imperial had directed Marom to move forward with earlier that month.

Imperial instructed Marom to submit a formal application for the policy and to get Mr. Victor medically approved at a preferred rating, since Imperial was uninterested in a policy at a standard rating.

178.   On October 15, 2009, Imperial again directed Marom to move forward with the Sun Life policy on the life of Mr. Victor, along with various other policies.  Imperial ranked the policies and instructed Marom which policies he should focus on first.  Because it was a relatively small face value policy compared to other deals, the Victor policy was low on Imperial's priority list.

179.   On November 3, 2009, Marom informed Imperial that he could not secure a preferred rating from Sun Life.  Marom asked whether Imperial was interested in moving forward with any other carriers.  On November 5, 2009, Imperial directed Marom to apply for a policy with a different insurer and product.  Later that day, Marom informed Imperial that he might be able to secure a preferred rating from Sun Life and asked whether Imperial wanted him to proceed with Sun Life or with the other insurer.  Imperial ran its own internal analysis of the two alternatives and determined that the Sun Life policy was more desirable.

180.   On November 6, 2009, Imperial instructed Marom to formally apply for the Sun Life policy.  On November 10, 2009, Marom completed a life insurance application for $1.5 million on the life of Mr. Victor and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the George Victor Irrevocable Life Insurance Trust.

181.   The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"

The insurance producers responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- The insurance producers also stated in the application that the source of the premium would be Mr. Victor or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, the insurance producers stated that Marom would receive 100% of the commission. This was a false statement because Imperial required Marom to relinquish at least 50% of his commission to Imperial as a requirement of the deal. Later, Imperial required that Marom forfeit his entire commission to Imperial.

182.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

183.    On November 23, 2009, Marom informed Imperial that the Victor policy was ready to be issued, but he was awaiting final approval from Imperial.

184.    On December 1, 2009, Marom informed Imperial that he was unable to secure a preferred rating. Later that day, Imperial informed Marom that it did not appear that the deal would work and instructed Marom to abandon the deal. Shortly thereafter, Imperial reran its

analyses and determined that the Sun Life policy would work at a standard rating only if Marom forfeited his entire commission to Imperial.  Based on the revised compensation agreement with Marom, Imperial gave its final approval to move forward with the Sun Life policy.

185.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $41,700 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

186.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on January 9, 2012, Imperial prepared certain information requests and sent them to Marianne Victor for her signature with instructions for her to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

187.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

188.    The fraudulent statements identified above are fully attributable to Imperial because the insurance producers acted as Imperial's agents.  In particular, by instructing the insurance producers to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically

and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things). The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Hannah Parnes

189.    On November 17, 2009, insurance producer Leon Lowenthal submitted an application to Sun Life for an $8 million policy of life insurance on the life of Hannah Parnes. The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing. Sun Life subsequently approved and issued the policy.

190.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy. Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

191.    In the summer of 2009, Lowenthal solicited Ms. Parnes to participate as an insured in Imperial's scheme. On October 1, 2009, Lowenthal provided Imperial with Ms. Parnes' medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations. At the time, Imperial was considering several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life. Lowenthal was prepared to submit a formal application as soon as Imperial approved the deal and selected an insurer.

192.    On November 17, 2009, Imperial approved the Sun Life deal and instructed Lowenthal to submit a formal application to Sun Life. That same day, Lowenthal completed a

life insurance application for $8 million on the life of Ms. Parnes and submitted it to Sun Life

via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of

the policy would be the Hannah Parnes Trust.

193.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Lowenthal responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Lowenthal also stated in the application that the source of the premium would be Ms. Parnes or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Lowenthal stated that he would receive 100% of the commission.  This was a false statement because Imperial required Lowenthal to relinquish at least 55% of his commission to Imperial as a requirement of the deal.

194.    Imperial was aware that Sun Life's application asked questions regarding the

source of premium and the intent to use financing.  Imperial was also aware that Sun Life would

not issue a policy where premium would be financed under a program like Imperial's.  Indeed,

it was thus understood and required by Imperial that the application would contain these

material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and

application containing the fraudulent statements before the policy went in force, but proceeded

with the loan transaction anyway.

195.    On November 23, 2009, Imperial included Ms. Parnes on a list of future deals and indicated that the deal was awaiting formal approval from Sun Life.  Imperial worked with Wendy Reichhelm to place the policy and instructed her to push on Sun Life to have the policy approved.  On December 10, 2009, the policy was approved by Sun Life, and Reichhelm wrote to Imperial and Lowenthal and asked that they forward the signed delivery form and the check for the initial premium so that the policy could be placed in force.

196.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $196,881 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

197.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Moshe Schecter for his signature with instructions for him to submit them to Sun Life.  Imperial made two such requests on January 9, 2012 and March 8, 2012.  Furthermore, on January 18, 2010, Imperial directed Lowenthal to obtain Mr. Shecter's signature on Imperial's behalf for various forms that needed to be sent to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

198.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

199.    The fraudulent statements identified above are fully attributable to Imperial because Lowenthal acted as Imperial's agent.  In particular, by instructing Lowenthal to move forward with the Sun Life policy, Imperial acknowledged that Lowenthal would act for Imperial's benefit.  Lowenthal, in turn, followed Imperial's instructions.  Although Lowenthal was obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of his daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  Lowenthal willingly complied to ensure that Imperial would fund the transaction and to ensure that he would be paid.

### Donna Solk

200.    On December 16, 2009, insurance producers Jerrie Prothro, Ron Rechter, and Todd Bernstein submitted an application for a $10 million policy of life insurance on the life of Donna Solk.  The application stated that the policy was needed for income replacement and estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

201.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than a year prior to the submission of the application.

202.    In 2009, Bernstein and Prothro solicited Ms. Solk's participation in Imperial's scheme.  On August 14, 2009, Prothro provided Imperial with Ms. Solk's medical records, medical record disclosure authorizations, and an "Imperial Cover Page" and asked Imperial to "review and let [them] know if this case will work with any carrier."  At the time, Imperial was

considering several multi-million dollar policies to be issued by at least four insurers in addition to Sun Life.

203.    On August 24, 2009, Imperial initially directed Prothro to "move forward" with two different life insurance carriers, but would not let them obtain a policy for anything more than $10 million.  Prothro followed Imperial's instruction and stated in response that "[t]his is great! At this point we will get what ever [sic] we can...$$$[.]"

204.    On August 25, 2009, Imperial requested a status on the application process for Ms. Solk and twenty-eight other policies that Imperial was placing through Prothro, Rechter, and Bernstein.  Imperial requested a similar update on October 8, 2009, regarding thirty-one policies, including at least one policy on the life of Donna Solk.

205.    On November 30, 2009, Imperial informed Prothro that it would no longer finance a policy for Ms. Solk through another carrier.  As a result, Prothro stopped pursuing a policy from that insurer.

206.    On December 1, 2009, Imperial directed Prothro to "[p]lease move forward with Sun Life-Universal Protector (2009 v2) AKA LP6-preferred for Donna Solk."  On December 16, 2009, Bernstein completed a life insurance application for $10 million on the life of Donna Solk and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Donna Solk Irrevocable Trust.

207.    The application contained multiple material misrepresentations.

•    Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Bernstein responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Bernstein also stated in the application that the source of the premium would be Ms. Solk or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, Bernstein stated that he would receive 100% of the commission. This was a false statement because Imperial required Bernstein to relinquish at least 80% of his commission to Imperial as a requirement of the deal.

208. Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

209. Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $123,050 to place the policy in force. Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

210. Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement. For example, Imperial prepared certain information requests and sent them to Bud Solk for his

signature with instructions for him to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.  For example, on April 23, 2012, Imperial instructed Bud Solk to sign a form requesting a grace notice from Sun Life so Imperial could determine the amount needed to keep the policy in force.

211.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

212.    The fraudulent statements identified above are fully attributable to Imperial because Prothro, Rechter, and Bernstein acted as Imperial's agents.  In particular, by instructing Prothro, Rechter, and Bernstein to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Prothro, Rechter, and Bernstein, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Evelyn Blakeslee

213.    On July 30, 2009, insurance producers Peter Blatt, Bernie Kurit, and Bradley Kurit submitted an application for an $8 million policy of life insurance on the life of Evelyn

Blakeslee.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.

214.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than six months prior to the submission of the application.

215.    In March 2009, Blatt met with Ms. Blakeslee and solicited Ms. Blakeslee's participation in Imperial's scheme.  Blatt provided Imperial with Ms. Blakeslee's medical records and medical record disclosure authorizations.  At the time, Imperial considered several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life.

216.    On July 7, 2009, Blatt informed Imperial that he had obtained a preferred underwriting classification on policies from Sun Life and another carrier.  He also asked Imperial if it needed to order a life expectancy report for Evelyn Blakeslee to help Imperial determine if it should pursue a policy.

217.    On July 8, 2009, Imperial informed Blatt to "[m]ove forward with Sun" and to order a life expectancy report.  On July 30, 2009, Bradley Kurit completed a life insurance application for $8 million on the life of Evelyn Blakeslee and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Blakeslee Irrevocable Trust.

218.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"

Bradley Kurit responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Bradley Kurit also stated in the application that the source of the premium would be Ms. Blakeslee or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Bradley Kurit stated that he would receive 100% of the commission.  This was a false statement because Imperial required Bradley Kurit to relinquish more than 65% of his commission to Imperial as a requirement of the deal.

219.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

220.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $37,000 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

221.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with

respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Michael Schrimsher for his signature with instructions for him to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.  For example, on May 18, 2011, Imperial sent Mr. Schrimsher a form for his signature so that Imperial could obtain "A current in force ledger showing minimum level premiums and positive account value for all years to age 100."

222.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

223.    The fraudulent statements identified above are fully attributable to Imperial because Blatt, Kurit, and Kurit acted as Imperial's agents.  In particular, by instructing them to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Blatt, Kurit, and Kurit, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**Sandra Berner**

224.     On December 3, 2009, insurance producer Robert Friedman submitted an application to Sun Life for a $1.8 million policy of life insurance on the life of Sandra Berner. The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

225.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

226.     In June 2008, Friedman first solicited Ms. Berner to participate as an insured in Imperial's scheme.  On October 19, 2009, Friedman provided Imperial with Ms. Berner's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life.  Friedman was prepared to submit a formal application as soon as Imperial approved the deal and selected an insurer.

227.     On October 21, 2009, Imperial instructed Friedman to move forward with the Sun Life policy.  On December 3, 2009, Friedman completed a life insurance application for $1.8 million on the life of Ms. Berner and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Sandra Berner Irrevocable Insurance Trust.

228.     The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Friedman responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Friedman also stated in the application that the source of the premium would be Ms. Berner or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Friedman stated that he would receive 100% of the commission.  This was a false statement because Imperial required Friedman to relinquish at least 55% of his commission to Imperial as a requirement of the deal.

229.   Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

230.   On November 23, 2009, Imperial included Ms. Berner on a list of future deals and indicated that Imperial expected the policy to be formally approved by Sun Life within three weeks.  On December 16, 2009, the policy was approved by Sun Life.  Imperial instructed Friedman that it needed additional medical records and HIPPA authorization before giving final

approval to fund the policy and have it issued.  Friedman provided the requested information minutes later.  Imperial gave final approval for the deal, and asked Friedman to which address it should forward the premium payments.

231.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $22,149 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

232.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on August 2, 2011, Imperial directed Melvin Berner to sign a form requesting when the policy would enter grace.  Knowing when the policy went into grace allowed Imperial to make the minimum amount of premium payments needed to keep the policy in force without risking the policy would lapse.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

233.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

234.    The fraudulent statements identified above are fully attributable to Imperial because Friedman acted as Imperial's agent.  In particular, by instructing Friedman to move forward with the Sun Life policy, Imperial acknowledged that Friedman would act for Imperial's benefit.  Friedman, in turn, followed Imperial's instructions.  Although Friedman was

obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the his daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  Friedman willingly complied to ensure that Imperial would fund the transaction and to ensure that he would be paid.

### Polya Blitshtein

235.    On November 10, 2009, insurance producers Alan Rubenstein and Leon Lowenthal submitted an application to Sun Life for an $8.5 million policy of life insurance on the life of Polya Blitshtein.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

236.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

237.    In November 2008, Rubenstein and Lowenthal first solicited Ms. Blitshtein to participate as an insured in Imperial's scheme.  Rubenstein and Lowenthal had placed advertisements at Ms. Blitshtein's doctor's office promising that $10,000 would be given to a participant's children for funeral services in exchange for participating in the scheme.  Ms. Blitshtein informed her doctor that she wanted to participate.

238.    Shortly thereafter, two men came to Ms. Blitshtein's apartment.  They took blood and urine samples and asked Ms. Blitshtein, who does not speak or read English, to sign various documents that she did not understand.  After signing the documents, Ms. Blitshtein felt

wrong about what was happening and tried to tear up the papers, but the men took the papers away from Ms. Blitshtein before she could destroy them.

239.    On November 20, 2008, Rubenstein and Lowenthal provided Imperial with Ms. Blitshtein's medical records, life expectancy reports, medical record disclosure authorizations, and life insurance policy illustrations.  Additionally, on February 12, 2009, Imperial ordered its own additional life expectancy reports to determine whether a policy on the life of Ms. Blitshtein would be profitable.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least two insurers in addition to Sun Life.  Rubenstein and Lowenthal were prepared to submit a formal application as soon as Imperial approved the deal and selected an insurer.

240.    On October 21, 2009, Imperial instructed Rubenstein and Lowenthal to move forward with the Sun Life policy.  On November 10, 2009, Lowenthal completed a life insurance application for $8.5 million on the life of Ms. Blitshtein and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Polya Blitshtein Family Trust 2009.

241.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Lowenthal responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Lowenthal also stated in the application that the source of the premium would be Ms. Blitshtein or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Lowenthal stated that he would receive 100% of the commission.  This was a false statement because Imperial required Lowenthal to relinquish at least 87.5% of his commission to Imperial as a requirement of the deal.

242.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

243.    On November 23, 2009, Imperial included Ms. Blitshtein on a list of future deals and indicated that Imperial expected the policy to be formally approved by Sun Life within three weeks.  On December 1, 2009, Imperial requested an update on the application status and was told that the application was being reviewed.  Imperial noted that it "sound[s] like we will know real quick on Polya!" referring to whether the deal would be going forward.  Sun Life approved the application shortly thereafter.

244.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $33,702.50 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

245.    Although Imperial effectively managed the assets of the irrevocable life

insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement. For example, on June 8, 2011, Imperial prepared certain information requests and sent them to Ira Einhorn for his signature with instructions for him to submit them to Sun Life. The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

246.     Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy. Imperial then submitted a policy ownership and beneficiary change request form to Sun Life. This is the first time that Imperial revealed its interest in the policy.

247.     The fraudulent statements identified above are fully attributable to Imperial because Rubenstein and Lowenthal acted as Imperial's agents. In particular, by instructing Rubenstein and Lowenthal to move forward with the Sun Life policy, Imperial acknowledged that they would act for Imperial's benefit. Rubenstein and Lowenthal, in turn, followed Imperial's instructions. Although Rubenstein and Lowenthal were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things). Rubenstein and Lowenthal willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Helene Miller

248.     On December 31, 2009, insurance producers Sam Katz, Glenn Spinner, and Wendy Reichhelm submitted an application for a $3.5 million policy of life insurance on the life

of Helene Miller.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

249.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than a year prior to the submission of the application.

250.    In 2009, Spinner solicited Ms. Miller's participation in Imperial's scheme. Imperial then requested that Katz and Reichhelm help Ms. Miller fill out the application.  Katz and Reichhelm provided Imperial with Ms. Miller's medical records, life insurance policy illustrations, and her medical record disclosure authorizations.  Imperial then directed Reichhelm and Katz to submit an application to Sun Life.

251.    On January 11, 2010, Reichhelm informed Imperial that Sun Life would give Ms. Miller a preferred underwriting classification.

252.    On or around December 31, 2009, Imperial instructed Katz to move forward with the Sun Life policy.  Katz thereafter completed a life insurance application for $3.5 million on the life of Helene Miller and submitted it to Sun Life via U.S. mail and/or interstate wire. According to the application, the owner and beneficiary of the policy would be Lee Margolis. In order to comply with Imperial's directions, Katz and Reichhelm set up The Helene Miller Irrevocable Life Insurance Trust.

253.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?"

Katz responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Katz also stated in the application that the source of the premium would be Ms. Miller or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, Katz stated that he would receive 100% of the commission. This was a false statement because Imperial required Katz to relinquish at least 65% of his commission to Imperial as a requirement of the deal.

254. Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

255. Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $38, 342.50 to place the policy in force. Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

256. Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement. For

example, Imperial prepared certain information requests and sent them to Lee Margolis for his signature with instructions for him to submit them to Sun Life. The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden. For example, on May 16, 2011, Imperial instructed Lee Margolis to sign a form requesting when the policy would enter grace, an annual statement and the account value of the policy. Given Imperial's interest in the policy, they also informed Margolis that it was "imperative" for him to provide Imperial with any policy-related information from Sun Life.

257.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy. Imperial then submitted a policy ownership and beneficiary change request form to Sun Life. This is the first time that Imperial revealed its interest in the policy.

258.    The fraudulent statements identified above are fully attributable to Imperial because Katz, Reichhelm, and Spinner acted as Imperial's agents. In particular, by instructing Katz, Rechter, and Spinner to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit. Katz, Reichhelm, and Spinner, in turn, followed Imperial's instructions. Although Katz, Reichhelm, and Spinner were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of their daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things). Katz, Reichhelm, and Spinner willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**James DeBerry**

259.     On January 28, 2010, and April 26, 2010, insurance producers Richard Bearden and Tim Edwards submitted applications for a $5 million dollar life insurance policy on the life of James DeBerry.  The applications stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

260.     Contrary to the statements in the applications, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than six months prior to the submission of the applications.

261.     In early 2009, Edwards and Bearden solicited Ms. DeBerry's participation in Imperial's scheme.  On October 27, 2009, Edwards provided Jonathon Moulton with two life expectancy reports on Mr. DeBerry and a life insurance illustration for a carrier other than Sun Life.  At the time, Imperial was considering several multi-million dollar policies to be issued by multiple insurers in addition to Sun Life.

262.     On November 3, 2009, after receiving the information from Edwards, Moulton instructed Imperial's pricing department to "have this priced ASAP."

263.     Edwards informed Imperial on November 11, 2009 that one insurer offered a preferred underwriting classification for a policy on Mr. DeBerry's life and that he would continue to update Imperial as they progressed on the case.  In the same communication, Edwards informed Imperial that he changed the carrier for a different client as previously instructed by Imperial.  This was not atypical, since Imperial routinely worked on several deals at once with its team of top agents.

264.    Several weeks later, Edwards asked Imperial how he should proceed with respect to the creation of the trust and the timeline for when Imperial would formally fund a policy with a carrier other than Sun Life.  Pursuant to Imperial's new guidelines against putting such instructions in writing, Moulton asked another Imperial employee to call Edwards on December 7, 2009.  After the call, that employee told Moulton that "He's [(Edwards)] all set.  We should have the policy next week."

265.    When the policy from that carrier did not work out, Imperial continued to direct Edwards to seek a policy from other carriers, including Sun Life.  However, on April 22, 2010, Moulton expressed concerns that the "new Sun product really isn't good" and asked Edwards to "call [Moulton] to discuss."  Minutes later, Edwards sent Imperial additional medical records concerning Mr. DeBerry.

266.    On or around April 26, 2010, Imperial instructed Bearden to move forward with the Sun Life policy.  Bearden thereafter completed a life insurance application for $5 million on the life of James DeBerry and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the applications, the owner and beneficiary of the policy would be The DeBerry Irrevocable Insurance Trust.

267.    The applications contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Bearden responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Bearden also stated in the applications that the source of the premium would be Mr. DeBerry or the trust. The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party. In response, Bearden stated that he would receive 100% of the commission. This was a false statement because Imperial required Bearden to relinquish at least 80% of his commission to Imperial as a requirement of the deal.

268. Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing. Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's. Indeed, it was thus understood and required by Imperial that the applications would contain these material misrepresentations. Furthermore, Imperial was provided with a copy of the policy and applications containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

269. On May 10, 2010, Imperial sent Edwards an Indication of Interest for a $5 million policy to be issued by Sun Life. The Indication of Interest stated that Imperial would receive 80% of the total target commission. Edwards indicated that Bearden would move forward at Imperial's direction, but cautioned that because Sun Life only had a fifteen-day free-look period, "[e]veryone involved is motivated to get this in force, and get closing [documents] ASAP." Under the free-look period, an applicant has the ability to relinquish the policy and receive a full refund on any premiums that may have been paid. Since Edwards and Bearden were only interested in obtaining the policy for Mr. DeBerry if it would be funded by Imperial,

it was essential that the loan be finalized before the free-look period ended so no one lost the initial premium payment that Imperial would reimburse as soon as the "loan" was finalized.

270.   Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $43,325 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

271.   Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on October 31, 2011, Imperial directed Lynn Freiheit to sign a form requesting the when the policy will enter grace.  Knowing when the policy went into grace allowed Imperial to make the minimum amount of premium needed to keep the policy in force without risking the policy would lapse.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

272.   Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

273.   The fraudulent statements identified above are fully attributable to Imperial because Bearden and Edwards acted as Imperial's agents.  In particular, by instructing Bearden and Edwards to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Bearden and Edwards, in turn, followed Imperial's instructions.  Although Bearden and Edwards were obligated ethically and legally to

act in the best interests of the insured, Imperial controlled all aspects of their daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  Bearden and Edwards willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Manfred Von Nordheim

274.    On June 23, 2008 and July 15, 2008, insurance producers Spiros Pappas and Charlie Collins submitted applications for a $3 million policy of life insurance on the life of Manfred Von Nordheim.  The applications stated that the policy was needed for income replacement and estate planning purposes.  An amendment to the initial application signed on July 7, 2008, denied any intent to use premium financing.  Sun Life subsequently approved and issued the policy.

275.    Contrary to the statements in the applications, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than a year prior to the submission of the application.

276.    In late 2008, Collins and Pappas solicited Mr. Von Nordheim's participation in Imperial's scheme.  On April 28, 2008, Collins sent Imperial a "new case."  In the same communication, Collins provided Mr. Von Nordheim's medical records, medical record disclosure authorizations, and life insurance policy illustrations.  At the time, Imperial was considering several multi-million dollar policies to be issued by at least three insurers in addition to Sun Life.

277.    On May 13, 2008, Imperial provided an Indication of Interest to Collins for a

$3 million policy to be issued by Sun Life.  The Indication of Interest stated that Imperial would receive 45% of the total target commission, later increased to 60%.

278.    On or around June 23, 2008, Imperial instructed Pappas to move forward with the Sun Life policy.  Pappas thereafter completed a life insurance application, later amended on July 15, 2008, for a $3 million policy on the life of Manfred Von Nordheim and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Manfred Von Nordheim Trust.

279.    The application contained multiple material misrepresentations.

- •    Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Pappas did not respond to the question in the initial application; however, Pappas responded "no" in the July 7, 2008, amendment to the application, despite the fact that the premium would be funded by a loan that Imperial had already approved.

- •    Pappas also stated in the application that the source of the premium would be Mr. Von Nordheim or the trust.  The actual source of the premium would be Imperial.  In fact, Mr. Von Nordheim sent a letter to Pappas, Collins, and Imperial to confirm that he would never be responsible for any premium payments on the policy.

- •    Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Pappas stated that he would receive 100% of the commission.  This was a false statement because Imperial required Pappas to relinquish at least 60% of his commission to Imperial as a requirement of the deal.

280.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the applications would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and applications containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

281.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $14,879.52 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

282.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on July 29, 2009, and November 16, 2009, Imperial prepared certain information requests and sent them to Lori Pratt for her signature with instructions for her to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

283.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

284.     The fraudulent statements identified above are fully attributable to Imperial because Pappas and Collins acted as Imperial's agents.  In particular, by instructing Pappas and Collins to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Pappas and Collins, in turn, followed Imperial's instructions.  Although Pappas and Collins were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of their daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  Pappas and Collins willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Martin Wasser

285.     On September 21, 2009, insurance producers Todd Weishaus, Ron Rechter, and Jerrie Prothro submitted an application for a $5 million policy of life insurance on the life of Martin Wasser.  The application stated that the policy was needed for estate planning purposes and denied any intent to use premium financing.  Sun Life subsequently approved and issued the policy.

286.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began more than seven months prior to the submission of the application.

287.     In August 2008, the insurance producers solicited Mr. Wasser's participation in Imperial's scheme.  On February 2, 2009, the insurance producers provided Imperial with Mr. Wasser's medical records, life expectancy reports, and medical record disclosure authorizations.  The insurance producers were prepared to submit a formal application as soon

as Imperial approved the deal and selected an insurer and represented to Imperial that they could get a policy issued in 90 days.

288.    On February 13, 2009, Imperial instructed the insurance producers to apply for a $5 million life insurance policy with an insurer other than Sun Life.  Imperial attached to that communication a formal Indication of Interest that stated that Imperial would receive over 90% of the target commission.  Imperial directed the insurance producers to "[p]lease have the policy issued with $222,900 [target premium] in all years" and to complete an Imperial form with basic information about the insured.  On February 17, 2009, the insurance producers returned the completed Imperial form, which Imperial used to create a trust to act as the owner and beneficiary of the Wasser policy.

289.    On April 14, 2009, Imperial informed the insurance producers that it was pulling the plug on the deal and closing the case.  The insurance producers immediately replied that the deal had already been approved by Imperial and asked for an explanation.  Imperial directed the insurance producers to discuss the call over the phone rather than by e-mail.  Imperial and the insurance producers were able to work out the issue via phone, and Imperial reapproved the deal with a new Indication of Interest with a reduced target premium on April 24, 2009.  Imperial later increased the target premium via a third Indication of Interest on June 12, 2009, forwarded the insurance producers a trust for the insured to execute, and asked the insurance producers to confirm that they were moving forward with the case.  The insurance producers confirmed that they were that same day.

290.    On August 14, 2009, the insurance producers asked Imperial what other insurers would work for policies on the life of Mr. Wasser.  On August 18, 2009, Imperial directed the insurance producers to move forward with $5 million policies from Sun Life and another new

insurer.  On August 25, 2009, Imperial reminded the insurance producers that Imperial had twenty-nine approved policies in their system waiting to be issued and asked whether formal applications had been submitted yet.

291.    On September 21, 2009, Weishaus completed a life insurance application for a $5 million policy on the life of Mr. Wasser and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Martin Wasser Irrevocable Life Insurance Trust.

292.    The application contained multiple material misrepresentations.

• Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" The insurance producers responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

• Weishaus also stated in the application that the source of the premium would be Mr. Wasser or the trust.  The actual source of the premium would be Imperial.

• Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Weishaus stated that he would receive 100% of the commission.  This was a false statement because Imperial required Weishaus to relinquish at least 60% of his commission to Imperial as a requirement of the deal.

293.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed,

it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

294.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $173,000 to place the policy in force.  Imperial served as the source of funds for all of the premium payments for the policy and directed Bank of Utah to make renewal premium payments in subsequent years.

295.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Dorothy Wasser for her signature with instructions for her to submit them to Sun Life.  Additionally, Imperial also directed Linda Lentz, an employee at Life Equities (the same company where Jerrie Prothro and Todd Bernstein worked), to obtain information from Sun Life on several occasions, including August 16, 2011 and November 29, 2011.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

296.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

297.    The fraudulent statements identified above are fully attributable to Imperial because the insurance producers acted as Imperial's agents.  In particular, by instructing the insurance producers to move forward with the Sun Life policy, Imperial acknowledged that they would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of their daily activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

**Diane Pastore**

298.    On July 28, 2008, insurance producer Gabriel Giordano submitted an application to Sun Life for a $1.5 million policy of life insurance on the life of Diane Pastore.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

299.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

300.    In February 2008, Giordano first solicited Ms. Pastore's participation in Imperial's scheme.  Ms. Pastore agreed to participate in the plan because she would not be required to make any premium payments in connection with the policy.

301.    On April 15, 2008, PRG Financial Resources, Giordano's insurance brokerage,

asked Imperial to provide pricing options for premium financing on a policy on the life of

Ms. Pastore.  On the same day, Imperial requested Giordano to provide Ms. Pastore's medical

information and a HIPPA waiver.

302.    With the information provided by Giordano, Imperial's internal underwriting

department prepared a report on August 23, 2008 outlining Ms. Pastore's major medical

conditions and life expectancy.  The report was necessary for Imperial to determine the

expected rating that Imperial could obtain on Ms. Pastore's life and to estimate the amount of

premium Imperial would need to pay before it could expect to collect the death benefit.

303.    On April 24, 2008, Giordano asked Imperial whether it had "any idea if this case

will work?"  According to Jonathan Moulton, an account executive at Imperial, none of the

carriers suggested by Giordano were "competitive" enough.  Instead, on April 25, 2008,

Moulton instructed Giordano to consider six different insurers, including Sun Life.

304.    As of July 10, 2008, Imperial was still evaluating offers from multiple carriers—

including a preferred underwriting classification on a policy from Sun Life—to determine

which Policy would provide the greatest financial benefit to Imperial.

305.    Shortly thereafter, on July 22, 2008, Imperial sent Giordano an Indication of

Interest for a $3 million Sun Life policy on the life of Ms. Pastore, with 45% of the commission

going to Imperial and instructed Giordano to move forward with the Sun Life policy.  Imperial

subsequently increased Imperial's commission to 65%.

306.    On or around July 28, 2008, Imperial instructed Giordano to move forward with

the Sun Life policy.  Giordano thereafter completed a life insurance application for $1.5 million

on the life of Ms. Diane Pastore and submitted it to Sun Life via U.S. mail and/or interstate

wire.  According to the application, the owner and beneficiary of the policy would be the Diane Pastore Family Insurance Trust.

307.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Giordano responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Giordano also stated in the application that the source of the premium would be Ms. Pastore or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Giordano stated that he would receive 100% of the commission, despite the fact that he planned to relinquish at least 65% of his commission to Imperial as a requirement of the deal.

308.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

309.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $50,025.00 to place the policy in force.  Imperial served as the source of

funds for the initial and all subsequent premium payments for the policy, directing Bank of Utah to make renewal premium payments in subsequent years.

310.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Brenda Barrera for her signature with instructions for him to submit them to Sun Life.  Additionally, Imperial also directed Gabriel Giordano and Ian Frisch, who also worked at PRG Financial, to obtain information from Sun Life on several occasions, including on August 25, 2009, June 23, 2010, and January 11, 2011. The purpose of making these requests through the trustee and others was to obtain information about the policy while keeping Imperial's involvement hidden.

311.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

312.    The fraudulent statements identified above are fully attributable to Imperial because Gabriel Giordano acted as Imperial's agent.  In particular, by instructing Giordano to move forward with the Sun Life policy, Imperial acknowledged that he would act for Imperial's benefit.  Giordano, in turn, followed Imperial's instructions.  Although Giordano was obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of his daily activities (*i.e.*, the selection of Sun Life, the selection specific insurance product, the face value of the policy, and the ownership structure, among other things).  Giordano willingly

complied to ensure that Imperial would fund the transaction and to ensure that he would be paid.

### Kalman Talansky

313.    On July 20, 2007, insurance producers Donny Fein and Andrew Sossin submitted an application to Sun Life for a $2.5 million policy of life insurance on the life of Kalman Talansky.  The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

314.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began several months prior to the submission of the application.

315.    In early 2007, Sossin and Fein first solicited Mr. Talansky's participation in Imperial's scheme.  On June 26, 2007, Sossin sent Imperial an illustration for a Sun Life policy and three life expectancy reports.  James Purdy, a national account manager for Imperial, directed Imperial's pricing department to "Please have this priced."  Once Imperial determined the policy would be profitable, it directed Sossin to obtain the policy for Imperial's benefit.

316.    On July 17, 2007, Imperial instructed Sossin to make sure the policy referenced the trust and to verify the beneficiary to the policy matched the beneficiary to the trust.  These revisions were important to Imperial because it ensured Imperial would maintain control of death benefit during the period it was hiding its involvement from Sun Life.

317.    On the next day, Imperial conducted an internal review of the trust to make sure it fully complied with Imperial's requirements and instructed that "we [Imperial] are adding *our*

NJ trustee as co-trustee." (Emphasis added).

318.    On or around July 20, 2007, Imperial instructed Fein and Sossin to move forward with the Sun Life policy.  Fein completed a life insurance application for $2.5 million on the life of Mr. Talansky and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Kalman Talansky Irrevocable Trust.

319.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" The insurance producers responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- The insurance producers also stated in the application that the source of the premium would be Mr. Talansky or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, the insurance producers stated that Fein would receive 100% of the commission, despite the fact that Fein planned to relinquish at least 50% of his commission to Imperial as a requirement of the deal.

320.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these

material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

321.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $64,400.00 to place the policy in force.  Imperial served as the source of funds for the initial and all subsequent premium payments for the policy, directing Bank of Utah to make renewal premium payments in subsequent years.

322.    After the policy was issued, Imperial forced the trust to be amended again on or around August 21, 2007 to "Remove any authority for the benes [sic] to remove the trustee."  The amendment ensured that the trustee appointed by Imperial had the power to make decisions for the trust without fear of removal from the beneficiary—Mr. Talansky's daughter.  Imperial subsequently appointed William Gahwyler, Jr., its New Jersey Trustee, as the trustee for the trust.

323.    On September 24, 2007, a representative from Washington Mutual in Boca Raton, FL informed Imperial that they "opened the account for the KALMAN TALANSKY irrevocable trust."  In the same communication, the representative asked if Imperial would be making "the initial deposit."

324.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to William Gahwyler, Jr. for his signature with instructions for him to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping

Imperial's involvement hidden.  For example, on November 19, 2007, Imperial directed Mr. Gahwyler to sign a form so Imperial could change the premium mode on the account to annual. Later, on February 9, 2009, Imperial directed Mr. Gahwyler to pay a $35,608.12 premium toward the policy on Imperial's behalf.

325.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

326.    The fraudulent statements identified above are fully attributable to Imperial because Donny Fein and Andrew Sossin acted as Imperial's agents.  In particular, by instructing the insurance producers to move forward with the Sun Life policy, Imperial acknowledged that the producers would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (*i.e.*, the selection of Sun Life, the selection specific insurance product, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Sheila Bernstein

327.    On January 19, 2010, insurance producers Todd Bernstein and Justin Eriksen submitted an application to Sun Life for a $3 million policy of life insurance on the life of Sheila Bernstein.  The application stated that the policy was needed for estate planning purposes

and denied any intention to use premium financing.  Sun Life subsequently approved and issued the policy.

328.     Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy.  Moreover, Imperial's involvement in the origination of this policy began at least a year prior to the submission of the application.

329.     In early 2008, Eriksen and Todd Bernstein first solicited Ms. Bernstein's participation in Imperial's scheme.  On April 16, 2008, Eriksen sent Imperial Ms. Bernstein's medical records, a HIPPA authorization form, life insurance illustrations, and life expectancy reports predicting when Ms. Bernstein would die.  At this time, Imperial was considering policies on Ms. Bernstein's life with several different life insurance carriers.

330.     On May 29, 2008, Imperial informed Eriksen that one of the carriers did "not look attractive," and instructed them to seek other options.

331.     As of June 2009, and later on August 14, 2009, Imperial continued to evaluate potential carriers for a policy on the life of Ms. Bernstein.  In fact, Imperial was also working on over 31 deals with Bernstein's brokerage, Life Equities, including two other policies eventually obtained from Sun Life on the life of Donna Solk and Martin Wasser.

332.     By November 30, 2009, Imperial informed Bernstein that it could no longer use a certain insurer's policies in its program, which required Imperial and Bernstein to select another carrier's product that would yield a similar profit.  Based on Imperial's calculations, a policy from Sun Life met Imperial's criteria.   Accordingly, on December 2, 2009, Imperial directed Bernstein to "Please move forward with the following for Sheila Bernstein:  Sun Life – Universal Protector (2009 v2) AKA LP6 – Preffered [*sic*]."

333.    On the same day, Todd Bernstein completed a life insurance application for $3 million on the life of Ms. Bernstein and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Sheila Bernstein Irrevocable Life Insurance Trust.

334.    The application contained multiple material misrepresentations.

• Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Bernstein responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

• Bernstein also stated in the application that the source of the premium would be Ms. Bernstein or the trust.  The actual source of the premium would be Imperial.

• Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  In response, Bernstein stated that he would receive 100% of the commission, despite the fact that he planned to relinquish at least 60% of his commission to Imperial as a requirement of the deal.

335.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  Indeed, it was thus understood and required by Imperial that the application would contain these material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent statements before the policy went in force, but proceeded with the loan transaction anyway.

336.    Once Imperial confirmed that it would provide the necessary funding, Sun Life received a check for $40,530.00 to place the policy in force.  Imperial served as the source of funds for the initial and all subsequent premium payments for the policy, directing Bank of Utah to make renewal premium payments in subsequent years.

337.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, Imperial prepared certain information requests and sent them to Joel Bernstein for his signature with instructions for him to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.  For example, on June 20, 2011, Imperial directed Mr. Bernstein to sign and fax certain forms to Sun Life.  The forms requested when the policy would enter its grace period, which allowed Imperial to learn what premium was needed to prevent the policy from lapsing, and, consequently, from Imperial losing its substantial investment in the policy.

338.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

339.    The fraudulent statements identified above are fully attributable to Imperial because Todd Bernstein and Justin Eriksen acted as Imperial's agents.  In particular, by instructing the insurance producers to move forward with the Sun Life policy, Imperial acknowledged that the producers would act for Imperial's benefit.  The insurance producers, in turn, followed Imperial's instructions.  Although the insurance producers were obligated

ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' daily activities (*i.e.*, the selection of Sun Life, the selection specific insurance product, the face value of the policy, and the ownership structure, among other things). The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

### Ronald Spohn

340.    On December 10, 2009, insurance producers Scott Neubauer, Mark Neubauer and Justin Eriksen submitted an application for a $3 million policy of life insurance on the life of Ronald Spohn. The application stated that the policy was needed for estate planning purposes and denied any intention to use premium financing. Sun Life subsequently approved and issued the policy.

341.    Contrary to the statements in the application, and unbeknownst to Sun Life, Imperial provided the funds to pay the premium on this policy. Moreover, Imperial's involvement in the origination of this policy began almost a year prior to the submission of the application.

342.    In early 2008, Eriksen and the Neubauers solicited Mr. Spohn's participation in Imperial's scheme. At the time, Imperial considered several multi-million dollar policies to be issued by at least two insurers in addition to Sun Life. In connection with identifying which policy would best satisfy Imperial's standards, Imperial obtained Spohn's medical records and medical record disclosure authorizations on January 16, 2009. Imperial also obtained its own life expectancy report on Mr. Spohn's life on April 16, 2009.

343.    On December 4, 2009, Imperial performed a pricing analysis for a $5 million Sun Life policy. Because Imperial's pricing analysis on a $5 million policy from Sun Life

would be profitable under Imperial's model, Imperial instructed Eriksen and the Neubauers to move forward with a Sun Life policy on or around December 4, 2009.  Scott Neubauer thereafter completed a life insurance application for $3 million on the life of Mr. Spohn and submitted it to Sun Life via U.S. mail and/or interstate wire.  According to the application, the owner and beneficiary of the policy would be the Ronald Spohn 2009 Irrevocable Life Insurance Trust.

344.    The application contained multiple material misrepresentations.

- Sun Life asked if "the premium for this policy will be financed through single or multiple loan(s) from a private or public lender now or in the future?" Scott Neubauer responded "no," despite the fact that the premium would be funded by a loan that Imperial had already approved.

- Scott Neubauer also stated in the application that the source of the premium would be Mr. Spohn or the trust.  The actual source of the premium would be Imperial.

- Sun Life asked the agent to identify whether the commission for the policy was being shared with any other party.  Scott Neubauer stated that he would receive 100% of the commission, despite the fact that he planned to relinquish at least 50% of his commission to Imperial as a requirement of the deal.

345.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  It was thus understood that the application would contain material misrepresentations.  Furthermore, Imperial was provided with a copy of the policy and application containing the fraudulent

statements before the policy went in force, but proceeded with the deal anyway.

346.    Although Imperial effectively managed the assets of the irrevocable life insurance trust through Bank of Utah, Imperial continued to direct the original trustee with respect to routine policy correspondence in order to conceal Imperial's involvement.  For example, on January 18, 2012, Imperial prepared certain information requests and sent them to Bruce Dern for his signature with instructions for him to submit them to Sun Life.  The purpose of making these requests through the trustee was to obtain information about the policy while keeping Imperial's involvement hidden.

347.    Approximately two years after policy issuance, and after the expiration of the contestable period, the trust defaulted on its loan to Imperial, and Imperial took formal title to the policy.  Imperial then submitted a policy ownership and beneficiary change request form to Sun Life.  This is the first time that Imperial revealed its interest in the policy.

348.    The fraudulent statements identified above are fully attributable to Imperial because Eriksen and Neubauer acted as Imperial's agents.  In particular, by instructing Eriksen and Neubauer to move forward with the Sun Life policy, Imperial acknowledged that the insurance producers would act for Imperial's benefit.  Eriksen and Neubauer, in turn, followed Imperial's instructions.  Although the insurance producers were obligated ethically and legally to act in the best interests of the insured, Imperial controlled all aspects of the insurance producers' activities (i.e., the selection of Sun Life as insurer, the specific insurance product to apply for, the face value of the policy, and the ownership structure, among other things).  The insurance producers willingly complied to ensure that Imperial would fund the transaction and to ensure that they would be paid.

E.    **Government Investigation and Non-Prosecution Agreement**

349.    On September 27, 2011, agents from the Federal Bureau of Investigation, as well

as officers from the Boca Raton Police Department, raided the offices of Imperial in connection with a criminal investigation conducted by the United States Attorney's Office for the District of New Hampshire concerning Imperial's premium finance business.

350.    On April 30, 2012, Imperial entered into a Non-Prosecution Agreement ("NPA") with the United States Attorney's Office for the District of New Hampshire.  The NPA is attached hereto as Exhibit 1.

351.    Under the NPA , the United States Attorney's Office for the District of New Hampshire agreed not to criminally prosecute Imperial or any of its present or former subsidiaries or affiliates for any crimes "related to the Company's involvement in making or agreeing to make, or aiding and abetting the making of, misrepresentations on life insurance applications in connection with its premium finance business from 2006 through 2011 … and potential securities fraud claims related to the premium finance business."  Exh. 1, at 1.

352.    As part of the NPA, Imperial made a series of admissions concerning its premium finance business, including the fact that, as alleged herein, Imperial utilized life insurance producers who made misrepresentations on life insurance applications concerning the source of funds for policies in order to procure policies that the insurer would not have issued if the insurer had known of Imperial's involvement.  Specifically, Imperial admitted that it (i) "facilitated and/or made misrepresentations on applications that the prospective insured was not seeking premium financing when the insurance carrier was likely to deny the policy on the basis of premium financing," and (ii) "failed to take appropriate precautions to prevent other misrepresentations that may have been made on said life insurance applications by employees, prospective insureds, and external agents and brokers."  Exh. 1, Appendix A, ¶¶ 12, 15.

353.    As part of the NPA, Imperial agreed to pay a monetary penalty of $8 million in

equal amounts to the Federal Bureau of Investigation, the United States Secret Service, and the United States Postal Service Consumer Fraud Fund.

354.    In addition, in order to avoid criminal prosecution, Imperial agreed to terminate its premium finance business and to terminate members of its senior sales staff associated with Imperial's premium finance business.

**F.    RICO Elements**

355.    Imperial is civilly liable under 18 U.S.C. § 1964(c) for violations of 18 U.S.C. §1962(a) and (c).

**(i)    Person**

356.    Imperial is a person for RICO purposes.  *See* 18 U.S.C. § 1961(3).

**(ii)    Enterprise**

357.    Imperial is associated with an association-in-fact enterprise for purposes of RICO, which is referred to herein as the "Life Wagering Enterprise."  The Life Wagering Enterprise was organized, managed, controlled, operated, and conducted by Imperial and was made up of a network of insurance producers (including those individuals specifically identified in paragraph 37), insureds (including those individuals specifically identified in paragraphs 54 to 348), the trustees, the Bank of Utah, and the Family Insurance Trust, each of which had separate identities apart from the Life Wagering Enterprise and the pattern of racketeering activity discussed herein.  The Life Wagering Enterprise was an ongoing organization with a framework for making decisions, functioned as a continuing unit, and had ascertainable structures and systems of authority guiding its operations, separate and apart from the pattern of racketeering in which the enterprise engaged.  The ongoing purpose of the Life Wagering Enterprise, which had an ascertainable structure of authority and control starting with Imperial, was to induce Sun Life and other insurers to issue life insurance policies for the purpose of

illegally wagering on the lives of the named insureds and to maintain those ill-gotten policies until the insured passed away and the insurer paid a death benefit.

### (iii)   Engaged in or Affecting Interstate Commence

358.    The Life Wagering Enterprise (which included various insureds, agents, and trustees from across the country) was engaged in and/or affected interstate commerce by submitting to Sun Life (headquartered in Massachusetts) and other insurers fraudulent applications and other documents supporting such applications and by engaging in various financial transactions in furtherance of its scheme to illegally procure life insurance policies through a system of fraud, misrepresentations, and deceit.  The Life Wagering Enterprise was organized, managed, controlled, operated and conducted by Imperial, a Florida corporation, which funneled premium payments through the Bank of Utah and the Family Insurance Trust, both operating out of Utah.

### (iv)   Pattern of Racketeering Activity

359.    Imperial participated in the operation, management, and conduct of the Life Wagering Enterprise's affairs though a pattern of racketeering activity that was conducted in accordance with the scheme designed by Imperial.  The pattern of racketeering began in or around 2006 and continued at least until Imperial was raided by the FBI on September 27, 2011.

360.    Imperial's pattern of racketeering activity included but is not limited to the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 described in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344, *supra*.  Each and every one of these actions was undertaken by an agent of Imperial and at Imperial's Holdings' instruction and direction.  Upon information and belief, the policies specifically mentioned herein are an exhaustive of the policies originated, maintained, and controlled by Imperial.

### (v)        § 1962(a) Violations

361.    In violation of 18 U.S.C. § 1962(a), Imperial managed, controlled, and participated in the conduct of the Life Wagering Enterprise through a pattern of racketeering activity.  Imperial received income derived from this pattern of racketeering activity because its conduct resulted in the issuance of the policies and, in turn, generated commissions that were unlawfully relinquished to Imperial.

362.    The commissions relinquished to Imperial by the insurance producers represented a large portion of Imperial's operating income and enabled Imperial, through the investment of such income into the Life Wagering Enterprise, to pay the premiums on the policies it had illegally procured and to manufacture new ones.  Additionally, upon information and belief, Imperial received death benefits on other policies issued by Sun Life and/or other insurers that Sun Life does not yet know about.

### (vi)       § 1962(c) Violations

363.    In violation of 18 U.S.C. § 1962(c), Imperial managed, controlled, and participated in the conduct of the Life Wagering Enterprise through the pattern of racketeering activity described above.

### (vii)      Sun Life's Damages

364.    As a result of Imperial's wrongful conduct, Sun Life was fraudulently induced to issue numerous life insurance policies with an aggregate face amount in the hundreds of millions of dollars.  Sun Life issued these policies on the premise that they were intended for a consumer market as indicated in the applications.  In fact, the policies were procured by Imperial for its own use in the investor market.  Imperial minimally funded the policies, thus depriving Sun Life of anticipated revenue sources that, in part, made it feasible for Sun Life to offer affordable insurance for customers.

365.     In addition, Imperial has selectively lapsed more than half of the Sun Life policies in its portfolio.  Unlike a consumer market, where lapses and persistency rates are driving by financial need, lapses and persistency rates on policies owned and controlled by Imperial are driven by anticipated mortality.  As a result, Sun Life's loss ratio has been severely distorted and this entire block of Sun Life policies is grossly unprofitable.  Sun Life has incurred significant losses due to Imperial's conduct.

366.     Sun Life has suffered injuries, for purposes of 18 U.S.C. § 1964(c), to its business or property as follows:

(a)     Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both;

(b)     Sun Life has incurred lost profits;

(c)     Sun Life has incurred internal administrative costs due to the procurement of the policies;

(d)     Sun Life has incurred substantial attorneys' fees and costs; and

(e)     To the extent that any policy cannot be declared void *ab initio*, Sun Life's damages include the cost of any future death benefit with respect to such policy.

**COUNT TWO – RICO CONSPIRACY**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**AGAINST IMPERIAL HOLDINGS, INC.**

367.     Imperial, its network of insurance producers, the Bank of Utah, and the Family Insurance Trust, unlawfully and willfully combined, conspired and agreed to violate 18 U.S.C. §1962(c), that is, to conduct and participate, directly or indirectly, in the conduct of the affairs

of an enterprise through a pattern of racketeering activity, all in violation of l8 U.S.C. § 1962(c).

368.    Part of the conspiracy was that Imperial and its network of insurance producers, the Bank of Utah, and the Family Insurance Trust each committed and agreed to commit two or more illegal racketeering acts, including mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, and conducted and agreed to conduct the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

369.    In furtherance of the conspiracy and to effect the objects thereof, Imperial and its network of insurance producers, the Bank of Utah, and the Family Insurance Trust each committed and caused to be committed a series of overt acts, as described above, which constitute a pattern of racketeering activity.

370.    Imperial and its network of insurance producers, the Bank of Utah, and the Family Insurance Trust conspired with one another and others to violate 18 U.S.C. § 1962(c) and thereby violated 18 U.S.C. § 1962(d).

371.    In violation of 18 U.S.C. § 1962(d), Imperial conspired with its network of insurance producers, the Bank of Utah, and the Family Insurance Trust, which each had separate identities apart from the Life Wagering Enterprise, to become associated with an association-in-fact enterprise for purposes of RICO.

372.    Imperial conspired with its network of insurance producers, the Bank of Utah, and the Family Insurance Trust to engage in and/or affect interstate commerce by submitting to Sun Life and other insurers fraudulent applications and other documents supporting such applications.

373.    Imperial conspired with its network of insurance producers, the Bank of Utah, and the Family Insurance Trust to conduct, manage, control, and participate in the conduct of

the enterprise's affairs though a pattern of racketeering activity as set forth in detail above.

374.    Imperial conspired with its network of insurance producers, the Bank of Utah, and the Family Insurance Trust to violate 18 U.S.C. § 1962(c) in the manner described herein. The conspiracy, the object of which was to fraudulently procure life insurance policies in order to illegal wager on the lives of strangers, commenced in or around 2005 and continues through today.

375.    Imperial conspired with its network of insurance producers, the Bank of Utah, and the Family Insurance Trust to commit the predicate acts described in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344.  Overt acts taken in furtherance of the conspiracy include but are not limited to the commission of these predicate acts and the procurement of the policies at issues.

376.    The conspirators acted in furtherance of a common plan, scheme or design intended to benefit them and to profit from the scheme at the expense of Sun Life.  Each did so with knowledge of the others' acts in furtherance of the conspiracy.

377.    As described in paragraphs 364 to 366, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the illegal policies; and Sun Life has incurred substantial attorneys' fees and costs.

## COUNT THREE – FRAUD
## AGAINST IMPERIAL HOLDINGS, INC.

378.    Imperial and its network of insurance producers, the Bank of Utah, and the Family Insurance Trust, engaged in a scheme to procure life insurance policies in order to wager

on the lives of strangers.

379.    Imperial was well aware of the legal prohibition on wagering policies.  Imperial was also aware that Sun Life prohibited STOLI and would not knowingly issue a policy where the source of premium would be a sham loan transaction.  Therefore, in order to procure policies for Imperial's account, Imperial acknowledged and accepted that its insurance producers would routinely lie in policy applications regarding the purpose of the policies and the source of premium.

380.    False statements of material fact concerning the Sun Life insurance policies are presently known to Sun Life are identified in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344, which are incorporated by reference.

381.    Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium would be financed under a program like Imperial's.  It was thus understood that the application would contain material misrepresentations.  Furthermore, Imperial was provided with copies of the policies and applications containing the fraudulent statements before the policies went in force, but proceeded with the loan transactions anyway.

382.    Although Imperial did not complete the applications itself, the insurance producers that did made the misrepresentations to Sun Life were agents of Imperial acting at its direction and for its benefit.  Indeed, these fraudulent acts were vital to Imperial's scheme to manufacture life insurance policies in violation of applicable insurance law and contrary to Sun Life's standards.  These fraudulent acts were also necessary for Imperial to obtain funds, via its requirement that the agents relinquish their commissions to Imperial, to perpetuate its scheme.

Thus, all of the fraudulent acts of the insurance producers are fully imputable to Imperial.

383.    Imperial and the insurance producers made these misrepresentations with the intention that Sun Life would rely on the misrepresentations and thus issue policies.  These misrepresentations were material to Sun Life's decision to issue and/or keep in force the Sun Life policies.  Indeed, Imperial and the insurance producers knew that Sun Life would not have issue any of the policies if it had known the true facts surrounding their procurement.

384.    As described in paragraphs 364 to 366, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

385.    Sun Life is also entitled to an award of punitive damages based on Imperial's wanton, malicious, deliberate and/or grossly negligent conduct described herein.

<u>**COUNT FOUR – AIDING AND ABETTING FRAUD**</u>
**AGAINST IMPERIAL HOLDINGS, INC.**

386.    As discussed in paragraphs 378 to 385, fraudulent statements were made with respect to each of the Sun Life policies at issue in this case.  Misrepresentations presently known concerning the Sun Life insurance policies are identified in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344, which are incorporated by reference.

387.    Imperial had knowledge of the aforementioned fraud.  Imperial was aware that Sun Life's application asked questions regarding the source of premium and the intent to use financing.  Imperial was also aware that Sun Life would not issue a policy where premium

would be financed under a program like Imperial's.  Thus, not only was it understood that the application would contain material misrepresentations, Imperial *required* that the insurance producers lie to Sun Life in order that the policies be issued.  Furthermore, Imperial was provided with copies of the policies and applications containing the fraudulent statements before the policies went in force, but proceeded with the loan transactions anyway.

388.    Imperial provided substantial other assistance to advance the fraud perpetrated upon Sun Life.  For example, Imperial provided its insurance producers with instructions as to which insurance company to apply to, which product to apply for, what amount of coverage needed to be sought, and how to structure ownership of the policy.  Imperial also provided the insurance producers with form trust agreements and insured affidavits, drafted by Imperial, in order make the fraud appear legitimate and to further conceal the fraud from Sun Life.  Additionally, Imperial paid all of the premiums on all of the policies at issue and, but for Imperial making those premium payments, none of the policies would even exist.  Imperial also directly funded the insurance producers' activities by allowing them to retain a portion of the commission paid on each policy.  Finally, Imperial continued to provide substantial assistance in the commission of the fraud during the life of the policies by amending and restating the trust agreements, monitoring the profit potential of the policies, requesting illustrations from Sun Life, providing form documents that the trustees used to obtain policy information, paying premiums on those policies determined to be profitable for Imperial, and deciding to allow other policies to lapse when Imperial decided that the policies would not be profitable.

389.    As described in paragraphs 364 to 366, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives,

or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

## COUNT FIVE – CIVIL CONSPIRACY TO COMMIT FRAUD
### AGAINST IMPERIAL HOLDINGS, INC.

390.    Imperial, its insurance producers, the Bank of Utah, and the Family Insurance Trust conspired to induce Sun Life to issue the policies at issue in this case for the purpose of illegally wagering on the lives of the named insureds.

391.    As discussed in paragraphs 378 to 385, fraudulent statements were made with respect to each of the Sun Life policies at issue in this case.  Misrepresentations presently known concerning the Sun Life insurance policies are identified in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344, which are incorporated by reference.

392.    The conspirators perpetrated this fraud by, among other things, collaborating to submit fraudulent applications and other documents and information to Sun Life in connection with the policies.  Overt acts of Imperial and the insurance producers' conspiracy included all of the following:

- The insurance producers solicited the insureds' participation in the scheme;

- The insurance producers, insureds, and trustees submitted false application documents, as described in paragraphs 62, 74, 84, 100, 115, 129, 142, 153, 166, 181, 193, 207, 218, 228, 241, 253, 267, 279, 292, 307, 319, 328, and 344, which are incorporated herein by reference;

- Imperial and its producers established and used sham insurance trusts to act as the owners and beneficiaries of the policies in order to conceal Imperial's involvement and facilitate Imperial's maintenance of the policies;

- Imperial funneled premium payments through the Family Insurance Trust account and other accounts at the Bank of Utah;

- Imperial used phony "loan" agreements to facilitate its acquisition of the policies; and

- All of the conspirators knowingly concealed from Sun Life that the policies were intended for wagering, among other things.

393.    The conspirators acted in furtherance of a common plan, scheme or design intended to benefit them and to profit from the scheme at the expense of Sun Life, and each did so with knowledge of the others' acts in furtherance of the conspiracy.

394.    As described in paragraphs 364 to 366, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

## COUNT SIX – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST IMPERIAL HOLDINGS, INC.

395.    Each of the insurance producers who sold the Sun Life insurance policies at issue in this case had a valid, binding, and enforceable contract with Sun Life.  These contracts required that the insurance producers comply with all applicable laws and standards of

professional conduct and prohibited the insurance producers from using sales concepts not approved by Sun Life.

396.    The use of fraudulent statements in the applications for life insurance as described above constituted a breach of the producer contracts.  Similarly, the sale of life insurance policies solely for the purpose of wagering on human life constituted a violation of the insurance producers' contracts.

397.    Imperial knew of the existence of these producer contracts and knew of that the insurance producers were in breach of the producer contracts by selling the Sun Life policies at issue in this case.  Indeed, Imperial itself, and through its network of insurance producers, the Bank of Utah, and the Family Insurance Trust, actively assisted producers with the submission of applications and related documents seeking to obtain the Sun Life policies, which contained knowingly false representations pertaining to the true purpose and nature of the policies, the source of premiums and, in many cases, the financial condition of the insured.  Imperial further assisted producers by establishing a sham trust and a common trust through which premiums were funneled—i.e., the Family Insurance Trust—in order to conceal from Sun Life the true nature of the policies and Imperial's interest in them.

398.    The actions of Imperial in connection with the procurement of these wagering policies and in the establishment of the sham trusts, among other things, constituted a knowing, intentional, and unjustified interference with the insurance producers' contractual relationships with Sun Life, and a knowing, intentional, and unjustified inducement of the insurance producers to breach their respective contracts with Sun Life.

399.    As described in paragraphs 364 to 366, Sun Life has incurred substantial damages as a result of this wrongful conduct.  Sun Life has paid commissions on policies that

should not have been issued because they were either unlawful, violated Sun Life's directives, or both; Sun Life has incurred lost profits; Sun Life has incurred internal administrative costs due to the procurement of the policies; and Sun Life has incurred substantial attorneys' fees and costs.

400.    Sun Life is also entitled to an award of punitive damages based on Imperial's wanton, malicious, deliberate and/or grossly negligent conduct described herein.

## COUNT SEVEN – DECLARATORY JUDGMENT
### 28 U.S.C. § 2201
### AGAINST ALL DEFENDANTS

401.    The Sun Life policies were issued in accordance with a scheme initiated and carried out by Imperial, the insurance producers, the Bank of Utah, and the Family Insurance Trust.

402.    The purpose of each of these policies was for Defendants to gamble upon the lives of the insureds who were complete strangers to them.  As such, each of the policies procured through the Imperial scheme lacked an insurable interest at its inception and should be declared void *ab initio*.

## RELIEF REQUESTED

A.    An award of compensatory damages as warranted under law, including but not limited to damages under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1964;

B.    An award of punitive damages as warranted under law;

C.    An award of Sun Life's attorneys' fees and costs, as determined by the Court and associated with seeking this judgment;

D.    A judgment against all Defendants declaring each policy procured through the Imperial scheme void or voidable due to a lack of insurable interest at its inception; and

E.      A judgment declaring that Imperial and/or any others who promoted and/or funded the policies are estopped or otherwise precluded from seeking a return of any of the premiums paid on these policies due to their fraudulent conduct in procuring the policies (or, in the alternative, a declaration that Sun Life is entitled to offset any return of premiums by the costs and expenses it has incurred, including any and all commissions it has paid to Imperial and its associates—i.e., its damages as a result of placing these policies in force).

Dated:  July 30, 2014                    PETT FURMAN, PL
                                         Attorneys for Plaintiff
                                         2101 N.W. Corporate Blvd., Suite 316
                                         Boca Raton, FL 33431
                                         (561) 994-4311
                                         (561) 982-8985 (fax)

                                         By: ___/s/ Wendy L. Furman
                                             Wendy L. Furman
                                             Fla. Bar No. 0085146
                                             wfurman@pettfurman.com

                                         *Of Counsel*
                                         Stephen C. Baker *(Pro Hac Vice)*
                                         Jason P. Gosselin *(Pro Hac Vice)*
                                         Thomas S. Downie *(Pro Hac Vice)*
                                         John Bloor *(Pro Hac Vice)*
                                         Nolan Tully *(Pro Hac Vice)*
                                         **DRINKER BIDDLE & REATH LLP**
                                         One Logan Square, Ste. 2000
                                         Philadelphia, PA 19103-6996
                                         (215) 988-2700
                                         Stephen.Baker@dbr.com
                                         Jason.Gosselin@dbr.com
                                         Thomas.Downie@dbr.com
                                         John.Bloor@dbr.com
                                         Nolan.Tully@dbr.com

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on July 30, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


      <u>/s/ Wendy L. Furman</u>
      Wendy L. Furman
      Fla. Bar No. 0085146
      wfurman@pettfurman.com