**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH**
**CASE NO.  13-80385-CIV-BRANNON**

SUN LIFE INSURANCE COMPANY
OF CANADA,

                    Plaintiff,

      vs.

                                          West Palm Beach, Florida
                                          December 9, 2014
IMPERIAL HOLDINGS, INC., *et al.,*

                    Defendant.
_____


                          **TRANSCRIPT OF**
              **DEFENDANT'S MOTION TO DISMISS**
           **BEFORE THE HONORABLE DAVE LEE BRANNON**
               **UNITED STATES MAGISTRATE JUDGE**


**APPEARANCES:**

**FOR THE PLAINTIFF:**
                          *Drinker, Biddle & Reath, LLP*
                          **BY: JASON P. GOSSELIN, ESQ.**
                          **BY:  JOHN BLOOR, ESQ.**
                          One Logan Square
                          Suite 2000
                          Philadelphia, PA  19103


**FOR THE DEFENDANT:**
                          *Holland & Knight, LLP*
                          **BY:  JESUS E. CUZA, ESQ.**
                          **BY:  PHILIP E. ROTHSCHILD, ESQ.**
                          701 Brickell Avenue
                          Suite 3000
                          Miami, Florida 33131

```
 1   REPORTED BY:        DAWN M. WHITMARSH, RPR
                         Official Court Reporter
 2                       400 N. Miami Avenue, 10S03
                         Miami, Florida  33128
 3                       Telephone:  305-523-5598
```

P-R-O-C-E-E-D-I-N-G-S

THE COURT:  Thank you.  Please be seated.

Ladies and gentlemen, we're here today for oral argument on the motion to dismiss in case number 13-80385-civil. Sun Life Assurance Company of Canada versus Imperial Holdings, Inc., et al.

Would counsel state their appearance please for the record.

MR. GOSSELIN:  Good morning, Your Honor.  Jason Gosselin from Drinker, Biddle and Reath in Philadelphia and I'm joined by my colleague John Bloor.  He has not yet submitted a *pro hac vici* application, but he will do so soon, and with your permission, I would like him just to sit here at the table with me.

THE COURT:  Yes, sir.  That's absolutely fine.  And it's good to see you in person after so many telephonic meetings over the time.

MR. GOSSELIN:  Likewise, Your Honor.

THE COURT:  Thank you.

MR. CUZA:  Good morning, Your Honor.  Jesus Cuza and Philip Rothschild on behalf of the Imperial parties.  Your Honor, it's a pleasure to be here.

1          THE COURT:  And good morning to you gentlemen.

2          Of course, I've been reviewing everything that

3   everybody has, and I believe that there's also been an issue

4   raised about a discovery matter?

5          MR. GOSSELIN:  Yes, Your Honor.  We were sort of racing

6   to kind of finish everything up given the impending deadlines.

7   A few things have come out of the recent depositions.  I talked

8   to Mr. Cuza about this just before this began, and he advised

9   that he's going to go back and take a look at some of the things

10  that we've discussed and maybe we'll have another conversation.

11  So it may not be necessary immediately to put a discovery

12  hearing on the calendar, hopefully we can resolve as much of

13  what we can resolve, we'll do it soon.  And if we need to do

14  something, you know, perhaps late this week or early next week

15  we would come back to you if necessary.

16         THE COURT:  Okay.  Very good.  Then sufficient for

17  today what we have for today.  Okay.  Very well.

18         Well, Imperial, this is your motion.  I'd like to set

19  aside 45 minutes per side for any argument and then it's my

20  intention, if I can, to rule from the bench today and tell you

21  what my decision is.

22         Sir, since it's your motion, how would you like to

23  split your time?

24         MR. CUZA:  Your Honor, I will start, I'll reserve 15

25  minutes for rebuttal.

1          THE COURT:  So 30 and 15.  Very well.

2          MR. CUZA:  Your Honor, we prepared a book which

3     includes matters that are already part of the record.  I think

4     it will help expedite matters.

5          (Inaudible - counsel walked away from microphone)

6          THE COURT:  Yes, you may.  Okay.  Very well.  Thank

7     you, sir.

8          MR. CUZA:  So Your Honor, with your permission, I'm

9     going to proceed.

10          THE COURT:  Yes, sir.

11          MR. CUZA:  Your Honor, it appears to be that the

12     starting point clearly has to be the Eleventh Circuit.  And

13     there is no question that *Martinez* is dispositive in this

14     particular case.  The position that Sun Life has taken is that

15     *Martinez* does not support a dismissal of all the fraud claims.

16     And Your Honor, when you read Martinez, it's very simple to

17     arrive at the conclusion, Your Honor, that Sun Life is

18     incorrect.

19          When you go to tab one, Your Honor, and I'm going to go

20     very quickly over this, if you go to tab one, Your Honor, and

21     you go to page 18 --

22          THE COURT:  I'm there.

23          MR. CUZA:  -- if you look to the left and you look at

24     the title of the section, it says specifically fraud claims

25     barred once contestability period for policies has passed.

1    There's a complete section by the Eleventh Circuit that makes

2    crystal clear that the contestability period, Your Honor, bars

3    every fraud claim.

4         If you go to, Your Honor, page 20, and this is just one

5    example, Your Honor.  Now, bear in mind, Your Honor, in

6    Martinez, the Eleventh Circuit confirmed the dismissal.  And

7    what's interesting in *Martinez* is what the Eleventh Circuit did,

8    because the Eleventh Circuit dismissed a great number of claims

9    based on a position that the District Court had not taken.  And

10   what the court in *Martinez* did was it looked at the

11   contestability provision in each of the contracts, it determined

12   what was specifically included in the contestability period and

13   it concluded that if you're beyond the contestability period,

14   every fraud claim is barred.  And this is but one example.

15        If you look at page 20 and you look at the bottom, Your

16   Honor, to the left, where it says "thus, we affirm".  If you

17   read the entire paragraph -- let me read it for the record, Your

18   Honor.  It says "thus, we affirm the District Court's decision

19   to dismiss DFL's request to declare the Mullins policies void *ab*

20   *initio* and its common law fraud and civil conspiracy claims,

21   Counts Five, Three, Four respectively".

22        Now, look how interesting this is, Your Honor.  The

23   Eleventh Circuit says although the court did not specifically

24   find that these claims were barred, under the policy's

25   incontestability clauses we do find this to be the case.

1          Your Honor, the claims raised in Martinez, if you go

2     back and you read the District Court opinion, if you go back and

3     you look at the complaint, the claims raised in *Martinez* are

4     most identical to the claims raised in this case.  They're fraud

5     claims barred by the Eleventh Circuit.  Conspiracy claims barred

6     by the Eleventh Circuit.  RICO claims based by the Eleventh

7     Circuit.  There is no question, Your Honor, that the law in this

8     circuit, which we all have to follow, bars fraud claims beyond

9     the contestability period.  That is the law.  And there's no

10    room for doubt in this circuit.

11         So once we understand the law Your Honor, once we read

12    the law and once we figure out what is it that us attorneys and

13    judges and those that are applying the law have to do under the

14    law, what is the next -- what's the next thing that we have to

15    do.  We have to look at the facts.  So let's look at the facts,

16    Your Honor.

17         In the reply, and this is tab two, Your Honor, in the

18    reply, we included, as the court might recall, a chart and that

19    chart covered two issues.  It covered the issues relating to

20    controllable interest, who was the beneficiary, but it also

21    covered the issue of the contestability provision.  And if you

22    look at, Your Honor, the last column of the chart, it's titled

23    contestability period expired.  The case -- Your Honor, you can

24    take notice because it's part of the record that the case -- the

25    complaint in this case was filed in March 2012.  '13, Your

1   Honor.  I'm sorry.  If you look at the contestability period
2   expiration date for each of the policies, they all predate the
3   filing of the complaint.  There's no question, Your Honor, that
4   that is the case.  And there's also no question that every
5   single policy in this case had a contestability provision.  And
6   we have given the court, Your Honor, an example of the
7   contestability provision in the *Good* case which is the example
8   policy that was filed as part of the record.  Your Honor, will
9   note that there's no fraud exceptions in the contestability
10  period.  And while, Your Honor, in very few of the policies they
11  included a fraud exception, as we noted in our briefs, in every
12  single jurisdiction where they included a fraud exception, there
13  is law that clearly says you can not include a fraud exception
14  into the contestability period, it doesn't apply.  So Your
15  Honor, with regards to this case, there's no question, Your
16  Honor, that the Eleventh Circuit has to be followed.

17          Then their argument, it appears to be, Your Honor, that
18  their argument then is that in Count 7, they raised a count
19  where they're asking the judge to declare the policies void *ab
20  initio* because of lack of insurable interest.  When you look at
21  the count, Your Honor -- let me refer you to tab seven which
22  only includes Count 7, obviously the page that includes Count 7.
23  Your Honor, it's one page.  Notice that the paragraphs 401 and
24  402 do not incorporate by reference any paragraph.
25          Now, you might recall that you issued an order in this

1      case dismissing the amended complaint.

2              THE COURT:  That would be docket entry 142?

3              MR. CUZA:  Yes, Your Honor.  And if you go to your

4      order, Your Honor, you were very specific and your instructions

5      were the declaratory judgment count has to be pled with

6      specificity.  That is at the end of your order.  There's no

7      room, Your Honor, for misunderstandings here with regards to

8      that issue.  Your instructions were in black and white.

9              Your Honor, paragraph 401 and 402 has no -- 401 and 402

10     has no specificity whatsoever.  Now, let's look at what

11     paragraph 401 and 402 says.  In 401, Your Honor, note how they

12     make reference to a scheme initiated and carried out by

13     Imperial, the insurance producers, Bank of Utah and the Family

14     Assurance Trust.  Now again, these are conclusory statements.

15     But it doesn't matter.  And why does it not matter?  Because of

16     what it doesn't say.  It doesn't say that the scheme was

17     initiated or carried out by the insured, by the owner of the

18     policy or by the beneficiary of the policy which are the parties

19     that are relevant to the analysis that has to be done with

20     regards to insurable interest.

21              If you go to tab three, Your Honor, in tab three we

22     included insurable interest law.  And the relevant sections,

23     Your Honor are -- I'm making reference to Florida Statute

24     627.404.  The relevant section is section B2 and B5.  Okay.  And

25     section B generally talks about insurable interest and when is

1   it that there is insurable interest.  Section B2 clearly

2   establishes, and I'm paraphrasing Your Honor, a family member

3   has an insurable interest in life of an insured.  Clearly

4   there's no question about it.  Again, I'm paraphrasing.  But

5   that is what section B2 stands for.  And section B5 stands for

6   -- explains when is it that a trust has insurable interest.

7          And you have to have two things among other things,

8   Your Honor, but if you had these two things, there's insurable

9   interest.  Number one is, the settler of the trust has to be the

10  insured, plus the beneficiary of the trust has to be someone

11  with insurable interest; for example, a family member.  In this

12  particular case, Your Honor, there is no question -- if you go

13  back to the chart in tab two, Your Honor, there is no question

14  that the facts alleged in the complaint and the documents made

15  reference to in the complaint, which can be used at this

16  particular point in time, clearly establish that there is

17  insurable interest.  I'm not even getting yet, which I will, to

18  their failure to properly plead a lack of insurable interest

19  case.  What I am saying goes beyond that at this particular

20  point in time.  What I am saying, Your Honor, is that the

21  complaint establishes insurable interest.

22         There's no question, Your Honor, that the beneficiary

23  of the trust was a family member.  There's no question, Your

24  Honor, that the beneficiary of the policy was the trust.

25  Interesting enough, if you go to the application, Your Honor,

1   the application has a section which is tab five that

2   specifically talks about -- if you go to tab five and you go to

3   page three, the application has a section that talks about who

4   is the beneficiary of the policy.  In every single application,

5   Your Honor, like in the *Good* application, it says that it's the

6   trust.  Guess what, Your Honor?  Their complaint does not allege

7   that that is a misrepresentation.  There is no question, Your

8   Honor, that the trust is the beneficiary of the policy and that

9   the trust is the beneficiary of the policy at the time of

10  inception.

11          Look at -- let me read to Your Honor what they allege

12  in paragraph 61 of the complaint at the end.

13          THE COURT:  Just give me a minute to get to that.

14          MR. CUZA:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. CUZA:  It says, according to the application, "the

17  owner beneficiary of the policy would be Robert -- the Robert

18  Good Irrevocable Trust".  They do pretty much the same thing for

19  each and every one of the policies.  Your Honor, we'll stipulate

20  to that.  We don't disagree with that.  If you read paragraph

21  62, it talks about what are the misrepresentations.  And the

22  misrepresentation is not who is the beneficiary of the trust.

23          So Your Honor, when you apply the law, as we must, to

24  the facts alleged in the complaint, there is no question, Your

25  Honor, that there is insurable interest.  And once again, Your

1    Honor, the chart that we included in the reply which starts at

2    page four and ends at page six, talks about who is the

3    beneficiary of the policy, and it mentions who is the

4    beneficiary of the trust.

5        THE COURT:  Let's say that I find that the *Martinez*

6    case is distinguishable from the instant case.  What is your

7    position on the proving of a conspiracy or scheme?

8        MR. CUZA:  Your Honor, the -- proving a conspiracy and

9    scheme --

10       THE COURT:  Or I'm sorry, alleging a -- whether we have

11   sufficient facts that have alleged a conspiracy or scheme.

12       MR. CUZA:  Your Honor, there is no allegation in the

13   complaint that my client entered into an agreement or a scheme

14   with anyone to misrepresent the truth in the application.  It

15   simply isn't there.

16       When you look at, Your Honor, what is the alleged bad

17   act, the alleged bad acts are misrepresentations in the

18   application.  Okay.  And you're talking about specifically three

19   misrepresentations.  You're talking about premium finances,

20   you're talking about who is the payor and you're talking about

21   commission.  By the way, Your Honor, commission is not even part

22   of the application, just so that Your Honor knows and that has

23   legal consequences which, at this particular point in time,

24   we're not going to deal with.  So when you're pleading a fraud

25   claim, and that takes us kind of to *Martinez* 1, you have to plea

1    with specificity.  And actually, that is relevant to aiding and

2    abetting as well.  Okay.  There's no question, Your Honor, you

3    stated clearly in your order, and there's no agreement with that

4    that Imperial never made a misrepresentation.  Your initial

5    states that.

6         So in order to establish this sort of conspiracy or

7    aiding and abetting, let me talk about aiding and abetting.  You

8    need -- because it's going to help with the conspiracy.  You

9    need three things.  You need a fraud, okay; you need knowledge

10   of the fraud at the time that the fraud is being committed.

11   That's *Martinez* 1.  It's the last case in this book, Your Honor.

12   Okay.  And you need substantial assistance.  Committing the

13   fraud.

14        The fraud is on the application.  Fraud is filling out

15   the application.  Okay.  Your Honor, it is not one allegation,

16   not one in this complaint, that put my client anywhere near the

17   application.  Not one.  There is not one allegation that says

18   that my client helped fill out the application; there is not one

19   allegation that says that my client had knowledge of what was in

20   the application at the time that the application was being

21   submitted; there is no allegation, Your Honor who, what, when or

22   where with the specificity required by law that even shows that

23   my client even saw the application at the time that it was being

24   filled out or even after it was being -- it was being -- after

25   it was being filled out, but it was submitted to the insurance

1   company.  The fraud has to do with statement in the application,

2   Your Honor.  My client is nowhere around the statements in the

3   application.

4           THE COURT:  What about this notion though that some of

5   the commissions would be -- the amount of the commission that

6   the person would keep would be controlled by Imperial?

7           MR. CUZA:  Well Your Honor, the -- let me show you --

8   Your Honor, first of all, we have to distinguish what is illegal

9   from what's legal.  And in *Martinez* 1, Judge Moreno does a great

10   job in the *Martinez* case.  There is such a thing as a First

11   Amendment.

12           THE COURT:  I'm familiar with it.

13           MR. CUZA:  Okay.  And Your Honor, there's nothing wrong

14   -- I could go tomorrow -- and I want to go back to your

15   question, Your Honor.  But I can go tomorrow or today, I can

16   open up a business and I can just put a huge billboard in front

17   of Sun Life's office that says I lend monies and use as

18   collateral Sun Life's policies.  Perfectly legitimate, Your

19   Honor.  Premium finances is a regulated business, I have the

20   right to advertise, okay, and the fact that Sun Life does not

21   like that an owner of the policy, which an asset, uses the asset

22   to secure a loan does not make that act illegal, it just

23   doesn't.

24           My client is a public company.  If you look at the S

25   One, the S One makes a full disclosure about how is it that it

1    conducts its business.  The SEC had no problems allowing my

2    client to go public.  Premium finances, perfectly legal.

3          Your point, Your Honor, about the commissions, two

4    things.  Number one, Your Honor, it's not commissions.  It's a

5    fee that my client charges.  Guess what, Your Honor, it's

6    customary in the industry.  Let me show you, Your Honor -- let

7    me make reference and I will show you, and this is just

8    argument.  But Your Honor, you raised the question, let me show

9    you a document.  Okay.

10         THE COURT:  You may approach.

11         MR. CUZA:  If you look at tab three, this is a

12    document, a Sun Life document.  And this is a document that has

13    a list of the premium finances programs that they approve, that

14    they were working with.  Okay.  It has what they called CMS

15    which was, by the way, AIG behind CMS.  They had UBS, they had

16    Goldman Sachs, these are big names.  If you look at the top

17    column Your Honor, the top, look at where it says commission

18    split.  You can't tell or -- yes, you can, if you look at CMS 2,

19    if you look under that column, look it says 80-20.  The AIG

20    program had a commission split.  Look at, Your Honor, Goldman

21    Sachs.  Go further down.  The hybrid program had an 80-20

22    commission split.  This is their program, the program that they

23    approved.  Look at Gold -- look under Goldman Sachs, Concorde

24    (ph) Gold, 60-40.  Look at old Concorde Ultra Plus, 70-30.

25         Your Honor, charging a fee is part of the industry.

1    And there's nothing illegal about it.  This is a regulated

2    industry.

3         And by the way, making reference -- let me bring

4    *Martinez* 1 into this case.  Your Honor, charging a fee does not

5    amount to a misrepresentation.  It simply doesn't.

6         And the reality is, Your Honor, in none of it --

7    remember -- you were talking about fraud, notice that an

8    agreement to premium finances has not been specifically alleged

9    prior to the policy being issued and it cannot -- in order to

10   allege such an agreement, you have to allege, you have to make

11   reference to who at Imperial entered into the agreement, when

12   was it -- was it entered into, how was it entered into.  There

13   is no agreement -- there is no reference in the complaint that

14   makes reference to a specific agreement prior to the policy

15   being issued.  And it can't be, because the facts simply don't

16   support it.

17        THE COURT:  You have three minutes left, sir.

18        MR. CUZA:  Your Honor, let me briefly address the

19   insurable interest void and the right of private cause of

20   action.

21        If you look at *QBE*, you know, *QBE* very clearly -- and I

22   will make reference to it in my rebuttal.  *QBE* is very clear

23   that the courts cannot implicitly read into a statute a penalty

24   clause if it isn't there.  *QBE*, Your Honor, is a 2012 case.  *QBE*

25   came after *Brasner*.  *QBE* came after all these cases that they're

1    citing to and *QBE* is a Florida Supreme Court case.  Then you

2    have *Lema*.  *Lema* is an Eleventh Circuit case, Your Honor.  I'm

3    going to briefly -- go to tab nine.  If you go to page four, if

4    you go to the left side, at the bottom look what it says after

5    "furthermore".  Furthermore, the Florida Supreme Court held that

6    an insured's failure to comply with the statute does not render

7    a noncomplaint provision in an insurance void and unenforceable

8    because the legislature has not provided for the penalty".

9         If you look at specifically, Your Honor, the statute,

10   let's go back to the statute.  And this is extremely important.

11   There's no question that the insurable interest statute does not

12   say that if there is a violation the policy is void.  It simply

13   doesn't say it.  Now, look at what the statute does do.  We've

14   discussed in the briefs, Your Honor, section 6274.045, open

15   paren five, which is that -- it's the second page, Your Honor.

16   Okay.  And here, I'm sorry, four, Your Honor.  Are you with me?

17        THE COURT:  Yes, I am.

18        MR. CUZA:  Here it talks about specifically when there

19   is an insurable interest, the insured or the representative of

20   the insured has a private right of action to sue those who

21   receive the benefit to recover the benefit.  But more

22   interesting than that provision is the one before that because

23   it specifically talks about the carriers.  Section three, Your

24   Honor, says "an insured shall be entitled to rely upon all

25   statements, declarations and recommendations made by an

1    applicant for insurance relative to insurable interest which

2    such applicant has in the insured, and no insurer shall incur

3    any legal liability except", this is important, "as set forth in

4    the policy by virtue of any interest statement, declarations or

5    representations so relied upon in good faith by the insurer".

6         Look what it says, Your Honor.  That provision --

7    hypothetically speaking, carrier issues a policy, there's no

8    insurable interest.  As a result of that, someone passes away,

9    family member sues the carrier.  Sues the carrier because

10   there's no insurable interest when you issued the policy.  What

11   does the statute say.  One moment.  Okay.  If the carrier relied

12   on what's in the application, under this particular statute, the

13   carrier is not liable except, look at this Your Honor, except as

14   otherwise stated in the policy.  Guess what, Your Honor?  So if

15   there's a lack of insurable interest, that doesn't -- it can't

16   void the policy because if there's lack of insurable interest,

17   the carriers are actually liable under the terms of the policy.

18        THE COURT:  Very well, sir.  Thank you.  You still have

19   your 15 minutes for rebuttal.

20        MR. CUZA:  Thank you, Your Honor.

21        THE COURT:  Okay.  Mr. Gosselin.

22        MR. GOSSELIN:  Good morning, Your Honor.

23        THE COURT:  Good morning, sir.

24        MR. GOSSELIN:  I want to address *Martinez* because I do

25   believe it's distinguishable.  But I want to do two things

1    before I get to *Martinez* because it's important.

2         Number one, *Martinez* was the second part of a two part

3    argument that Mr. Cuza made in his briefing.  He sort of skipped

4    over the first part of that argument, and you need to address

5    that before you even get to *Martinez*.  I don't think we can get

6    there.

7         But even before I address Mr. Cuza's arguments, I want

8    to talk about what this case is really about.  Because Mr. Cuza,

9    he frames this as an attempt to contest 24 policies.  And he

10   tries to limit the case to that.  And it's really much, much

11   broader.  The insurance industry, the life insurance industry

12   and the life settlement market have sort of been in this battle

13   for the last several years because a robust secondary market

14   emerged over a decade ago.  And there have been lots of cases

15   over what exactly are the proper lines for wagering on human

16   life versus taking out a policy, and then later transferring it.

17   Life insurers and life settlement, the investor community,

18   they've been fighting that battle for several years.  I've

19   gotten to know Mr. Cuza very well because of these battles,

20   we're on opposite sides of that.  This is not a case about

21   whether or not STOLI, we call it STOLI, Stranger-Originated Life

22   Insurance, this is not a case about whether STOLI is proper or

23   not proper.  It is part of the case in one respect because if

24   the court determined that any of these policies are wagering

25   contracts, they're void *ab initio* and there's nothing that the

1   insurance company can do about it, there is nothing that the

2   owner of the policy can do it about it. That's something as a

3   matter of public policy, the government in the state, in

4   whatever state applies, says you cannot have a contract on a

5   topic that violates public policy.

6        So that is a question ultimately for the court. We do

7   have a claim on that, but this is really a case for damages.

8   Sun Life believes STOLI is not good for the life insurance

9   industry, it's not good for consumers. Now, whether Imperial

10  wants to agree with that or not is really beside the point.

11       Back in 2005 and 2006, Sun Life made its decision that

12  it's not going to participate in this market. Some of the

13  reasons were sort of altruistic, you know, protecting the

14  policy. Sun Life actually believes the life insurance product

15  is a good thing. People should use it for financial protection

16  and if you use it for that, it benefits the entire economy and

17  individual families who need it for financial protection. Some

18  of it, I think you could say, was a little bit more

19  self-directed. These policies -- you know, insurance is based

20  on the law of large numbers, and every insurance company, no

21  matter what kind of policy it is, has to decide how much it's

22  going to charge for a particular insurance policy. If every

23  policy went to claim, the premiums for those policies would be a

24  lot higher. If only some of those policies actually go to

25  claim, those premiums are lower and insurance becomes more

1   affordable for people who need it.

2          So Sun Life's actuaries go through a fairly complex

3   procedure to figure out how much they're going to charge for

4   their life insurance policies.  There are two principle

5   assumptions that go into the cost of pricing out life insurance.

6   These types of policies are known as universal life insurance

7   policies.  Not everybody understands them, but they're actually

8   pretty simple.  You buy your insurance, but you can put extra

9   premium into the account and that account value builds up and

10   you earn interest off of that money, and it's all specified in

11   the policy, people earn interest usually.  I mean, there's a

12   minimum amount of interest that the insurance company has to pay

13   and if a policy like this makes sense for your personal

14   financial planning needs, perhaps you'll enter into a policy

15   like this and you'll earn that interest.

16          Sun Life, based on 100 years of mortality data and 25

17   years or actually 35 years of data on these types of policies,

18   has a general idea of how a consumer market will fund a policy

19   like this.  They make an assumption based on the customer and in

20   this case, we're dealing with people who are over the age of 65.

21   They make an assumption that these people are going to fund

22   their policies at a certain level, and that goes into the

23   pricing model.  They also make an assumption regarding how many

24   of these policies are going to lapse and under what

25   circumstances they will lapse.  Ordinarily, you and I, most

1    people who have life insurance who need it, we will keep life

2    insurance until the financial need for it no longer exists.

3    When a policy is owned by an investor as part of a portfolio,

4    the policies that terminate are the ones where the insureds are

5    the healthiest, and the ones that stay in force are the ones

6    where the insureds are the most sick.

7              Because of these, the -- because policies owned by

8    investors behave differently and they're harder to predict than

9    policies owned by consumers, Sun Life, and frankly most of the

10   industry, said we don't want to participate in this market.  It

11   doesn't mean that a policy that is legitimately taken out and

12   later transferred, that that's improper. We're not saying that

13   at all.  Sun Life concluded that it does not want life insurance

14   policies taken out where the intent from the get-go is to have

15   that policy end up in a portfolio like the ones in this case.

16             So, Sun Life, in 2006, initiated a bunch of procedures

17   to try to determine what exactly is this policy going to be used

18   for.  And one of the mechanisms that investors were procuring

19   policies was nonrecourse premium financing.  This idea that you

20   know the investor can't take out the policy directly, so what

21   they'll do is they'll say to the owner all right, look, we'll

22   give you a loan, that will pay all the premium.  If you can't

23   pay back the loan, that's okay.  In lieu of paying back the

24   loan, you just give us the policy.  That was a common mechanism

25   that Sun Life saw not just from Imperial, but elsewhere and

1    that's why it changed its application, went to all of the

2    insurance departments all over the country and changed the

3    application to put a question on there asking "do you intend to

4    use premium financing".

5            What ended up happening is that -- and this is all laid

6    out in the complaint so I'm not going to go into great detail on

7    this, but Imperial and these producers got around Sun Life's

8    efforts by simply saying there's no intent to use premium

9    financing.  The policies ended up being issued and exactly what

10   Sun Life didn't want to have happen, ended up happening.

11           So the harm here is not really -- and frankly, it's not

12   even the fact that they might have to pay a death benefit on a

13   policy that goes to claim; the harm is that they don't have the

14   income on the 30 policies that have already terminated.  So the

15   harm is not merely the fraud in the applications.  The harm is

16   this effort to turn -- to create a portfolio that is hugely

17   unprofitable to Sun Life.  It's turned the loss ratios on its

18   head and it's harmed Sun Life because they can't make money on

19   this.  They never expected to make a lot of money on this

20   business, but they're actually losing an amount of money on this

21   business.  So that's what the case is about.

22           THE COURT:  And the social harm, in your view, would be

23   that if you can't make money on it, people will quite writing

24   insurance and that benefit will go away.

25           MR. GOSSELIN:  Ultimately that is sort of a worse case

1    scenario.  Before that, insurance will be come too expensive for

2    people that actually need it.  So once everything is owned or --

3    not everything, but once a substantial block of business is now

4    owned by the investor community and they're terminating policies

5    where people are healthy, keeping them in force while people are

6    sick, the only response a company can come to is it wants to

7    stay in business to raise prices and that will then price out

8    the legitimate market.  So that is a social harm Sun Life is

9    very concerned about.

10         And for all of those reasons, Sun Life did not want to

11    get into this business.  If Imperial wants to be involved in it

12    on its own, Mr. Cuza is right, they can do that, but they have

13    to do it with policies that were legitimately procured.   They

14    can't be involved in generating the policies solely so they can

15    be flipped into the secondary market.  Or if they want to do

16    that, we aren't forced to participate in it.  I think that's the

17    way I would say it.  If they want to do that and some other

18    company is willing to do it, that's fine for Imperial and that

19    other company.  Sun Life does not have to participate in that

20    market.  Okay.

21         So just to kind of set the table, that's what our case

22    is about.

23         The two-step argument that Mr. Cuza talked about, first

24    what he said is that all of these policies -- I'm sorry, all of

25    these policies had a contestable clause, and therefore any

1   fraud-based claim is automatically barred by the contestable

2   clause.  Now, that forgets the fact that this case involves 66

3   policies in this whole broader scheme.  It's not just about the

4   24 policies that are currently active.  But in order to get to

5   his argument, you must first conclude that all of these policies

6   are currently valid.  And you cannot make that assumption.  Now

7   you cannot come to that conclusion, for a couple of reasons.

8          Number one, you have to remember, this is a complaint.

9   We tried to do our best to do what you told us to do, to be

10  specific.  Unfortunately, it gave you a lot more to read, but I

11  thought the point that Your Honor made was important and we

12  tried to adhere to that. But what we still don't have is any

13  ability to do a choice of law analysis on these 24 or 25

14  policies.  They are not --

15         THE COURT:  Would you do me a favor and just pull the

16  microphone a little bit more pointed directly at you just to

17  make sure we're getting a good record here.

18         MR. GOSSELIN:  Sure.  You don't have the ability to do

19  a choice of law analysis to determine whether any of these

20  policies are void *ab initio* as wagering contracts.  That's a

21  fact intensive -- I mean, it's a fact intensive inquiry to

22  determine whether they are void *ab initio*.  Before you can even

23  do that, you have to know what state's law you're going to

24  apply.  Mr. Cuza has been focusing on Florida law.  I don't know

25  why he's been doing that.  We never said that Florida law

applies to all these policies.  It may apply to some, but we're

not there yet.

The law generally, and we don't have to get into a

choice of law analysis, but generally the law that applies will

be the law where the policy was issued.  And here we've got many

policies, perhaps the vast majority of policies, they're not

Florida policies.  Mr. Cuza knows that, but there's nothing in

the record that would allow the court to do a choice of law

analysis and conclude that Florida law applies in this case.

That's number one.

Number two, if you actually do -- if you were to

conclude, okay, Florida law applies to some of these policies --

pardon me while I get my -- look at some of my -- the briefing

covers this.  This debate -- I mean, a lot of this debate about

wagering and insurable interest, a lot of that is played out in

Florida and there is a host of cases in Florida that say in

order to have an insurable interest, the policy actually has to

be taken out in good faith.  It's not enough that you made it

look like it was a legitimate policy because you used a trust

and you nominally named a beneficiary.  That isn't necessarily

enough.  You actually have to have a policy that's taken out in

good faith.  That, by the way, that comes from a Supreme Court

of Florida decision, *Knox versus Guarantee Income Life Insurance

Company* where it was first written that a policy lacking an

insurable interest at inception is a wagering contract and is

1    void *ab initio*.  But it has then been applied in numerous cases

2    in this very context.  Some of these -- and again, all of these

3    are in the briefing.

4            The *Pruco Life Insurance Company versus Brasner*, that

5    was here in the Southern District of Florida in front of Judge

6    Cohn.  And I think in that case, the court -- I think there's

7    nothing controversial about this and nothing groundbreaking

8    either.  The court said that the primary dispute in that case is

9    whether the policy was void *ab initio* for lack of insurable

10   interest.  And you know, a quote, "Florida courts have long held

11   that insurable interest is necessary to the validity of an

12   insurance contract and if it is lacking, the policy is

13   considering a wagering contract and void *ab initio* as against

14   public policy.  Florida law generally permits a life insurance

15   policy to be assigned to an entity with no insurable interest in

16   the life of the insured, but only if such assignments are made

17   in good faith and not as sham assignments made simply to

18   circumvent the law's prohibition on wagering contracts".  And I

19   could go on and on, and there are other cases that essentially

20   say the same thing.

21           Much of the disputes in these cases -- you always have

22   a situation where a policy is issued, it looks like a legitimate

23   policy on the face of it, and then when you find out what's

24   really going on, you realize it's a sham.  And all of the cases

25   in Florida have dealt with is this really a sham or is it

1    legitimate, and that's a factual question that a jury normally

2    would have to make for purposes of a motion to dismiss.  We've

3    alleged enough to suggest that these were sham transactions.  So

4    even if we were going to apply Florida law, and forget that the

5    policies are from around the country, you could not conclude at

6    the motion to dismiss stage that there was an insurable interest

7    in this case.

8            There's another factual question that goes to -- that's

9    part of that inquiry.  In order to have a valid trust, a trust

10   can have an insurable interest, it's a common estate planning

11   tool, and if the grantor of the trust, usually it's the insured,

12   creates the trust and funds it, the beneficiaries of that trust

13   can receive the death benefits of the policy.  But Florida trust

14   law requires that the purpose of the trust be lawful.  So

15   there's a factual inquiry as to whether the purpose of creating

16   this trust was legitimate, was intended to benefit these insured

17   or was it part of a broader effort to procure wagering policies,

18   which itself violated public policy.

19           So lots of factual questions that preclude the court

20   from making a determination that the policies are void *ab*

21   *initio*.  If you can't conclude that the policies are void *ab*

22   *initio*, you never actually need to get to *Martinez* because

23   *Martinez* said in that case that the claims did not involve an

24   allegation that the policies were void *ab initio*.  And if it

25   did, it would be a whole different story.  Because if the policy

1    is void *ab initio*, that means it never existed.  If the policy

2    never existed, the contestable clause never existed.  So the

3    defense of the contestable clause does not save a claim that a

4    policy is void for lack of insurable interest because the

5    contestable clause doesn't exist.  So we can't get to *Martinez*.

6           But let's hypothetically get to *Martinez*.  It doesn't

7    apply.  The contestable clause is essentially a contractual

8    waiver of the right to void a policy.  There's a distinction

9    between void *ab initio* and voidable.  If I have a contract with

10   somebody that paved my driveway, just to use a strange

11   hypothetical, and I learned that that person committed some sort

12   of fraud to induce me to enter into that contract, I have the

13   right to void the contract because of that fraud.  As the

14   nonbreaching party, as the innocent party, I have the right to

15   void that contract.  I don't have to.  It is a voidable contract

16   at the option of the person who has been defrauded.  That's a

17   voidable contract.  That's different from a contract to sell

18   drugs or a contract to sell illegal arms or a contract to engage

19   in wagering.  Those are all activities that are prohibited by

20   the government, by the state, as a matter of public policy, and

21   if you try to enter into a contract to do any one of those

22   things, those are void *ab initio*.  It is not voidable at my

23   election, it is voidable as a matter of law.  That's the

24   distinction.

25           The contestable clause is a limitation on my ability to

1    void a contract for fraud.  So in my pavement example, if I put

2    in the contract I would have the right to void the contract for

3    up to 30 days, that's my own limitation that I've agreed to and

4    I'm going to be bound by it.  In this case, the insurance

5    companies, they agree that the policies will be incontestable.

6    So they can't contest the policy.  That's what they're agreeing

7    not to do based on misstatements in the application after a

8    period of two years.

9         The reason *Martinez* does not apply in this case most

10   fundamentally is because Roberto Martinez was the owner of the

11   policy.  He has the right to invoke to contestable clause.  All

12   of the policies in that case -- and I know a little something

13   about the case because I was involved in it.  It's not my

14   happiest memory, I will tell you.  But I do know what the case

15   is about.  Mutual Benefits acquired the ownership title to all

16   of these policies and these were policies on AIDS patients and

17   the viaticals years and years ago.  Mutual Benefits actually

18   owned the policies.  They were the owner of the policies, Mutual

19   Benefits had the right to invoke the contract based offenses,

20   including the contestable clause.  Roberto Martinez was

21   appointed the receiver of Mutual Benefits when that party went

22   into receivership, so he stood in the shoes of Mutual Benefits,

23   the actual owner.  He had the ability to invoke the contestable

24   clause.

25        In this case, the racketeering claims, the fraud -- the

1    racketeering, the conspiracy to commit racketeering, the fraud,

2    aiding and abetting fraud, tortious interference, and I might be

3    forgetting one other claim, but all of the claims except for the

4    last one which seeks to have the policies declared void *ab*

5    *initio* as wagering contracts, all of those other claims had been

6    asserted against Imperial Holdings, Inc.  Imperial Holdings,

7    Inc. is not a holder of the policy.  It is a third party.  It

8    cannot invoke the defenses contained in these contracts.  There

9    are circumstances under which a nonparty can invoke a defense of

10   a contract.  You have to be an intended third party beneficiary,

11   clearly they are not in this case.  You know, that's actually

12   what the whole case is about.

13          The bottom line, though, *Martinez* is distinguishable

14   because the contestable clause was invoked by the owners in that

15   case, that's not what's going on here.

16          Now even if we had claims against the policy owners, I

17   think it is still distinguishable.  I want to --

18          THE COURT:  Let's say I accept the notion that you can

19   distinguish *Martinez*.  So you win on that.  Is there -- are

20   there sufficient facts alleged here to show some kind of

21   conspiracy or common scheme?

22          MR. GOSSELIN:  Absolutely.  I mean, what we have here

23   and -- this is all in the complaint, it's very long, but it's

24   all there.  The Imperial employed producers.  The way a producer

25   relationship works, an insurance company can't just go into a

1   state and start having people sell their products.  You actually

2   have to have a contract with the insurance company, you have to

3   be licensed and there's all kind of requirements.  If you meet

4   the requirements, the company can appoint you to be a seller of

5   their products.  It doesn't mean the producer is the agent of

6   the insurance company, there's lots of law on that.  The

7   producers in this case were not the agents of Sun Life, they

8   were independent producers that could go to all different

9   companies.

10      What happened here is Imperial, they had Sun Life --

11   unbeknownst to Sun Life, they actually had these producers on

12   staff at Imperial.  So they had a contract with Sun Life, but

13   they were employees of Imperial.  Sun Life didn't know they were

14   employees of Imperial.  And they were generating policies and

15   submitting them to Sun Life without Sun Life ever knowing that

16   Imperial was involved because these were their employees.  The

17   reason that's relevant is because when Sun Life made it clear

18   that it did not want to get involved in this business, it sent

19   out communications to its entire broker force.  So that's the

20   way that -- the first thing they did and they changed their

21   underwriting, they changed their application process, that took

22   a little bit of time because they had to go to all the state

23   insurance departments.

24          The first thing they did was they told all of the

25   people who had a contract to sell Sun Life products that we

1    don't want people appointed to sell our products to participate

2    in this market.  So please don't send us this business.  We

3    don't want it, it's not good for us, it's not good for consumers

4    and ultimately it's not good for you.  Imperial employees

5    received those communications.  The name is Jonathan Moulton and

6    Susan Rubio.  Those are appointed Sun Life agents, but they were

7    employees of Imperial.

8         Imperial also now -- and, you know, this not in the

9    complaint, but Mr. Cuza went on at length about things that are

10   not in the complaint.  I would ask your indulgence.  One thing

11   we learned in the complaint is that Imperial actually pitched

12   this program to Sun Life and Sun Life said no, we think this is

13   a cover for the kind of stuff that we don't want.  This is not

14   the type of loan program that people will use in a legitimate

15   way.  If you want to do it, it's up to you, but please not with

16   us.  So they pitched it to Sun Life in 2007, Sun Life said no,

17   we don't want to be part of this.  Imperial was perfectly aware

18   of Sun Life's desire to avoid this market.

19        And what the complaint shows, what all the evidence

20   shows, is that despite this knowledge and despite knowing that

21   the applications asked whether premium financing was going to be

22   used and if so, that would result in a denial of the

23   application, Imperial's senior sales staff, people that were at

24   the middle management, if not middle management, not upper

25   management, certainly middle management of the company, directed

1   these producers to submit applications to Sun Life knowing full

2   well that those applications falsely stated, falsely denied the

3   intent to use premium financing.

4         And what happens here, if you look at -- I'll get just

5   a couple of things here.

6         THE COURT:  Would there be a difference between

7   Imperial deciding to take advantage of an opportunity that would

8   be available to it as opposed to directing somebody to create an

9   opportunity?

10         Let's say that I go to the Starbucks and I know that

11   this one particular person goes there about the same time, and

12   they don't drop their tip in the tip jar, they leave it on the

13   counter.  Okay.  And I figure if I get there soon enough, I can

14   scoop up that tip and then take it, you know, because it's there

15   on the counter.  It's not in the tip jar.  Okay.  That doesn't

16   mean that I'm conspiring with that person to short change the

17   barista, it means I'm taking advantage of an opportunity that is

18   happening in front of me.  Not that I would ever think about

19   taking a barista's tip, but just as an example.

20         MR. GOSSELIN:  It is -- I think it's a fair question

21   and it is a matter of degree.  If, for example, the example that

22   Mr. Cuza used -- I mean, if you had a situation where Imperial

23   says look, we issue premium financing and somebody legitimately

24   comes to Imperial after they've already bought a policy and paid

25   for it and said, you know what, I really wish I didn't spend

1  that $200,000 on that premium, I would like that money back, I

2  was being truthful when I submitted the application, but I want

3  to finance this now.  Could they do that?  Of course they could

4  do that.  They absolutely could do that.  And if we had only one

5  case, this would be a more difficult thing to establish on the

6  part of Sun Life.

7          But what we have here is a pattern that shows it each

8  and every time.  And where I think their arguments kind of break

9  down is that the evidence is overwhelming, and it's all laid out

10  in the complaint, that before these producers ever submitted an

11  application to Sun Life, they sent the information to Imperial.

12  They sent them a copy of an illustration.  The illustration

13  shows how much the policy would cost.  It has kind of a break

14  down of what the premium cost would be based on certain

15  assumptions.  They send in the illustration, they send them a

16  life expectancy report and medical records and the producers say

17  to Imperial, okay, we have, you know, Mrs. Smith.  These are her

18  statistics, tell me which policy might work for Imperial.  Then

19  Imperial runs -- it goes through its own pricing models, it has

20  very sophisticated pricing models, it knows all of the different

21  products that are available on the market and it decides whether

22  a particular type of policy would work for its model and then

23  there's a lot of back and forth.  And eventually, if they settle

24  on something that works, there will be a directive to the

25  producer saying okay, go ahead, submit the application to Sun

1    Life.  And the fact that the producer has already asked Imperial

2    whether it would work or not, I think makes it clear that

3    premium financing is contemplated.

4              It's possible that something will happen that will make

5    the deal fall apart, but certainly premium financing is

6    absolutely contemplated.  And at that point, when the question

7    asks do you intend to use premium financing now or in the

8    future, the producer has to answer that question correctly and

9    they didn't.  Imperial knew they weren't doing that.

10             After the policy --

11             THE COURT:  But is that different than Imperial is

12   directing them to do this?  I'm getting back to the example of

13   taking advantage of an opportunity as opposed to being part of a

14   common scheme or plan.

15             MR. GOSSELIN:  Yeah, I think -- give me one second

16   here.  I want to -- there's a -- one of the decisions, I believe

17   this was cited in the papers, it's *Salinas V United States* and

18   it's 552 US 52.  It's a Supreme Court decision from 1997.  And

19   the issue in this case, you had a defendant who was alleged to

20   be involved in a conspiracy to engage in racketeering.  There

21   were two specific underlying racketeering acts, and he was

22   actually acquitted of committing the underlying racketeering but

23   he was convicted of conspiracy.  And he took an appeal, saying

24   if I was not involved in the underlying -- if I was involved in

25   the -- or if my conspiracy did not involve a conspiracy to

1    commit those predicate acts, I can't be guilty of general

2    conspiracy.  I don't know if I said that properly, but he's

3    saying his conspiracy has to relate to the predicate acts.  And

4    the Supreme Court said no, that's not how it works.  If you have

5    -- if you conspire to participate in the overall scheme,

6    regardless of whether you specifically conspired to commit those

7    predicate acts, you are liable.

8            You know, the court said a conspiracy may exist even if

9    a conspirator does not agree to commit or facilitate each and

10   every part of the substantive offense.  The partners in the

11   criminal plan must agree to pursue the same criminal objective

12   and may divide up the work, but yet each is responsible for the

13   acts of the other.  If conspirators had a plan which calls for

14   some conspirators to perpetuate the crime and others to provide

15   support, the supporters are as guilty as the perpetrators.  As

16   Justice Holmes observed, plainly a person may conspire for the

17   commission of a crime by a third party.

18           That's exactly what's happening here.  The way the

19   distribution chain works is that only an appointed producer can

20   sell a product.  Sun Life will not issue a product unless it

21   comes through an appointed producer.  Imperial, they tried to

22   have producers on their own staff, and they did that for a

23   while, they also used these other independent producers to take

24   out the policies.  The goal of the producers were to get

25   policies that Imperial would finances and Imperial would also

1    receive the commission.  I mean, here we have Imperial receiving

2    half or more of the commission, so you have two people

3    benefiting directly from the money that's generated from these

4    applications that contain all this false information.  But --

5            THE COURT:  Let me try another example on this because

6    this is -- I think you're getting the sense that this is one of

7    the things I find most troubling is this notion of a conspiracy

8    here.  And that is, let's say I regularly go to the bank and do

9    my banking business and I like to use Uber.  And so I have this

10   one guy and he normally provides my transportation from the

11   bank, okay.  And so we do that on a repeated basis.

12           Then today, I decided I'm not going to make a

13   conventional withdrawal from the bank, I'm going to go ahead and

14   rob the bank and get all the money and I know that my Uber

15   driver is out front, and so I know that that's my get-away and I

16   hop out there and away we go.  I don't know that that means that

17   the driver is in on the conspiracy to rob the bank just because

18   I've taken advantage of the fact that I know that I will have a

19   get-away driver out there because of my relationship with this

20   Uber driver.

21           And I'm trying to see how that would fit in our

22   situation here, whether there is in fact a conspiracy as opposed

23   to a mutually beneficial relationship.

24           MR. GOSSELIN:  I think it's a good example because it

25   does highlight what's okay and what's not okay.  In your

1    example, I think the Uber driver gets off.  Unless he knew you

2    were going to rob the bank, he gets off.  If the Uber driver

3    knew that you planned to rob a bank and he still willingly

4    provided the get-away car, and you can show that, then he would

5    be guilty as a conspirator.

6              That's what we have here.  The complaint -- I mean,

7    maybe they will have a good explanation for a jury or even on

8    summary judgment, but the complaint establishes, and I think the

9    evidence establishes, that Imperial knew, and the complaint says

10   this specifically, Imperial knew that when the application went

11   from the producer to the insurance company, it would have false

12   information on it regarding the intent to use premium financing.

13   Imperial actually knew that was going to happen and that it

14   happened.  And if it didn't know it was going to happen, maybe

15   the first instance, the next step in the process after the

16   policy is issued, it gets sent to Imperial.  The policy has a

17   copy of the application attached to it before they issue the

18   loan.  Part of their procedure is to go and confirm that

19   everything in the application was answered.  They would know

20   that the person stated there was no intent to use premium

21   financing within sometimes minutes of the policy being issued.

22   So I think the evidence, and certainly the allegations in the

23   complaint, shows that Imperial knew there would be fraud in the

24   application.  But even if they didn't know it the first time,

25   they knew it immediately after the policy was issued that

1    somebody did not tell the truth.

2           And I mean, you know, again, if you have a -- one of

3    situations perhaps Imperial could reasonably conclude that

4    circumstances changed, I don't know how they could when they're

5    the ones -- they actually approved the policy because the

6    application was even submitted.  I mean, it only went to

7    Imperial because they were deciding whether to issue premium

8    financing.  I don't know how they could legitimately claim that

9    they had no idea that somebody would lie on the application

10   about the intent to use premium financing.  The sequence is the

11   same every single time.  Imperial says yeah, go ahead.  That

12   means we're going to issue premium financing on this policy once

13   we get it.  Application goes in, they lie about premium

14   financing.  Then the policy is issued, it goes right back to

15   Imperial.  The day it's issued, the producer sends it over to

16   Imperial and it's got the application so they know that the

17   person -- if they didn't know before, and they did, they know

18   immediately after that the policy was issued based on lies in

19   the application, and then they choose to go ahead and fund it

20   anyway.  Every single time that's what they do.  Clearly there's

21   enough in the complaint to put us on the side of your scenario

22   of knowledge.

23          So anyway, so I think there is -- there is enough here

24   for -- there's more than enough for conspiracy.  There's -- I

25   won't go and talk about *Martinez* if I don't have to, but I think

1     it's important to note that the -- that Judge Middlebrooks has

2     already addressed this question, and he said even if you have

3     the owner of the policy, there's a difference between bringing a

4     third party fraud claim in these kind of circumstances and, you

5     know, try to do an end-run around the contestable clause.

6           Let me just briefly look at my notes here to make sure

7     I've covered everything.

8           Couple of things.  This notion of agency, I don't want

9     to forget, I think agency is obviously very -- it's important.

10    Two of our claims require agency in order to go after Imperial.

11    That's our claim for fraud.  I mean, we acknowledge that the

12    conspirator that put the information on the application was

13    somebody other than Imperial, but they were doing it with

14    Imperial's knowledge.  But we would have to show that they were

15    the agent.

16          And also the 1962C claim, that also requires us to show

17    that these producers were agents of Imperial.  Your Honor cited

18    the restatement in the -- you know, sort of the standard

19    restatement definition of agency, and the restatement on agency

20    has a section on, you know, how you create actual authority.

21    And section 3.01 says "actual authority is created by a

22    principle's manifestation to an agent as reasonably understood

23    by the agent, expresses the principle's assent that the agent

24    take action on the principle's behalf".  And the restatement

25    always has some examples of how you apply it in real life.

1    One of them very simple example.  "P", a dealer in used

2    books, writes to "A" who purchases books on "P's" behalf stating

3    the titles of specific books and telling "A" to purchase one

4    copy of each and ship it to "P" immediately.  "A" does as

5    directed.  "A" acts with actual authority.  And then it goes on

6    to say "a person may request an action from another indicating

7    that no further communication should precede the action.  If the

8    action is taken, it is inferred that the actor consented to act

9    as an agent, unless the actor manifests a contrary intention".

10    If I may I'll hand up a copy of this.  It is something

11    per Your Honor's order that needs to be alleged with

12    specificity, but it isn't so complex and difficult that it can't

13    be done.  And frankly, it was done with ease in this case

14    because in every one of these circumstances, we had Imperial

15    telling the producer to apply for the policy. So the agents were

16    acting, or the producers, were acting as the agents of Imperial

17    because Imperial said go do that, and it did.  There's the

18    indication of -- that the agent will act on behalf of the

19    principle and the assent by the agent.

20    There's also a claim for aiding and abetting fraud.

21    Again, that's a claim that doesn't require us to show that the

22    producers were technically the agents of Imperial because if

23    they were the agents, we can go directly after Imperial for what

24    the agents did.  If it turns out they weren't the agents, then

25    we could still go after Imperial for aiding and abetting fraud,

1    and in that case, all that's necessary is that we show Imperial

2    provided substantial assistance.

3           And there are a couple of good cases, there are a

4    couple of informative cases here in the Southern District of

5    Florida that address that question.  There was a recent decision

6    by the Eleventh Circuit on aiding and abetting fraud and this is

7    the case of *Cordell Consultants, Inc. Money Purchase Plan and*

8    *Trust versus Abbott*, A B B O T T and that's 561 Fed appx 882.

9    And this came out just in April of 2014, and it involved a

10   person who took out a loan as part of a Ponzi scheme and the

11   victim, the bank, filed an action against the person that

12   committed the fraud, but also went after the -- filed an action

13   against the lawyers that represented the person that submitted

14   the application.  And there were actually two sets of lawyers.

15   There were the transactional lawyers and there were the

16   litigation lawyers.  The decision talks about how the

17   transactional lawyers, you know, created the documentation that

18   was then used to commit this fraud.  They clearly, with no

19   discussion, were aiders and abettors of the fraud.  The court

20   focused its inquiry on the litigation attorneys who actually did

21   not do anything to draft the documents.  The court noted that

22   the two litigation lawyers specifically advised the client to

23   borrow the $7 million at issue from the plaintiff.  This advice

24   was given, notwithstanding that the two litigation lawyers

25   allegedly had full knowledge of the client's Ponzi scheme and

1    his intent to use the proceeds to continue and conceal the

2    scheme.  More significantly, this advice was given

3    notwithstanding the allegations that the two litigation lawyers

4    knew that the client would obtain the loan based upon a false

5    financial statement.

6          What the Eleventh Circuit is telling us is that

7    knowledge, coupled with encouragement to engage in the activity,

8    is enough to hold somebody liable on an aiding and abetting

9    fraud.  I mean, that's sort of an alternative claim in there

10   because we think Imperial was actually liable for the fraud

11   because the producers were their agents.  But if there is some

12   issue with that, I think in front of the jury or even on summary

13   judgment, then the aiding and abetting cause of action would

14   still survive because we don't have to show direct agency, we

15   have to show that they did something to help this happen.  And

16   clearly, the complaint shows knowledge and encouragement to

17   engage in the fraud.

18         Lastly, you know, Mr. Cuza, he talks about how this

19   activity is legal.  It can be legal.  I mean, if a willing

20   participant wants to issue life insurance policies on policies

21   that would be financed through premium financing that will

22   ultimately result in the policies ending up in the hands of

23   investors, that is legal, that is legal.  If Imperial wanted to

24   put a billboard across from Sun Life's offices said that they

25   were doing this, that's legal too.  We agree there's the First

1    Amendment.

2            That's not what happened here.  That's not the

3    complaint says.  Imperial did everything it possibly can to

4    conceal its involvement because it knew Sun Life would not

5    participate in this business.  That's laid out in vivid detail

6    in 110 pages.  And if we remember the stage that we are at, the

7    stage we are at, we've alleged enough to state causes of action.

8            Unless Your Honor has more specific questions for me,

9    that's all I have.

10           THE COURT:  Thank you, sir.  I appreciate it.  Okay.

11           Mr. Cuza, you have 15 minutes, sir.

12           MR. CUZA:  What, when, where, how.  How do I get this

13   done in 15 minutes, Your Honor.

14           THE COURT:  I have great faith.

15           MR. CUZA:  Yeah.  Your Honor, we're here on a motion to

16   dismiss the -- typically what happens in motions to dismiss is

17   what's really relevant are two things and two things only:  The

18   law and the complaint.

19           THE COURT:  Okay.  Just make sure you talk in a

20   microphone.

21           MR. CUZA:  Sure.  The law and the complaint.  That's

22   what's relevant here.  The four corners of the complaint.  Has a

23   case been properly pled under the law.  I'm not so sure that

24   Mr. Gosselin, with whom I have a very good relationship,

25   actually met his burden.

1    But I will make reference to the complaint and I'm

2    going to start with *Martinez*.  And then I'm going to move to the

3    fraud issue which I'm going to make reference to what hasn't

4    been pled.

5    If you go to *Martinez*, you go to page 18, I've already

6    made reference to the title that the Eleventh Circuit used for

7    the discussion that follows which is fraud claims barred once

8    contested related period for policies has past.  If you look at

9    the paragraph that follows immediately thereafter, it says each

10   of the insurance policies that the insurer's challenge in their

11   amended complaint contain two year incontestability clauses.  As

12   noted recently in *All State*, so and so, incontestability clauses

13   function much like statutes of limitations.  While they'll

14   recognize fraud and all other defenses, they provide insurance

15   companies with a reasonable time in which to assert such

16   defenses and disallow them thereafter.

17   Your Honor, there's no exception to what the Eleventh

18   Circuit says here.  And I'm reminded, Your Honor, there's a

19   great opinion from the First Circuit that I read many years ago

20   when I was dealing with a case in Puerto Rico and I come across

21   this statement.  I think it was the chief judge that wrote it.

22   It was the Chief Judge Torruella.  And what was written by the

23   First Circuit says we mean what we say and we say what we mean.

24   Your Honor, I think that the Eleventh Circuit meant what it said

25   and it said what it meant.

1          The incontestability period is like a statute of

2  limitations, arguments with regards to fraud are valid,

3  insurance companies can raise them prior to the two year

4  contestability period.

5          Mr. Gosselin then argues that this case should not

6  apply to us, the *Martinez* holding should not apply to my client

7  because my client is not the owner of the policies.  Number one,

8  that's not written in the case anywhere and number two is when

9  you read the complaint, the complaint says the opposite.  If you

10  go to paragraph 50 of the complaint, it says Imperial acquired

11  title to the policies at the end of the two year loan term when

12  the trustee defaulted on the loan.

13          THE COURT:  Yes, sir.

14          MR. CUZA:  That's what the complaint says.  And Your

15  Honor, you actually have in the little book, tab two, it

16  actually makes reference to the 23 policies at issue in this

17  case and it actually talks about who the owners are.  And you

18  will see, Your Honor, that it's pretty much all Imperial because

19  the Ollip entities, as Your Honor might recall as defendants in

20  this case, these are Imperial entities.  But at the end of the

21  day, it doesn't matter what this charge says, the reality what

22  really is happening doesn't matter, what matters is what's in

23  the complaint.  And the complaint clearly says that Imperial is

24  the owner of the policies.

25          Then you'll have -- Your Honor, I want to address

1    *Brasner* very briefly, the issue of good faith, bad faith.  If

2    you look at the facts of *Brasner*, and in fact every other case,

3    including the Judge Middlebrooks case which I know as the Cohn

4    case, it's *Lincoln National*.  They're focused, Your Honor, on

5    the intent of the insured and they're focused on the intent of

6    the owner of the policy and they're focused on the intent of the

7    beneficiaries.

8          In *Brasner*, Your Honor, which is tab six, if you go to

9    page four, if you go to the right-hand column, the first full

10   paragraph at the very beginning, look what it says.  In this

11   case, the complaint asserts that Mrs. Berger, which is the

12   insured, never intended to maintain the policy herself and that

13   Mr. Berger, which is the beneficiary, never intended to retain

14   his interest.  It's all about their intent at the time that the

15   policy was issued to assign or transfer.

16         But guess what, Your Honor?  Go to Count 7.  There's no

17   reference whatsoever to the insured beneficiary or owner.  None

18   whatsoever.  There's no reference to the intent of either one of

19   them to transfer and or assign.  Guess what, Your Honor?  In the

20   entire complaint, there is no reference of any bad act by the

21   beneficiary of the trust, by the owner which is the trust, or by

22   the insured.  They haven't properly pled a case under *Brasner*.

23         Then let's talk a little bit about agency, Your Honor.

24   Your Honor, your order, your initial order focuses a lot on the

25   issue of agency.  And it talks about the elements.  Your Honor,

1   I'm looking for the -- which is the part of the book, the S One

2   which they made reference to in their complaint, it's paragraph

3   12.  I'm sorry.  Tab 12, Your Honor.  And if you go to tab 12

4   and you go to the third page of the tab which is page 13, again

5   this is what's published to the public, Your Honor.  This is

6   what Imperial publishes to the public.

7          Let's first talk about what are the three elements of

8   agency, Your Honor, very briefly.  There has to be an

9   acknowledgement by Imperial that the producers were acting on

10  Imperial's behalf.  There is no evidence, there is no evidence

11  or there's no allegation in the complaint that is properly

12  supported by a proper pleading under Rule Nine, which Your

13  Honor, Your Honor's order was very clear.  Agency has to be pled

14  with specificity.  That first element simply doesn't exist.  And

15  the -- it has to exist. The allegation that Imperial

16  acknowledged that the producers were acting for Imperial has to

17  be made for each and every one of the producers in the

18  complaint.

19         Now bear in mind, Mr. Gosselin represented to the court

20  that the producers were employees of Imperial.  That is simply

21  incorrect.  It's simply not true.  But the important thing is,

22  Your Honor, because we're in a motion to dismiss, it's not in

23  the complaint.  The -- it is true that Moulton and Rubio, Your

24  Honor, were employees of Imperial.  It is also true that neither

25  Moulton nor Rubio were the producers on any of the 23 policies

1    at issue in this case.  Not one.

2            So first element, an acknowledgement by Imperial that

3    the producers were acting on Imperial's behalf.  Doesn't exist

4    in the complaint.  If it exists, Your Honor, I want to know

5    where it is.

6            Number two is an acceptance by the producer that they

7    are acting on behalf of Imperial.  Where is that?  Where does it

8    say that when they were submitting the applications or when they

9    were interacting with the insurers, they were doing that on

10   behalf of Imperial?  It's not in the complaint.  Where is it

11   pled with the specificity required by law?  Where is it that

12   they comply with the law?

13           And the third element, Your Honor, is the element of

14   control.  Day-to-day control.  You cover it in your order.  Well

15   look at what the S One established, Your Honor.  This is page

16   13.  When you -- what it's titled is risk factors, Your Honor.

17   Okay.  This is what companies, public companies use to inform

18   the public, these are the risks.  Why is there a risk? Because

19   we have no control.  It happens to be that risk factors is

20   incompatible with we control.

21           Then look at the other statement, Your Honor, that

22   Imperial makes in the S One.  If you go to page 15.  If you go

23   to, Your Honor, the top first full paragraph.  Our success in

24   premium finances business depends on maintaining relationships

25   with our referral networks.  This doesn't say that they're

1    acting on our behalf.  These are people that refer business to

2    Imperial.  Your Honor, again, bear in mind this is under the

3    risk factor.

4            MR. GOSSELIN:  Your Honor, I object.  I tried to hold

5    my objections, but this is a document from Imperial that is not

6    part -- only one sentence of it is part of the complaint.  It

7    may be a valid factual defense, but it's not something that's

8    part of the record.

9            THE COURT:  Very well.  Your objection is -- I'm going

10   to overrule your objection.

11           MR. CUZA:  Then it says, Your Honor, look at the second

12   -- the third sentence.  "We do not have fixed contractual

13   arrangements with the referring agents and brokers and they are

14   free to do business with our competitors".  Not only do we not

15   have contracts, not only do we not have control, Your Honor,

16   they do business with our competitors at their will.

17           The S One, Your Honor --

18           THE COURT:  And then it goes on to say "the loss of any

19   of our top referring agents and brokers could have a material

20   adverse effect on our business financial condition and results

21   of operation".

22           So there's some grease to go with the gravy there.

23           MR. CUZA:  Your Honor, but once again, one has to read

24   the entire S One.  And there is no question, Your Honor, that

25   they have to properly allege that we acknowledge that they are

1   acting on our behalf.  That's not there.  The reason that I am

2   making reference to the S One is because it, in fact, goes the

3   other way.  But that doesn't change the fact that a proper

4   agency relationship has not been pled.  Let's forget about the S

5   One.  Okay.  Your Honor, let me --

6          THE COURT:  That was a two minute signal for those of

7   you that are wondering.

8          MR. CUZA:  Your Honor, with regards to the fraud, we've

9   already established, and this is really the, if you will, I

10  think the heart and soul of this case.  We've already

11  established that Imperial did not perpetrate a fraud.  There was

12  no misrepresentation.  Right, fraud has five elements, four

13  elements in Florida.  In other jurisdictions it's five.  The

14  fourth element is divided in other jurisdiction.  We've already

15  established that Imperial has not made any statements.

16         This argument that Imperial concealed, Your Honor, we

17  all know that in order for you to establish a case of fraud

18  under concealment, you first have to establish that there's a

19  duty.  That hasn't been established.  The -- so the court

20  already established and that hasn't changed, that no one is

21  alleging that Imperial actually misrepresented the truth.

22         So then the second issue is the issue is well, is

23  Imperial liable for any alleged misrepresentations by the

24  producers.  Is Imperial responsible for the actions of third

25  parties.  Well, that's the agency issue.  I think we've covered

1   it and it's fully briefed, Your Honor.

2           The third issue then in terms of law is the aiding and

3   abetting.  And the aiding and abetting, Your Honor, tab 16.

4   Your Honor, if you go to very briefly, and I know I have two

5   minutes --

6           THE COURT:  Well, you have about one now.

7           MR. CUZA:  Page -- sorry.  I was trying to get two.

8           THE COURT:  Nice try.

9           MR. CUZA:  Your Honor, page two of the footnote.

10          THE COURT:  Sure.

11          MR. CUZA:  I'm just going to read this.  Assuming that

12  we knew about any misrepresentations after the fact, Judge

13  Moreno was very clear, condoning fraud after its commissions is

14  not actual.  It's not a cause of action.

15          But the important thing, Your Honor, is if you go to

16  pages nine and ten, look at what it says.  To show that the

17  receivership entities assisted the insured in the commission of

18  such fraud, the Plaintiffs must allege the specific acts taken

19  by the companies to assist the insured in the filing of the

20  application and the name of the corporate agent or

21  representative who assisted the insured in the filing of the

22  application.

23          Your Honor, it's very specific.  Aiding and abetting

24  means aiding and abetting the fraud.  Aiding and abetting the

25  misrepresentation in the application.   There's no fact in the

1    complaint that puts Imperial anywhere near the application.

2         One last point.  Look at -- look at tab one, Your

3    Honor, of the little book.  Now, this is extremely important,

4    Your Honor, because these are the answers to interrogatories

5    that were given to us barely a month ago.  And as the court

6    knows, discovery is over.  If you look at interrogatory number

7    eight and the answer --

8         MR. GOSSELIN:  Objection, Your Honor.  Interrogatories

9    should not be considered as part of a motion to dismiss.

10        MR. CUZA:  Your Honor, this is argument and what I'm

11   doing at this particular point in time is I'm rebutting.

12        THE COURT:  I'll overrule the objection, but I'll give

13   the statement the weight that I should.

14        MR. CUZA:  If you look at -- the important

15   interrogatories are four, six and eight.  The answers to four

16   and six are similar to the answer of eight, but eight is

17   extremely important.  Look at eight, Your Honor.  "For each of

18   the policies, identify any pre-policy application communication,

19   whether verbal or in writing, that occurred directly between an

20   agent, broker, dealer, producer of a policy and anyone from

21   Imperial where Imperial instructed or otherwise encouraged any

22   agent, broker, dealer, producer to make misrepresentations of

23   any type in a Sun Life application.  Give us the evidence that

24   shows that Imperial encouraged any type of misrepresentations".

25        Their answer, it's long, but I'm going to focus on two

1    sections.  One, two, three, the fourth line, Your Honor, of

2    their answer to the right it starts with "Sun Life", after the

3    comma.  "Sun Life states that its knowledge of the

4    communications identified in interrogatory number four",

5    obviously that's number eight, and that was clarified in the

6    deposition that we just took on 30(b)(6) which was four,

7    supposed to be eight, "is limited to the documents produced by

8    Imperial".

9          So number one, Your Honor, is they're saying we have no

10    knowledge of Imperial encouraging any misrepresentation.  Your

11    Honor, this is this year, which means they had no knowledge when

12    they drafted the complaint.  This is not insignificant.

13          And then they say, Your Honor, let's keep reading.

14    Line -- if you go further down, it says "subject to the

15    foregoing, Sun Life states that it does not appear that any

16    communications responsive to interrogatory number eight were

17    produced in this matter".  What they're saying, Your Honor, is

18    that all these communications that they're making reference in

19    the complaint did not show or demonstrate that Imperial

20    encouraged any misrepresentations.

21          THE COURT:  Thank you, sir.

22          MR. CUZA:  Thank you, Your Honor.

23          THE COURT:  I want to commend counsel on their argument

24    here today.  I have found it very helpful and I've given a lot

25    of thought, as I'm sure you are well aware, prior to coming here

1    today.

2            I am prepared to go ahead and make a ruling from the

3    bench.

4            I will preface it by saying that the legal standards

5    are discussed in my previous order granting the Defendant's

6    motion to dismiss the amended complaint, that's docket entry

7    142.  So I'm not going to spend a lot of time going over the

8    applicable legal standards.

9            The matter before us now is really whether that

10   statement and requirements of the law as stated in that order

11   have been satisfied by this second amended complaint.  I will

12   tell you the number of policies involved is a factor that the

13   court does believe is important here.  As Ian Fleming once

14   wrote, once is happenstance, twice is a coincidence and three

15   times is enemy action.  And there's an awful lot of activity

16   here that's been alleged by the Plaintiff in this case and that

17   factual basis that the number of policies involving Imperial is

18   itself proof of bad acts something that they have alleged here.

19           The part that the court finds most troubling is the

20   conspiracy and scheme aspects.  Conspiracy is an old and

21   established part of Anglo-American law and its defining

22   characteristic is an agreement or understanding between two or

23   more persons to commit a bad act.  And we punish conspiracy

24   separately because we believe the combination itself is

25   dangerous, and is more likely to succeed in committing the bad

1    act if it is a combination rather than independent actors acting

2    through happenstance.

3         However, conspiracy is not a universal offense in legal

4    systems.  And there is rarely, if ever, a signed agreement to

5    conspire that can be introduced as evidence.  So proof of

6    knowledge of a conspiracy and participation in a conspiracy is

7    usually circumstantial, and there are inherent dangers in any

8    such prosecution for perjury which the evidence is such

9    circumstantial-type evidence, and that's whether the

10   prosecution, and I'm using it in its broadest sense of the word,

11   is civil or criminal.

12        To avoid those dangers, we have set up some unusual

13   precise rules, both evidentiary and procedural, that seek to

14   limit the dangers inherent in civil or criminal prosecutions for

15   conspiracy.  And in fact, it seems, from my examination of the

16   law, that this is even more true in civil matters where pleading

17   requirements are substantially higher than they are in criminal

18   matters when it comes to alleging a conspiracy.

19        In light of all of that, I'm going to grant in part and

20   deny in part the Defendant's motion to dismiss.  I'm going to

21   deny the motion with respect to Count 1, the RICO count, and I'm

22   going to grant the motion with respect to Count 2, the RICO

23   conspiracy count, because it does not appear from an examination

24   of the allegations here that sufficient facts have been pled to

25   establish an alleged conspiracy.

1          I'm going to deny the Defendant's motion with respect

2     to Count 3, the fraud count.

3          I'm going to grant the Defendant's motion with respect

4     to Count 4, the aiding and abetting fraud count, because I don't

5     see a specific pleading that indicates how the Defendant had

6     knowledge of the alleged fraud as is required for the aiding and

7     abetting.

8          I'm going to grant the Defendant's motion with respect

9     to Count 5, the civil conspiracy to commit fraud based on those

10    heightened pleading requirements I've mentioned earlier with

11    respect to conspiracy.

12         I'm going to grant the Defendant's motion with respect

13    to Count 6, the tortious interference with contractual

14    relations.  I don't see that specific facts have been pled

15    pursuant to Rule 9B as to how the Defendant knew of the

16    existence of the alleged producer contracts, and how Defendant

17    knew that the producers were in breach of those contracts.

18         And I'm going to grant the Defendant's motion with

19    respect to Count 7, the declaratory judgment, because I don't

20    believe we've got sufficient pleadings to establish an alleged

21    scheme.

22         So Counts 1 and 3 remain.  The other counts are

23    dismissed with prejudice at this point with the second amended

24    complaint.

25         Gentlemen, I know that will leave you all some material

1   to work with, and I know you have a settlement conference coming

2   up, I'm hoping that this may help everybody crystallize some

3   thinking about where they want to go from here.  I also suspect

4   that this may make the parties want to take a look at how long

5   we think it may take us to try this case, assuming that the case

6   doesn't settle.  There's still an awful lot left here to try,

7   but there's not everything that we had before to try.

8           Anything further from Plaintiff today?

9           MR. GOSSELIN:  I don't think so, Your Honor.

10          THE COURT:  Very well.  Anything further from the

11  defense today?

12          MR. CUZA:  No, Your Honor.  Thank you.

13          THE COURT:  Very well.  Gentlemen, I thank you for your

14  time and we're in recess.

15          COURTROOM DEPUTY:  All rise.

16          (PROCEEDINGS CONCLUDED)
                        * * * * *

17                C E R T I F I C A T E

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

19

20  _____      /s/ Dawn M. Whitmarsh
    Date                       DAWN M. WHITMARSH, RPR

21

22

23

24

25

**PROCEEDINGS RECORDED BY DIGITAL AUDIO RECORDING**
**TRANSCRIPT PRODUCED BY COMPUTER**