## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:13-CV-80385

**SUN LIFE ASSURANCE COMPANY
OF CANADA (U.S.),**

**PLAINTIFF,**

 **v.**

**IMPERIAL HOLDINGS, INC., ET AL.,**

**DEFENDANTS.**

_____/

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SECOND AMENDED CIVIL ACTION COMPLAINT

Defendants (collectively, "Defendants" or "Imperial"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby file this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment on the remaining two counts in Plaintiff SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.)'s ("Sun Life['s]" or "Plaintiff['s]") Second Amended Civil Action Complaint (the "SAC").

Dated:  December 23, 2014

Respectfully submitted,

By:  /s/ *Jesus E. Cuza*
Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Telephone:   (305) 374-8500
Facsimile:    (305) 789-7799

*Counsel for Defendants*

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.  Sun Life's Business and Relationship with its Appointed Producers**

**A.  Sun Life's Business**

1.      Until 2011, Sun Life sold individual life insurance policies in the U.S.  *See* Dep. of Thomas Foley (current Asst. VP of Underwriting at Sun Life), Dec. 4, 2014, Ex. 1 ("Foley Dep.") 17:12–15; Dep. of Kathleen Alfano (former VP of Underwriting), Sep. 5, 2014, Ex. 2 ("Alfano Dep.") 19:14–23.  In 2011, Sun Life stopped selling individual life insurance policies in the U.S. because "[t]he earnings were lower than expected."  *See* Dep. of Leston Welsh (current VP at Sun Life), Sept. 4, 2014, Ex. 3 ("Welsh Dep.") 167:13–23; Alfano Dep. 21:15–18.

2.      Between July 2007 and August 2010, Sun Life issued the 23 policies at issue in this case (the "Policies").  *See* Composite Ex. 4 ("Policies").

3.      Each Policy contains an incontestability provision stating: "After this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, [Sun Life] cannot contest it except for non-payment of premiums." *See* Policies.[1] The contestability period for each Policy has expired, as demonstrated below.[2]

| Insured | Contestability Period  Expired | Insured | Contestability Period Expired |
|---------|-------------------------------|---------|-------------------------------|
| Berner, Sandra | Dec. 15, 2011 | Korn, Joan | Oct. 30, 2011 |
| Bernstein, Sheila | Jan. 19, 2012 | Miller, Helene | Jan. 29, 2012 |
| Blakeslee, Evelyn | Sept. 24, 2011 | Mitchel, Evelyn | Dec. 28, 2011 |
| Blitshtein, Polya | Jan. 25, 2012 | Parnes, Hannah | Dec. 8, 2011 |
| DeBerry, James | April 29, 2012 | Pastore, Diane | Sept. 9, 2010 |
| DeGraw, Terry | Oct. 3, 2010 | Solk, Donna | Jan. 19, 2012 |
| Dickler, Dale | Dec. 4, 2011 | Spohn, Ronald | Dec. 31, 2011 |
| Fuhrman, June | Aug. 19, 2011 | Talansky, Kalman | April 17, 2009 |
| Geller, Elizabeth | Aug. 12, 2012 | Victor, George | Dec. 4, 2011 |
| Good, Robert | Dec. 8, 2011 | Von Nordheim, Manfred | June 27, 2010 |
| Granby, Gary | Dec. 29, 2011 | Wasser, Martin | Oct. 8, 2011 |
| Klein, Esta | Jan. 28, 2012 | | |

---

[1]   Notably, in the contestability provision, Sun Life failed to disclose to consumers that it would in fact contest the policies beyond the two-year period for reasons other than non-payment of premiums, including for alleged lack of insurable interest.

[2]   There are four Policies that purport to include a fraud exception to the incontestability provision.  As discussed in Imperial's Motion for Summary Judgment, however, those fraud exceptions are legally unenforceable.

1

**B.  Sun Life's Relationship with its Appointed Producers**

4.      To conduct its life insurance business, Sun Life relies on a network of appointed broker general agents and individual producers to solicit business on its behalf and sell its products.  *See* Dep. of James Cahill (VP Relationship Management), Sept. 10, 2014, Ex. 5 ("Cahill Dep.") 30:12–32:13, 32:21–33:9, 34:1–18, 34:25–35:6, 50:3–50:8.

5.      Under state law, Sun Life is required to file appointments with the offices of insurance regulation for each producer authorized to solicit business on its behalf. *See* Market Conduct Guide, Ex. 6 (noting producers must be appointed by Sun Life in the states in which they offer products).  For example, in Florida, the Office of Insurance Regulation requires a carrier to submit a form certifying that "[t]he person for whom an appointment is requested, has been thoroughly investigated as to integrity and character; that his/her reputation is good; and he/she is trustworthy. . . . I further certify that the appointing entity is willing to be bound by the acts of the person being appointed . . . . "  *See* Fla. OIR Form DFS-H2-501, Ex. 7.

6.      Sun Life entered into Individual Licensing Sales Agreements with each individual producer who Sun Life appointed to sell its products, including each producers of the 23 Policies at issue here ("Producers"). *See* Composite Ex. 8 ("Sales Agreements"); *See* Dep. of Donald Gregory Lawrence (VP of Capital and Profitability Management), Dec. 3, 2014, Ex. 9 ("Lawrence Dep.") 397:20–398:5; Cahill Dep. 32:14–20.  The Sales Agreements, which Sun Life refers to as "agency agreements," consist of, among other things, an Appointment Data Sheet, Broker Acknowledgment, and Sales Representative Agreement.  *See* Sales Agreements; Lawrence Dep. 397:20–398:5; *see also* Cahill Dep. 32:21–33:7, 34:25–35:11.

7.      In the Broker Acknowledgment section of the Sales Agreement, Sun Life appointed each Producer to "solicit[] applications for approved products of the Company," and each Producer acknowledged Sun Life's appointment.  *See* Sales Agreements at 4; *see also* Cahill Dep. 32:21–33:1.  Indeed, the Broker Acknowledgment form states that the producer's authority includes "the solicitation, sale and servicing of the Company's policies."  Sales Agreements at 4.

8.      The Sales Representative Agreement also recognizes that the Producer will perform "business activities  . . . *on behalf of . . . the Company*."  *Id.* at 8 (emphasis added).  And it requires each Producer "to conduct business under this Agreement in compliance with all applicable written procedures, rules, and regulations the Company has or may establish to govern the conduct of its business, including the Company's Code of Business Conduct and its Field

Compliance Manual." *Id.* at 11.

9. Sun Life's Market Conduct Guide sets forth specific guidelines the Producers are required to follow. For example, the Guide requires that the Producers' marketing material be approved by Sun Life. *See* Market Conduct Guide at 7. It also requires the Producers to keep written files containing all fact-finding data, analyses, and other information for each customer that supports the amount and the type of product sold. *See id.*

10. Sun Life also has a right to, and did, provide the Producers with its own marketing and sales materials. Sales Agreements at 11; Foley Dep. 343:25–344:5. Additionally, Sun Life gave the Producers access to Sun Life's illustration system, which allowed the Producers to run illustrations for Sun Life's products. Foley Dep. 363:9–364:17.

11. Sun Life required the Producers to comply with its guidelines to ensure it had control over how each Producer "conduct[ed] business on behalf of the company." *Id.* 347:1–22. Indeed, Sun Life's Code of Business Conduct was essentially Sun Life's way of telling the Producers: "We want you to do the following things when you're out there selling and soliciting Sun Life policies." *See id.* 348:14–24.

12. As a Sun Life appointed agent, each Producer was responsible for assisting the insureds and/or policyowners in completing the life insurance application. *Id.* 351:5–25. In fact, according to Sun Life, the Producers (not the insureds) were responsible for completing the application. *Id.* 351:16–17; *see* Cahill Dep. 35:19–36:25; Dep. of Suzanne Schrimsher (former assistant to producer), Oct. 3, 2013, Ex. 10 ("Schrimsher Dep.") 160:11–20, 161:7–23.

13. Sun Life relied on the Producers to ask the applicants the relevant information to accurately fill out the applications. Foley Dep. 352:2–11; 353:4–5.

14. Sun Life also relied on the Producers to clarify any questions the applicants might have regarding the language in the applications, including the language of the premium finance question. *Id.* 354:8–24, 355:2–356:3.

15. As Sun Life acknowledged, the Producers were acting as representatives of Sun Life ***during the application process***. *Id.* 353:15–16 ("The broker is the representative of the company during the application process.").

16. Sun Life also relied on the Producers to collect the initial premium payment from the applicants on Sun Life's behalf. *Id.* 359:6–16.

17. In exchange for the Producers' services, Sun Life agreed to directly compensate the

Producers.  *See id.* 332:17–24; Sales Agreements at 8.   As part of the Sales Agreement, Sun Life also had the right to terminate the Producers. Foley Dep. 338:7–18; Sales Agreements at 10.

## II.    Imperial's Lack of Involvement in Relationship between the Producers and Insureds/Trustees

18.    Imperial had no involvement in, or knowledge of, a Producer's activities or relationships with the insureds. Dep. of Antony Mitchell (CEO of Imperial), Nov. 20, 2014, Ex. 11 ("Mitchell Dep.") 154:4–9; Aff. of Antony Mitchell, Ex. 12 ("Affidavit") ¶¶ 2–3.

19.    Imperial did not control the manner in which the Producers solicited life insurance business or the Producers' day-to-day activities. Mitchell Dep. 154:4–9; Aff. ¶ 6.   Nor has Imperial ever acknowledged that the Producers would act on its behalf.  Aff. ¶ 4.

20.    Imperial was not involved in any of the communications between a Producer and an insured or trustee, nor was Imperial made aware of whether a policyowner was interested in premium financing until after a policy was issued. Aff. ¶ 10; Lawrence Dep. 93:17–94:4 (Sun Life admits it does not know whether Imperial was aware of these communications).

21.    When selling Sun Life's products, the Producers communicated—on Sun Life's behalf—directly with the insureds or trustees.  Cahill Dep. 33:2-34:19.

22.    By contrast, Imperial had no pre-issuance contact with the insureds or trustees of the Policies.  In fact, the insureds and trustees of the Policies had not even heard of Imperial prior to issuance of their Policies.  *See* Degraw Dep., Sept. 25, 2013, Ex. 13 ("Degraw Dep.") 42:11–13, 42:20–24, 66:18–25; Dep. of Ira Einhorn, Aug. 15, 2013, Ex. 14 ("Einhorn Dep.") 55:11–16; Dep. of June Fuhrman, July 29, 2013, Ex. 15 ("Fuhrman Dep.") 68:18–24; Dep. of Elizabeth Geller, Aug. 13, 2013, Ex. 16 ("Geller Dep.") 40:14–15, 42:5–7; Dep. of Robert Good, July 15, 2013, Ex. 17 ("Good Dep.") 16:2–6, 17:22–24, 79:6–9; Dep. of Virgil Thomas, July 15, 2013, Ex. 18 ("Thomas Dep.") 57:25–58:9; Dep. of Gary Granby, Aug. 30, 2013, Ex. 19 ("Granby Dep.") 38:12–20, 40:15–41:3, 60:19–21; Dep. of Lynn Kimpling, Aug. 30, 2013, Ex. 20 ("Kimpling Dep.") 29:17–30:5; Dep. of Esta Klein, July 16, 2013, Ex. 21 ("E. Klein Dep.") 45:15–18; Dep. of Harvey Klein, July 16, 2013, Ex. 22 ("H. Klein Dep.") 94:5–17; Dep. of Helene Miller, July 17, 2013, Ex. 23 ("Miller Dep.") 68:19–21, 72:14–73:5; Dep. of Evelyn Mitchel, Aug, 20, 2013, Ex. 24 ("E. Mitchel Dep.") 95:12–13; Dep. of Ronald Spohn, July 22, 2013, Ex. 25 ("Spohn Dep.") 74:10–15; Dep. of Bruce Dern, July 22, 2013, Ex. 26 ("Dern Dep.") 40:8–41:5; Dep. of George Victor, Oct. 1, 2013, Ex. 27 ("Victor Dep.") 62:10–12.

23.     Indeed, Sun Life admits that it cannot identify any pre-issuance communications between  Imperial and the insureds or trustees of the Policies.  *See* Sun Life's Supp. Resp. to Imperial's Third Set of Interrogatories, Ex. 28 ("Interrogs.") at 4; Lawrence Dep. 55:6–64:5; 110:22–111:25, 122:17–123:6, 140:24–141:12, 151:7–153:23, 167:22–168:25, 170:11–23.

### III.    The Application Process and Sun Life's Issuance Of The 23 Policies – Imperial Not Involved.

#### A.     Application Is Completed and Submitted to Sun Life by Producer

24.     As discussed above, the Producers are responsible for completing the applications and assisting the applicants in answering the questions.  Foley Dep. 351:5–25, 352:2–11, 353:4–5, 357:1–21; Cahill Dep. 35:19–25.

25.     ***Sun Life acknowledges that, in completing and submitting the applications, the Producers were acting on behalf of Sun Life***.  Foley Dep. 353:15–16; Cahill Dep. 36:14–25.

26.     Moreover, Imperial was not involved in the completion of a life insurance application or its submission to Sun Life for any of the Policies, and in fact had a stated policy of not being involved in the insurance application process. *See* Mitchell Dep. 97:17–19; Nov. 30, 2009 Email, Ex. 29 (containing disclaimer explaining Imperial's policy against involvement in application). *See* Aff. ¶¶ 7, 11; *see also* Degraw Dep. 67:4–7; Fuhrman Dep. 69:1–7; Geller Dep. 60:15–17, 61:2–4, 8–15; E. Klein Dep. 60:15–18; Miller Dep. 73:6–10; E. Mitchel Dep. 95:14–22; Spohn Dep. 73:23–74:15; Victor Dep. 55:25–56:4.

27.     No one at Imperial ever instructed a Producer, insured, or trustee on how to fill out an application for the Policies. Dep. of Carol-Ann Beers (former Case Manager in Sales at Imperial), Sept. 24, 2014, Ex. 30 ("Beers Dep.") 192:14–193:17; Aff. ¶¶ 7, 11.

28.     ***Indeed, Sun Life admits that it cannot identify any communications wherein Imperial "instruct[ed] . . . or encourag[ed]" the insured or trustee to misrepresent any fact on the application."***   Lawrence Dep. 55:6–64:5 (emphasis added); Interrogs. at 5.  ***Sun Life also admits it has no knowledge of any instructions or encouragement by Imperial to any Producer or general agent to make a misrepresentation in the applications for the Policies.***  Lawrence Dep. 66:15–71:15; Interrogs. at 6.

29.     Additionally, Imperial did not have any direct communications with the insureds or trustees about the applications for the Policies and was not aware of any discussions that occurred between the Producers and the insureds or trustees about the life insurance applications.

Dep. of Robyn Kelly Jacobs (former Case Manager in Sales at Imperial), Aug. 7, 2014, Ex. 31 ("Kelly Dep.") 98:13–17; Aff. ¶¶ 7, 10, 11. And Sun Life has admitted that it does not know whether Imperial was aware of such conversations. Lawrence Dep. 93:17–94:4, 126:5–127:6, 140:24–141:12, 167:22–168:9.

30.    Imperial does not know what statements were made by the insureds or trustees on the applications for these Policies before they were submitted or when or where the applications were completed.  Aff. ¶ 11.

31.    Indeed, Sun Life acknowledged that it has no evidence that Imperial ever saw the application for a Policy prior to submission. *See* Lawrence Dep. 94:20–95:10; 110:22–111:25, 122:17–123:6, 140:24–141:12, 151:7–153:23, 167:22–168:9, 168:18–25, 170:11–23.  The first time Imperial saw the applications was *after* Sun Life issued each Policy.  Aff. ¶ 8.

**B.    Selection of Trustee and Formation of the Trust**

32.    Here, the owners of the Policies were irrevocable trusts established by the insureds. *See* Policies.

33.    As Sun Life acknowledges, there was nothing unusual about a trust owning a life insurance policy.  Alfano Dep. 122:3–6.  Indeed, according to Sun Life's former head of underwriting, there are tax advantages to having a trust own the policy.  *Id.* 122:7–10.

34.    Imperial has no knowledge of the circumstances surrounding creation of the trusts that served as the owners of the Policies.  Aff. ¶ 9.  Nor does Imperial have any knowledge of who bore the expenses associated with their formation or the selection of the trustees.  *Id.*

**C.     Sun Life's Underwriting of Applications Generally**

35.    Upon receipt of an application, a Sun Life underwriter would spend, on average, an hour and half reviewing the application and determining whether to request additional information.  Alfano Dep. 46:24–25, 47:2–4, 48:17–21.

36.    Sun Life's underwriters were evaluated based, in part, on their turnaround time underwriting an application. *Id.* 55:17–18. From the time when a case was first presented, an underwriter generally had three days, in aggregate, to review a file, determine if any additional information is necessary, and respond to the producer.  *Id.* 55:21–24.

37.    The underwriter assigned to review an application generally did not have any conversations with the producer who submitted the application.  *Id.* 38:16–22, 42:23–43:3. Rather, it generally relied only on the evidence submitted with the application.  *Id.* 38:12–15.

38.     Despite that financial underwriting was important to Sun Life, Sun Life would not always request additional documentation to verify the financial information, including net worth and income, on the application.  *Id.* 89:17–19, 89:25–90:17.

39.     If Sun Life received additional documents from a producer or general agent, it would generally not verify that the information submitted was accurate. *Id.* 98:1–9.

40.     In August 2007, Sun Life became concerned that it was not receiving the accurate information on applications for insureds over 70 years old regarding net worth and use of premium financing. Alfano Dep. 101:4–103:10, 109:25–110:5, 172:24–173:9; Aug. 2, 2007 Email, Ex. 32.

41.     In 2007, Sun Life also become concerned with what it refers to as "stranger-originated life insurance" ("STOLI"). Alfano Dep. 171:6–10.

**D.      Sun Life's Admission Regarding Lack of Proper Underwriting of the Policies**

42.     The Policies were all applied for by elderly individuals after 2007, when Sun Life had become concerned about the information it was receiving on applications regarding net worth, income, and premium financing.

43.     As Sun Life acknowledges, however, it does not know if anyone in underwriting requested additional financial documentation on any of the Policies.  Foley Dep. 173:11–25. Specifically, Sun Life does not know whether it requested tax returns, inspection reports, or CPA statements for any of the Policies to verify the financial information on the applications.  *Id.*

44.     Moreover, Sun Life did not do anything additional to verify the answers on the applications concerning premium financing and who would be the payor of the premiums. Alfano Dep. 136:3–8, 138:6–14, 212:19–213:9; Foley 174:12–16.

45.     For example, Sun Life did not have any communications with the Producers about the answers to the premium finance question, despite having identified some of these producers on its Handle With Care List (discussed below).  Foley 174:12-16; Alfano Dep. 212:19–213:9.

46.     Additionally, Sun Life is unaware of any communications between Sun Life and the insureds or trustees during the underwriting process. Lawrence Dep. 107:24–108:22.

**E.      Sun Life's Underwriting Actions Post-Issuance**

47.     After a policy had been issued, Sun Life relied on the producers to submit the first premium payment from the policyowner. Foley Dep. 359:6–16. Imperial was not involved in the first premium payment.  Schrimsher Dep. 37:18–21; Aff. ¶ 12.  At the time, Imperial had no

knowledge of who was making the payment or how the payment was being made for these Policies. *Id.*

48.    Sun Life did not verify the source of funds for the first premium payment.  Alfano Dep. 136:3–8, 138:6–14. It simply looked to see that the check making the payment was from the insured's trust. *Id.* 130:20–131:7.

49.    Moreover, Sun Life did not do any further investigation during the two years after issuance to re-evaluate a policy unless "there [was] evidence provided or information provided that would suggest otherwise." *Id.* 211:24–212:4.

50.    Indeed, Sun Life was not aware of any investigation it conducted during the two years after issuance of the 23 Policies to determine the accuracy of statements made in the applications. Foley Dep. 174:2–5, 194:5–25.

51.    For example, Sun Life did not contact any of the insureds or Producers to discuss statements made in the applications.  *Id.* 174:12-16; Alfano Dep. 212:19-213:9; *see also* Degraw Dep. 78:10–79:9; Geller Dep. 66:22–67:17; E. Klein Dep. 62:11–63:9; Miller Dep. 74:25–77:6; E. Mitchel Dep. 98:6–99:23; Spohn Dep. 78:13–80:16.

## IV.    Sun Life's Decision to Continue Relationships with Producers Flagged for "STOLI" Activity

52.    Sun Life cannot describe what exactly it did during the contestability period to identify any bases for contesting policies.  Foley Dep. 55:3–24.  Sun Life did, however, institute a review of "post-contestable claims for concerns related to the industry and its practices," including concerns about "STOLI producer[s]." *Id.* 56:9–15, 57:15–17.

53.    In light of this concern, Sun Life created a Handle With Care list and STOLI lists.  *Id.* 69:3–70:25; 78:13–79:25.  In creating these lists, Sun Life conducted behavioral analyses of blocks of business submitted by producers with whom it was concerned.  *See id.* 84:19–85:9.

54.    Nevertheless, Sun Life does not know whether it ever terminated any of the producers on these lists.  *Id.* 87:8–15.  Indeed, when considering termination, Sun Life first determined whether a producer's block of business was profitable because Sun Life's objective was "always to write profitable business." *Id.* 301:10–11.

55.    Additionally, there was no "prescription or a guideline" as to what additional underwriting requirements, if any, Sun Life would require for applications submitted by the producers on Sun Life's lists. *Id.* 75:19–22.

56.     Significantly, Sun Life continued to issue policies from these producers despite its prior determinations that those producers warranted placement on the lists.  *Id.* 87:16–88:12.  It also did so notwithstanding that Sun Life's Vice President of Underwriting at the time considered the producers on the Handle with Care list to be "bad STOLI actors." *Id.* 90:23–91:7; *see* Mar. 2, 2011 Email, Ex. 33.

57.     ***For example, in 2008, Sun Life "ran into difficulty with producer Todd Bernstein" because "[i]t appeared he was involved with premium financing as well as possible settlement business."*** Foley Dep. 202:16–203:12 (emphasis added); Feb. 11, 2010, Email Ex. 34.  ***Then in 2009, when underwriting a case, Sun Life became aware Bernstein had offered to pay the policy premiums for the policyowner***.  *See* Ex. 34.  ***Despite its concerns, Sun Life still issued the Policies to Bernstein's clients (Donna Solk and Sheila Bernstein) in 2010***.  *See* Policies.  ***And Sun Life did not, when underwriting those Policies, make any effort to call the insureds or trustees to determine whether Bernstein had similarly offered to pay their premiums***.  Foley Dep. 217:16–23.

58.     The insureds and trustees who were deposed confirmed that Sun Life made no effort to contact them during the contestability period.  Degraw Dep. 78:10–79:9; Geller Dep. 66:22–67:17; E. Klein Dep. 62:11–63:9; Miller Dep. 74:25–77:6; E. Mitchel Dep. 98:6–99:23; Spohn Dep.78:13–80:16.

59.     Not only was Sun Life continuing to work with Producers it identified as problematic, ***it was encouraging and rewarding their business***.  For instance, by August 2010, Sun Life had created a Handle With Care list that included three of the Producers (Sam Katz, Todd Weishaus, Todd Bernstein).  *See* Handle With Care List, Ex. 35; *see also* Alfano Dep. 235:16–21.  In addition, in February 2010, Sun Life had already identified Todd Bernstein and Todd Weishaus as "high risk agents." Feb. 11, 2010 Email, Ex. 36; Alfano Dep. 228:20–233:25.  Likewise, Sun Life had identified Sam Katz as having policies fitting the "STOLI demographic" with "lots of smoke." May 24, 2010 Email, Ex. 37.

60.     ***Yet, at the same time, Sun Life was planning on sending Katz and Weishaus to its Life Sales Leaders Conference at a Ritz Carlton in the Virgin Islands to reward them for being among Sun Life's top agents***.  *See* Sun Life 2011 Sales Leaders Conference Flyer, Ex. 38; List of Sun Life's Top 25 Producers, Ex. 39; Foley Dep. 222:10–223:24.

61.     Notably, the Policies with which Katz and Weishaus were involved (those insuring

the lives of Miller, Granby, and Wasser) were still within the contestability period at the time they were placed on the Handle With Care list. *See* ¶ 3, *supra*. Yet Sun Life did not take any action relating to these Policies until over two years later.   Alfano Dep. 233:20–25.

62.   Similarly, by March 2010, three of the Policies (those insuring the lives of Diane Pastore, Helene Miller, and Gary Granby) were placed on a STOLI list. *See* Mar. 26, 2010 Email Ex. 40; STOLI List, Ex. 41. All three of these Policies were still within the contestability period at that time. *See* ¶ 3, *supra*. Yet again, Sun Life did not take any action relating to those Policies until well after the contestability periods for those Policies had expired. *Id.*; ¶¶ 44–46, *supra*.

## V.   There was no Agreement, or even a Commitment by Imperial, to Make a Premium Finance Loan at the Time of Application

63.   Notwithstanding its allegations in the SAC, *Sun Life has admitted that it does not really know if an agreement existed between Imperial and any of the Producers*. Lawrence Dep. 396:2–9, 14–20.

64.   *And Sun Life acknowledges that an agreement to fund a loan is not reached until after a policy is put in force*. Lawrence Dep.  248:12–25. In fact, given the structure of Imperial's premium finance business, it would be impossible to reach an agreement until the Policies are issued, in force, and Imperial's full diligence process has been completed. *See* Section VI, *infra*. And the Producers understood that Imperial financed policies only *after* they were issued. Dep. of Peter Blatt (Producer), Aug. 21, 2013, Ex. 42 ("Blatt Dep.") 31:18–31:24; 55:8–10 ("Imperial would never approve a policy for financing until after the policy was issued.").

65.   Sun Life has acknowledged that it does not know of any discussions about premium financing between the Producers and the insureds, nor does it know whether the insureds or trustees were even considering applying for a premium finance loan at the time of the application (or at any point prior to issuance of the Policies). *Id.* 103:14–23.

66.   In fact, Sun Life admits that it does not know of any insured or trustee who had ever even heard of Imperial before the Policies were issued. *Id.* 168:18–25. And the insureds and trustees who were deposed in this action confirmed that they had no knowledge of Imperial prior to issuance of the Policies. *See* ¶ 22, *supra*.

67.   Thus, a "yes" answer to the premium financing question at the time of application

would have been an incorrect answer.  Alfano Dep. 127:8–21.  Indeed, Sun Life's former Vice President of Underwriting agreed that if an individual does not know if he is going to premium finance a policy at the time he fills out the application, the correct answer would be "No."  *Id.*

## VI.    Imperial's Premium Finance Business

68.    During the relevant time period, Imperial provided premium financing for individual life insurance policies.  *See* Excerpt of S-1, Aug. 12, 2010, Ex. 43.  As such, Imperial complied with SEC requirements and regularly made public filings discussing its business.  *See id.*

69.    Imperial's business model was vetted by multiple entities and legal counsel, including AIG and its counsel, as well as by Imperial's various credit facilities and their counsel.  Mitchell Dep. 210:7–211:9.  And its public filings, including its S-1 explaining the business model, were reviewed by Foley & Lardner, LLP and underwriters' counsel (Locke Lord LLP).  *See id.*

70.    As part of its business model, and as is customary in the industry, Imperial charged a fee to the producing agent in exchange for Imperial's premium finance service.  Mitchell Dep. 51:18–22.  The fee arrangement was documented by a Fee Agreement between Imperial and the producer, and the amount of the fee was based on the amount of the commission paid to the producer by the carrier.  *Id.* 205:16–21; *see* Fee Agreements, Composite Ex. 44.

71.    Notably, Imperial was one of many lenders offering premium finance.  Mitchell Dep. 76:4–9.  There were several premium financing companies that Sun Life was willing to work with, including CMS, UBS, Goldman Sachs, Insurative Premium Finance, and Concord.  Lawrence Dep. 233:11–21; Sun Life Overview of Premium Finance Programs, Ex. 45.  Like Imperial, these entities used the term "commission split" to describe their fee arrangement with producers.  Lawrence Dep. 237:12–238:24; Ex. 45.  ***And Sun Life has acknowledged that these types of arrangements are neither inappropriate nor illegal***.  Lawrence Dep. 237:12–238:24.

72.    Sun Life does not dispute that premium financing is entirely legal or that it is an available option to policyowners.  Foley Dep. 267:17–19; 268:3–14.  Sun Life agrees that there is nothing in the Policies that would prevent an insured from obtaining a loan after the Policies were issued.  Lawrence Dep. 292:7–24.

### A.    Business Model – Loan Application Review and Approval Process

#### 1.    Imperial's Sales Department (No Commitment and No Agreement)

73.    During the first phase of Imperial's premium finance process, Imperial's Sales Department screened potential cases submitted by the Producers to determine if any had

potential. Kelly Dep. 235:10–18; Mitchell Dep. 173:20–24.

74.     Imperial's Sales Department never communicated with the insureds or trustees for the Policies during this phase. Kelly Dep. 246:12–24. It communicated only with the Producers. Mitchell Dep. 97:13–19.

75.     When Imperial's Sales Department communicated with the Producers during this phase, the sales executives had no idea whether the policyowners were interested in premium financing. Aff. ¶ 10; Lawrence Dep. 93:17–94:4.

76.     Generally, the Producers could submit basic information to Imperial by email (e.g., potential insured's gender, age, health).  Imperial would use this information to run a generic pricing model. Beers Dep. 22:21–23:3, 25:17–19, 26:8–11; Kelly Dep. 20:6–18; 61:10–25; Schrimsher Dep. 39:25–40:9.

77.     The purpose of pricing at this time was to assess whether a policy was attractive for a potential premium finance deal.  Beers Dep. 27:24–28:5; Schrimsher Dep. 48:11–14; 149:23–150:4.  Once a pricing was conducted, an Imperial sales executive would review the pricing and determine whether there was sufficient potential to move onto the next step in the loan underwriting process.  Beers Dep. 29:10–13.

78.     If the Sales Department told the Producers to "move forward" or that a potential deal looked "viable" or "should work," that simply meant the deal had potential for a premium finance loan.  Beers Dep. 144:5–6; Kelly Dep. 36:25–37:17; Schrimsher Dep. 57:10–22. Imperial sometimes issued indications of interest, which was another form of communicating to the Producers that a deal had potential.  Kelly Dep. 91:15–92:24; Mitchell Dep. 203:10–13; *see* Sample Indication of Interest, Ex. 46.  The Producers understood that Imperial was simply "interested in" the deal, and they were aware that Imperial had a "very long, tedious" process and nothing was guaranteed.  Schrimsher Dep. 49:9–12, 157:12–25.

79.     Both the Sales Department and the producers recognized that any number of things could eliminate the potential deal at any point in the process.  Kelly Dep. 36:25–37:17.

80.     No one from Imperial's Sales Department had the ability to bind Imperial to, or commit to funding, a loan.  Mitchell Dep. 77:2–13; 253:14–24; 249:1–9.  The Producers were aware of this and understood that an agreement could not be reached until after a policy was issued, in force, and survived Imperial's diligence process—and, even then, only if the insured or trustee were interested in a premium finance loan.  Schrimsher Dep. 36:4–9, 192:17–21.  Indeed,

at any point in the process, the borrower (the Trust) could decide (for any reason) that it did not wish to enter into the loan agreement.

## 2. Receipt of Issued Policy and Initial Review (Still No Commitment or Agreement)

81.     When Imperial received an issued Policy, Imperial would begin its initial review by ordering a Medical Underwriting Review (MUR) from AIG (the LPIC provider)[3] as well as a life expectancy (LE) report from another LE provider. Beers Dep. 38:16–22; 48:12–19; Kelly Dep. 236:11–238:1; Dep. of Annette Collado (Head of Funding at Imperial), Nov. 21, 2014, Ex. 47 ("Collado Dep.") 30:1–12; Aff. ¶ 13.

82.     Once Imperial received the MUR from AIG, it would run a new pricing and request a Pre-Certificate Review (PCR) from AIG.  Collado Dep. 30:1–12; 30:24–31:10.  In its PCR, AIG would either tentatively approve or decline (and therefore disqualify) the potential deal.  *Id.* AIG declined to approve numerous deals for a variety of reasons (many of which were not even communicated to Imperial).  *See* Aff. ¶ 15.

83.     If AIG approved, the updated pricing would be reviewed by management, who would sign off on the pricing if the potential deal was acceptable to management.  This signed pricing was referred to as a "final pricing" and signaled that Imperial was interested in the potential deal. Collado Dep. 24:1–10; 25:23–26:5. The Legal and Compliance departments would then begin their preliminary reviews.  *Id.* 41:12–20.

84.     The Legal Department would draft the loan documents and send them to the insured and trustee.  The fact that loan documents were sent out meant only that Imperial still believed the case had potential.  Beers Dep. 153:7–9.

## 3. Diligence (Still No Commitment and No Agreement)

85.     If the signed loan documents were returned to Imperial, the Compliance and Legal departments conducted more in-depth reviews of the potential deal.  Collado Dep. 65:4–22.

86.     If the potential deal was not disqualified by Legal or Compliance, it would proceed to the Funding department and be reviewed by a funding analyst and the funding manager.  *Id.* 65:4–66:8.

87.     During this phase, AIG would again review the entire transaction and all related

---

[3]     AIG through its subsidiary, Lexington Insurance Company, provided Lender Protection Insurance Coverage (referred to as "LPIC"), which provides insurance coverage in the event of a premium finance borrower default.  *See* Aff. ¶ 15

documents and send Imperial a final MUR (while maintaining the right to disqualify the potential deal). Mitchell Dep. 190:17–191:1.

88.    Imperial would also request from AIG an LPIC certificate, which constituted AIG's final approval. Collado Dep. 66:12–67:19; Mitchell Dep. 183:20–184:14. The LPIC certificate was required by Imperial's credit facility agreements as a condition to funding a premium finance loan. *See* Aff. ¶ 16. If at any point the deal did not meet one of AIG's requirements, it was impossible to do the deal because AIG would "not budge." Mitchell Dep. 185:6–17.

89.    Thus, Imperial entered into a premium finance agreement only after reviews were completed by all departments, including Legal, Compliance, Funding, Management, and AIG. Collado Dep. 18:21–19:8; 67:13–69:10; Mitchell Dep. 193:21–194:15. The potential deal could fail at any stage before funding, and it often did. Collado Dep. 49:5–49:12; Mitchell Dep. 162:6–20; 229:2–6; Schrimsher Dep. 157:5–158:3. In fact, the Producers working with Imperial complained that they worked these deals, but Imperial never funded them. Schrimsher Dep. 105:19–23; 157:5–158:3; Nov. 17, 2009 Email, Ex. 48.

### 4. Agreement to Premium Finance

90.    Once every department finished its review of the potential premium finance deal, a funding form was signed by 6 individuals—the Pricing Manager, Funding Manager, Accounting Manager, Account Executive, Management, and the president—confirming that the departments' respective diligence processes were completed. Collado Dep. 18:21–19:8; 67:20–68:17, 69:21–24; Mitchell Dep. 193:21–194:15. No one at Imperial was authorized to enter into an agreement prior to Imperial's internal diligence process being completed and the funding form being signed by all six parties. Collado Dep. 18:21–19:8; 67:13–69:10; Mitchell Dep. 193:21–194:15; Aff. ¶ 17. After the funding form was signed, Imperial entered into and signed the loan documents. *Id*. ¶ 18.

91.    The chances of getting a loan approved by Imperial were *de minimus*. Mitchell Dep. 162:6–10; 229:2–6. In fact, Imperial received 211 issued Sun Life policies and over 70% of them did not make it through the diligence process. *Id.* 162:13–20.

### B.    Imperial's Ownership of the Policies

92.    As Sun Life has admitted, during the term of the loan, the borrower/policyowner could do whatever he wished with the policy. Lawrence Dep. 188:10–15. Likewise, at the time of maturity, the owner could choose how to satisfy his obligations under the loan. *Id.*

93.     With a few exceptions, Imperial did not acquire a policy upon a default of the loan. Indeed, it was never Imperial's business model to own the policies. Mitchell Dep. 232:20–233:12 ("It's extremely difficult and challenging to own life insurance policies and have the premium obligation."). Rather, where the policyowner chose to default on its loan, Imperial would make a claim to AIG under the LPIC policy. AIG would then pay the claim and had the right to direct the ownership of the policy. *Id.*; Dep. of Chris O'Reilly (Associate General Counsel), Nov. 20, 2014, Ex. 49 ("O'Reilly Dep.") 101:21–102:3.[4]

94.     Where AIG decided to keep a policy in force, it provided to Imperial the necessary funds to pay the premiums. Imperial, in its capacity as Servicer,[5] coordinated payment of the premiums while holding ownership of the policy subject to AIG's rights   O'Reilly Dep. 91:23–92:4, 99:15–21.

95.     Periodically, AIG, its sole discretion, would give Imperial the opportunity to pay off its subrogation rights. Mitchell Dep. 234:14–21.   If Imperial was interested in the policy, Imperial would pay off AIG's subrogation rights and acquire the right to take ownership of the policy. *Id.*   For each of the Policies with LPIC coverage, Imperial has paid off AIG's subrogation rights and has exercised its right to take ownership of the Policies.

96.     After acquiring ownership of the Policies, Imperial submitted to Sun Life a Change of Ownership form and a Change of Beneficiary form signed by the trustees and beneficiaries of the Policies. *See* COO/COB Confirmation Letters, Comp. Ex. 50.   Sun Life acknowledged and instituted the changes for all of the Policies except those insuring the lives of June Fuhrman and Elizabeth Geller. *Id.* Although Sun Life declined the Change of Ownership forms submitted by Imperial and signed by the trustees, the Policies themselves provide that the submission of the change forms is sufficient to confer ownership. *See* COO/COB forms for Fuhrman and Geller and Sun Life Denial Letters, Comp. Ex. 51; *see also* Policies.

97.     Notably, Sun Life recognizes that a policyowner has right to sell his policy and change the owner even as quickly as the day after a policy is placed in force. Foley Dep. 294:11–13.

---

[4]  The Policies insuring the lives of Elizabeth Geller, Helene Miller, and Esta Klein did not have LPIC coverage.  Thus, the LPIC analysis is inapplicable to those Policies.
[5]  The Servicer maintains (services) the asset by, among other things, making required premium payments and requesting policy documentation. Aff. ¶ 19.

Dated:  December 23, 2014

Respectfully submitted,

By:   /s/ *Jesus E. Cuza*
Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
/s/ J. Raul Cosio
Florida Bar No. 503630
Email: raul.cosio@hklaw.com
/s/ Monica Vila
Florida Bar No. 22976
Email: monica.vila@hklaw.com
/s/ Rebecca J. Canamero
Florida Bar No. 86424
Email: rebecca.canamero@hklaw.com
*/s/* Philip E. Rothschild
Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Telephone:   (305) 374-8500
Facsimile:    (305) 789-7799
*Attorneys for Defendants*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of December, 2014, a true and correct copy of this Motion was served by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record on the Service List below.


By:    */s/ Jesus E. Cuza*           

Jesus E. Cuza

## SERVICE LIST

Wendy Lynn Furman
Email: wfurman@pettfurman.com
PETT FURMAN PL
2101 NE Corporate Boulevard, Suite 316
Boca Raton, Florida  33431-7343
Telephone:  (561) 994-4311

Jason P. Gosselin
Email: jason.gosselin@dbr.com
John Bloor
Email: john.bloor@dbr.com
Stephen C. Baker
Email: stephen.baker@dbr.com
Thomas S. Downie
Email: thomas.downie@dbr.com
DRINKER BIDDLE & REATH, LLP
One Logan Square
Philadelphia, PA  19103
Telephone:  (215) 988-2700
*Attorneys for Plaintiff*