## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 9:13-cv-80385

**SUN LIFE ASSURANCE COMPANY
OF CANADA (U.S.),**

        **Plaintiff**,

**v.**

**IMPERIAL HOLDINGS, INC., et al.**,

        **Defendants**.

_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON
### PLAINTIFF'S SECOND AMENDED CIVIL ACTION COMPLAINT

Defendants (collectively, "Defendants" or "Imperial"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, move for summary judgment on the two remaining counts in Plaintiff SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.)'s ("Sun Life['s]" or "Plaintiff['s]") Second Amended Civil Action Complaint (the "SAC").

### INTRODUCTION

Each of the policies at issue (the "Policies") contains an incontestability clause, as required by state law.  It is undisputed that the contestability period for each Policy expired prior to the filing of this lawsuit.  The Eleventh Circuit has ruled that an insurance carrier cannot assert any claim based on fraud, including a RICO claim, based on misrepresentations in a life insurance application after the expiration of the contestability period.  Thus, Sun Life's fraud and RICO claims are barred and, for this reason, Defendants are entitled to summary judgment on the SAC as a matter of law.

Defendants are also entitled to summary judgment for other reasons.  First, as concerns the fraud claim, the undisputed evidence establishes that Imperial never made, or told anyone to make, any misrepresentation on any of the Policy applications and that the Producers[1] who made the alleged misrepresentations were not agents of Imperial (but were in fact acting for Sun Life).

---

[1]   Producers refers to the individuals identified in paragraph 6 of Defendants' Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment on Plaintiff's Second Amended Civil Action Complaint ("SUMF").

Moreover, the undisputed evidence demonstrates that the alleged misrepresentations were not false and that Sun Life did not justifiably rely on such misrepresentations.  Second, with regard to the RICO claim, the undisputed evidence shows that there was no pattern of racketeering activity and no agreement to commit an illegal act by any alleged members of the purported RICO enterprise to commit an illegal act.

   Indeed, *Sun Life's own admissions* and the uncontested evidence show that: (1) Imperial had no knowledge of the representations made to Sun Life on the applications; (2) Imperial never instructed *or even encouraged* an insured, trustee, or producer to make a misrepresentation in the applications; (3) Imperial never had communications with an insured or trustee prior to the issuance of the Policies; and (4) Imperial had no knowledge of any communications between the Producers and the insureds or trustees.  *In fact, the insureds and trustees have testified—and it is uncontested—that they had not even heard of Imperial before submitting the applications, thereby making it impossible for Imperial to have entered into a premium finance agreement with them at the time*.  Significantly, Sun Life itself has admitted that Imperial did not have an agreement to premium finance any of the Policies prior to their issuance.

For the above reasons, Defendants are entitled to summary judgment on the two remaining counts in Sun Life's SAC as a matter of law.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Additionally, Rule 56(e) of the Federal Rules of Civil Procedure provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).  The Supreme Court explained the movant's burden in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) as follows:

In our view, the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who
fails to make a showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear the burden of proof
at trial.

*Id.* at 322. The Court further stated that "Rule 56(c) therefore requires a non-moving party to go
beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to
interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine
issue for trial.'" *Id.*

Thus, "the mere existence of some alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for summary judgment; the requirement is that
there will be no genuine issue of material fact." *Citicorp Vendor Fin., Inc. v. Mavic Med. Ctr.*,
Inc., No. 02-2279-CIV, 2003 WL 26619566, at *3 (S.D. Fla. Sept. 10, 2003) (internal quotations
omitted). "While the burden on the movant is great, the non-moving party has a duty to present
affirmative evidence in order to defeat a properly supported motion for summary judgment, and
"[a] mere 'scintilla' of evidence in favor of the non-moving party, or evidence that is 'merely
colorable' or 'not significantly probative' is not enough." *Id.*

## ARGUMENT

### I.   ELEVENTH CIRCUIT PRECEDENT REQUIRES JUDGMENT FOR DEFENDANTS ON THE REMAINING COUNTS IN THE SAC.

The incontestability clause in each Policy bars Sun Life from pursuing the two remaining
claims (fraud and RICO) in the SAC.  *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043,
1063 (11th Cir. 2007).  As the Eleventh Circuit has noted:

[I]ncontestability clauses function much like statutes of limitations.  While they
recognize ***fraud and all other defenses***, they provide insurance companies with a
reasonable time in which to assert such defenses, and disallow them thereafter.

*Id.* (emphasis added); *see also Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1115 (11th Cir.
2005).

Contrary to Sun Life's assertion that *Martinez* is distinguishable, it is on point.  In
*Martinez*, seventeen life insurance companies filed an action against a group of viatical
settlement companies who—as Imperial did here—acquired ownership of certain policies.
*Martinez*, 480 F.3d at 1047 ("*Martinez II*").  In their complaint, the insurers sought to have the
policies declared void *ab initio* and ***also*** asserted ***affirmative claims*** **based on, among other**

3

*things, fraudulent misrepresentations and RICO violations*.  *See id.*; *see also Am. United Life Ins. Co. v. Martinez*, Case No. 04-61143 ("*Martinez I*"), ECF No. 33.  The insurers sought damages based on the payment of broker commissions; costs of administering the policies; legal fees and investigation costs; and payment of death benefits.  *See Martinez I*, ECF No. 33.  The district court dismissed the insurers' complaint, and the insurers appealed.  In affirming the dismissal, the Eleventh Circuit explained that "[i]n each of the cases at issue [], [the] contestability period ended years ago." *Martinez*, 480 F.3d at 1059.  Accordingly, the Court concluded that the incontestability clauses barred not only the claim seeking to void the policies, but also ***all of the insurers' fraud-based <u>affirmative claims seeking damages</u>***, explaining that "fraud in the procurement of the policy cannot be made a defense subsequent to the date fixed by the policy when it shall be deemed incontestable." *Id.* at 1061 (internal quotations and citations omitted) (holding that incontestability clause "necessarily bars [] fraud-based claims").

As in *Martinez*, (1) Sun Life's remaining claims are based on alleged fraudulent misrepresentations and RICO violations; (2) Sun Life seeks damages based on payment of commissions, the costs of administering the policies, legal fees, and the payment of death benefits; (3) each Policy contains an incontestability provision;[2] and (4) the contestability period for each Policy expired before Sun Life filed its action.[3]  Thus, this Court should conclude that the incontestability provision of each Policy bars both of Sun Life's remaining claims—which the Court has already found are based on fraud—*as a matter of law*.  Consequently, in accordance with *Martinez*, this Court should grant Defendants summary judgment on these claims.

Although Sun Life's position is far from clear, it has seemingly attempted to distinguish *Martinez* on three different grounds.  First, in its Response to Defendants' Motion to Dismiss the SAC, Sun Life made an obtuse argument that the contestability clause does not apply because it was not seeking "a voiding of the policies"; rather, according to Sun Life, the policies are inherently void *ab initio—regardless of any legal ruling this Court might make to the contrary*.[4] This metaphysical argument is nonsensical.  In any event, it is now inapplicable because this Court has precluded Sun Life from putting at issue the validity of the policies based on lack of

---

[2]  *See* SUMF ¶ 3.
[3]  *See id.*
[4]  *See* Resp. 8.

insurable interest.[5]  Second, at the December 9, 2014 hearing, Sun Life claimed *Martinez* was distinguishable because the "contestable clause was invoked by the owners in [*Martinez*], that's not what's going on here."[6]  Contrary to Sun Life's assertion, Defendants are indisputably the owners of the Policies.[7]  Indeed, by confirming and accepting the Change of Ownership forms submitted by Imperial, Sun Life has recognized that Imperial is the owner of the Policies.[8]  Moreover, paragraph 50 of the SAC specifically alleges that Defendants acquired title to the policies.  Thus, Sun Life's attempt to distinguish *Martinez* on this ground is specious.  Finally, to the extent Sun Life has argued that the incontestability clause does not apply because it is not contesting the validity of the Policies, but is instead asserting affirmative claims and seeking monetary damages,[9] *Martinez* squarely rejected this argument.  In *Martinez*, the Eleventh Circuit ruled that the incontestability clauses in the policies barred, in addition to the insurers' void *ab initio* claim, ***all affirmative fraud-based claims***, including separate claims for RICO violations seeking monetary damages.[10]

Notably, the holding of *Martinez* on this issue is consistent with decisions from other jurisdictions.  *See, e.g.*, *Hartford Life & Annuity Ins. Co. v. Doris Barnes Family 2008 Irrevocable Tr.*, CV 10-7560, 2012 WL 688817 (C.D. Cal. Feb. 3, 2012) *aff'd*, 552 F. App'x 664 (9th Cir. 2014).  For example, in *Hartford Life*, the court explained that allowing a plaintiff to

---

[5]  *See* Dec. 9, 2014 Order (dismissing Count VII *with prejudice*).

[6]  *See* Dec. 9, 2014 Hr'g Tr. attached as Ex. A at 30:13–15.

[7]  *See* SUMF ¶¶ 93–96.

[8]  *See* SUMF ¶¶ 96 & Ex. 50.

[9]  *See* Resp. 8.

[10]  Although the Policies for Sheila Bernstein, James Deberry, Diane Pastore, and Manfred Von Nordheim purport to provide a fraud exception, the applicable state statutes for those Policies, do not allow for a fraud exception.  *See* Mich. Comp. Laws § 500.4014; Colo. Rev. Stat § 10-7-102(1)(b); Cal. Ins. Code § 10113.5; Md. Ins. Code §16-203; *see also Hartford Life & Annuity Ins. Co. v. Doris Barnes Family 2008 Irrevocable Trust*, CV 10-7560 PSG DTBX, 2012 WL 688817 (C.D. Cal. Feb. 3, 2012) *aff'd*, 552 F. App'x 664 (9th Cir. 2014) ("Incontestability clauses are given broad effect and are strictly enforced . . . even in the face of gross fraud in procuring the policy."); *Buckner v. Old Republic Life Ins. Co.*, No. 262730, 2006 WL 664348, at *1 (Mich. Ct. App. Mar. 16, 2006) (incontestability provisions "prevent an insurer from voiding the contract for fraud or material misrepresentation after the period for contesting the contract has lapsed"); *Mut. Life Ins. Co. of New York v. Ins. Com'r for State of Md.*, 352 Md. 561, 570–71, (Ct. App. Md. 1999) (incontestability clause "provides a time  limit so that the insurer must investigate with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured").  Thus, the insertion of  that exception in those policies is *legally* inconsequential.

assert fraud and other "affirmative" causes of action based on misrepresentations in procuring a life insurance policy would be contrary to the purpose of incontestability provisions. *Hartford Life*, 2012 WL 688817 at *6. Otherwise, "an insurance company could always avoid an incontestability clause by bringing an affirmative claim for fraud, rather than contesting the policy itself. This would strip incontestability clauses of almost all meaning." *Id.*

Thus, to the extent Sun Life claims it is not contesting the Policies but is instead raising "affirmative" causes of action for damages, the caselaw is clear that those claims are barred by incontestability provisions. Sun Life's creative rhetoric does not diminish the impenetrable barrier to pursuing its claims, i.e., that "incontestability clauses are meant to serve as statutes of repose for the beneficiaries of policies, and establish a limited period of time for insurers to investigate and discover possible fraud by their insureds." *Id.* (internal quotations omitted). In short, Sun Life "cannot avoid the applicability of this 'statute of repose' merely by asserting affirmative claims for fraud." *See id.*

Therefore, under *Martinez*, Defendants are entitled to summary judgment on Sun Life's remaining claims.

## II. DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON COUNT III FOR FRAUD BECAUSE THE EVIDENCE DEMONSTRATES THERE WAS NO FRAUD COMMITTED BY, OR ATTRIBUTABLE TO, DEFENDANTS.

To succeed on a claim for fraud under Florida law, a plaintiff must establish that (1) the defendant made a false statement of material fact; (2) the defendant knew the representation was false at the time the representation was made; (3) the defendant intended that the plaintiff rely on the false statement; and (4) the plaintiff suffered damages in justifiable reliance on the false statement. *Yanks v. Barnett*, 563 So. 2d 776, 778 (Fla. 3d DCA 1990); *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. 2d DCA 1985). While Sun Life claims that Imperial committed fraud, the evidence demonstrates (1) that Imperial did not make or induce anyone to make any false statements and (2) that there is no agency relationship between Imperial (as principal) and the Producers (as its agents). And even if Sun Life could establish an agency relationship, the evidence does not satisfy the elements of fraud.

### A. The evidence shows that there was no agency relationship between the Producers and Imperial.

In order to establish an agency relationship, Sun Life must prove (1) acknowledgment by

the principal that the agent will act *on its behalf*; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the agent's actions and day-to-day activities. *PYCSA Panama, S.A. v. Tensar Earth Tech., Inc.*, 625 F. Supp. 2d 1198, 1252 (S.D. Fla. 2008); *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 326 (Fla. 3d DCA 2008). Here, the uncontested material facts show that the Producers were *not* Imperial's agents.[11]

First, the testimonial and documentary evidence establishes that there was no acknowledgment by Imperial that the Producers would act on its behalf and no acceptance by the Producers of such an undertaking.[12] Indeed, the evidence demonstrates that there was no agency agreement between Imperial and the Producers.[13] And Sun Life itself acknowledges it has no evidence of any such agreement.[14] Rather, as the evidence makes clear, *Sun Life* appointed the Producers to act on *its* behalf; the Producers had contractual agreements *with Sun Life* accepting this undertaking; and the Producers were in fact acting *on Sun Life's behalf* when soliciting insureds, ***filling out the applications***, and subsequently submitting them to Sun Life.[15]

Despite acknowledging the absence of any agreement between Imperial and the Producers—and as part of its strained effort to establish an agency relationship between Imperial and the Producers—Sun Life relies on unreasonable inferences it draws from email communications from Imperial's Sales Department wherein Imperial's sales personnel suggest that the Producers "move forward" with a particular product or carrier.[16] Sun Life argues these email communications indicate Imperial's acknowledgement that the Producers would act on its behalf and further argues that the Producers' subsequent actions establish their acceptance of the same.[17] But there is *nothing* about the innocuous statement to "move forward" and the Producers' actions that suggest any desire, agreement, or manifestation of an assent between

---

[11] *See* SUMF ¶¶ 18–23, 27–28. Notably, because the Producers were acting on behalf of Sun Life and within the scope of their authority when filling out the applications, any fraud or misrepresentations made on the application would be imputed to Sun Life. *Cavic v. Grand Bahama Dev. Co.*, 701 F.2d 879, 885 (11th Cir. 1983). Thus, any injuries incurred by Sun Life due to the alleged misrepresentations were self-inflicted.

[12] *See* SUMF ¶¶ 18–23, 27–28.

[13] *See id.*

[14] *See* SUMF ¶ 63 (Sun Life has admitted that it does not know if any agreement exists between Imperial and any of the Producers).

[15] *See* SUMF ¶¶ 4–17, 21, 24–25, 39, 47.

[16] *See, e.g.*, Resp. 9–11.

[17] *See id.*

Imperial and the Producers that the Producers would act *for Imperial* or *under Imperial's control*.[18]  *See F.T.C. v. Sterling Precious Metals, LLC*, No. 12-80597-CIV, 2013 WL 1442180, at *5 (S.D. Fla. Apr. 9, 2013) (to establish actual agency, both the principal and agent must indicate a desire to create such a relationship); *U.S. v. Tianello,* 860 F. Supp. 1521, 1524–26 (M.D. Fla. 1994) ("agreeing to act according to an entity's rules is not the same as agreeing to act under that entity's control"; would not be reasonable to infer that defendant agreed to act for the entity and under the entity's control); *see also W. Sugar Co-op. v. Archer-Daniels-Midland Co.*, CV 11-3473 CBM MANX, 2012 WL 3101659 (C.D. Cal. July 31, 2012) (to establish an agency relationship, plaintiff must allege that both the principal and the agent have manifested an assent that the principal has the right to control the agent).  And, significantly, although Sun Life's claims are premised on alleged misrepresentations made by the Producers on the applications, ***Sun Life has admitted (in responses to interrogatories and during its deposition) that it can cite no communications between Imperial's sales personnel and the Producers in which Imperial instructed <u>or even encouraged</u> anyone (including the Producers) to make misrepresentations on the applications.***[19]  ***Furthermore, Sun Life has further conceded that it has no evidence that Imperial had anything to do with the Producers' or the applicants' actions during the application process or that Imperial had any knowledge of what was being represented to Sun Life in the applications by the applicants and the Producers***.[20]  ***Thus, it is clear that the Producers were never acting on Imperial's behalf***.

The *only* contractual relationship that Imperial did have with the Producers is well-documented by the "Fee Agreement" for each particular loan reached long after—as shown below—each life insurance application had been submitted and long after Sun Life had decided—without any involvement by Imperial—to issue each Policy.[21]

| Insured | Sun Life App. Date | Issue Date | Date of Fee Agreement between Imperial and Producer |
|---|---|---|---|
| Berner, Sandra | 12/3/09 | 12/15/09 | 1/13/10 |
| Bernstein, Sheila | 12/2/09 | 1/19/10 | 2/16/10 |

---

[18]  *See* SUMF ¶ 78.
[19]  *See* SUMF ¶ 28.
[20]  *See* SUMF ¶¶ 28–29, 31.
[21]  *See* SUMF ¶ 70 & Ex. 44.

| Insured | Sun Life App. Date | Issue Date | Date of Fee Agreement between Imperial and Producer |
|---|---|---|---|
| Blakeslee, Evelyn | 7/30/09 | 9/24/09 | 1/8/10 |
| Blitshtein, Polya | 11/10/09 | 1/25/10 | 3/4/10 |
| DeBerry, James | 2/1/10 | 4/29/10 | 5/25/10 |
| DeGraw, Terry | 7/16/08 | 7/25/08 | 11/13/08 |
| Dickler, Dale | 10/27/09 | 12/4/09 | 12/23/09 |
| Fuhrman, June | 7/2/09 | 8/19/09 | 9/30/09 |
| Geller, Elizabeth | 7/28/10 | 8/10/10 | 2/18/11 |
| Good, Robert | 11/25/09 | 12/8/09 | 1/26/10 |
| Granby, Gary | 11/24/09 | 12/29/09 | 1/28/10 |
| Klein, Esta | 11/6/09 | 1/28/10 | 2/16/11 |
| Korn, Joan | 8/25/09 | 10/30/09 | 11/12/09 |
| Miller, Helene | 12/31/09 | 1/29/10 | 8/23/10 |
| Mitchel, Evelyn | 11/4/09 | 12/28/09 | 2/25/10 |
| Parnes, Hannah | 11/17/09 | 12/8/09 | 1/15/10 |
| Pastore, Diane | 7/28/08 | 9/9/08 | 12/9/08 |
| Solk, Donna | 12/11/09 | 1/19/10 | 2/11/10 |
| Spohn, Ronald | 12/10/09 | 12/31/09 | 1/28/10 |
| Victor, George | 11/10/09 | 12/4/09 | 1/27/2010 |
| Von Nordheim, Manfred | 6/23/08 | 6/27/08 | 11/21/08 |
| Wasser, Martin | 9/21/09 | 10/8/09 | 1/14/10 |

In stark contrast to Sun Life's Sales Agreements with its Producers (discussed below), Imperial's Fee Agreements *specifically disclaim any agency relationship with the Producers*. Specifically, the Agreements all state as follows:

> This Agreement relates solely to the procurement of premium financing of the above Policy and shall not create, or be construed as creating, a principal-agent, employer-employee or master-servant relationship between the Agent and [Imperial][22]

*See Commodity Futures Trading Com'n v. Gibraltar Monetary Corp., Inc.*, 575 F.3d 1180, 1189 (11th Cir. 2009) (noting that while express disclaimers of agency do not necessarily eliminate the existence of an agency relationship, if a party makes the effort to avoid an agency designation by including specific language to that effect in an agreement, such language is "palpable evidence that [the party] did not intend to consent or acquiesce to an agency relationship"). In addition, Imperial's public filings with the SEC, including its S-1 statements, make clear that Imperial had

---

[22] *See id.*

no control over the Producers, a fact that posed a risk to Imperial's business and was therefore disclosed under the section of the public filing titled "Risk Factors."[23]

In contrast, Sun Life's Sales Agreements with each of the Producers memorialized the Producers' authority **to act on behalf of Sun Life in soliciting and submitting applications for Sun Life products**.[24]  And Sun Life acknowledges that these agreements establish the conditions under which the Producers could solicit applications on Sun Life's behalf.  Sun Life also filed appointments with the Offices of Insurance Regulation in various states again **acknowledging the Producers' authority to act on its behalf**.[25]  Notably, the Florida OIR appointing form DFS-H2-501 requires carriers, including Sun Life, to certify that: "the appointing entity [Sun Life] is willing to be bound by the acts of the person being appointed [the Producers]. . . . "[26] Importantly, Sun Life has admitted that part of the Producers' duties to Sun Life **was to fill out the applications**, and to clarify any misunderstandings the insureds or trustees had when answering the application questions.  And Sun Life has acknowledged that the Producers are acting as "representatives of [Sun Life] during the application process."[27]  Thus, the Producers were contractually required to act for—and on behalf of—Sun Life at the time they were filling out the applications for Policies and discussing the same with the insureds and trustees.[28]  **In sum, it was Sun Life––and not Imperial––that was effectively present at the time the applications were being filled out by its own Producers**.

---

[23]  The S-1 states in pertinent part:
> We rely primarily upon agents and brokers to refer potential premium finance customers to us.  These relationships are essential to our operations and we must maintain these relationships to be successful.  We do not have fixed contractual arrangements with the referring agents and brokers and they are free to do business with our competitors.  Our ability to build and maintain relationships with our agents and brokers depends upon the amount of agency fees we charge and the value we bring to our clients . . .The loss of our top referring agents and brokers could have a material adverse effect on our business, financial condition and results of operation.

*See* Excerpt of S-1 relating to "Risk Factors," attached as Ex. B.

[24]  *See* SUMF ¶¶ 6–8.  In relevant part, the Sales Agreements appoint the Producers to "solicit[] applications for approved products of [Sun Life]" and recognizes that the Producers will perform "business activities . . . on behalf of . . . [Sun Life]."  *See* SUMF ¶¶ 7–8.

[25]  *See* SUMF ¶ 5 & Ex. 6 at 6 (noting producers must be appointed by Sun Life in the states in which they offer products for sale).

[26]  *See* SUMF ¶ 5 & Ex. 7.

[27]  *See* SUMF ¶ 15.

[28]  *See* SUMF ¶ 25.

With regard to the third element of agency, it is undisputed that Imperial had no control over the Producers' day-to-day activities.[29]   The evidence further shows that Imperial had no right to control the Producers and that Imperial in fact had no knowledge of the Producers' activities.[30]

By contrast, Sun life did have the right to control the Producers' activities.[31]   For example, in the agreements between Sun Life and its Producers, Sun Life requires compliance with its guidelines and procedures, and Sun Life has admitted that these requirements were in place to ensure Sun Life's control over how they conducted business on behalf of Sun Life.[32] Specifically, the agreements state as follows:

> Section 5.6 Compliance. The Sales Representative agrees to conduct business under this Agreement in compliance with all applicable written procedures, rules, and regulations the Company has or may establish to govern the conduct of its business, including the Company's Code of Business Conduct and its Field Compliance Manual.[33]

Moreover, Sun Life's Market Conduct guide sets forth specific guidelines that its Producers were required to follow, including requiring their marketing material to be approved by Sun Life.[34]   It also required its Producers to keep written files containing, among other things, all fact-finding data, analyses and other information for each customer that establishes the basis for the amount and the type of product sold.[35]   Thus, unlike Imperial, Sun Life had control over the Producers' activities relating to the soliciting and submission of life insurance business.

In short, Defendants are entitled to summary judgment on Count III because there is no agency relationship between Defendants and the Producers.[36]

---

[29]   *See* SUMF ¶¶ 18–22, 26–27.

[30]   *See id.*   The key to an agency relationship is the principal's right to control the day-to-day operations of the agent, including the time, manner, and method of the daily activities.  *See Cain v. Shell Oil Co.*, 994 F. Supp. 2d 1251, 1254 (N.D. Fla. 2014); *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1350 (N.D. Ga. 2005).

[31]   *See, e.g.,* SUMF ¶¶ 8–9.

[32]   *See* SUMF ¶¶ 8–9, 11.

[33]   *See* SUMF ¶8.

[34]   *See* SUMF ¶ 9 & Ex. 6 at 7–8.

[35]   *Id.* Ex. 6 at 13.

[36]   Importantly, to succeed on Count III in its entirety, Sun Life would have to prove an agency relationship with *each* of the Imperial Defendants, which it has failed to do.

**B.**     **There were no misrepresentations on the applications and Sun Life did not justifiably rely on any alleged misrepresentations.**

In the SAC, Sun Life identifies three purported misrepresentations in support of its fraud claim that relate to: (1) premium finance; (2) the Payor of the premiums; and (3) the Producer's commission.  The evidence demonstrates, however, that the answers at issue on the applications were not inaccurate, they were not material to Sun Life, and Sun Life could not have justifiably relied on any of the so-called misrepresentations.  Thus, Defendants are entitled to summary judgment on Count III.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (summary judgment for defendant must be granted where plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case"; there can be no genuine issue of material fact because a complete failure of proof on an essential element of a claim "renders all other facts immaterial").

**1.**     **Premium Finance Question**

- *No Misrepresentation*

Sun Life's life insurance application asks the following question:[37] "Will the premium for this policy be financed through single or multiple loan(s) from a private or public lender now or in the future?"[38]  In the SAC, Sun Life claims a "No" answer to this question is false because, according to Sun Life, Imperial had already agreed to provide premium financing for the Policies before the applications were submitted.  Sun Life is wrong for several reasons.

<u>First</u>, the question is directed to the applicant/policyowner and Sun Life has never alleged that the applicant/policyowner made any misrepresentations.[39]  The evidence shows that, at the time the applications were submitted, the applicants/policyowners did not know about Imperial and had not had any communications with Imperial, let alone a premium finance agreement with

---

[37]   *See* SUMF ¶ 3, Ex. 4 Section D to Application.

[38]   At the December 9, 2014 hearing on Defendants' Motion to Dismiss the SAC, counsel for Sun Life mischaracterized the premium finance question on the application, suggesting that it asked whether an insured or policy owner had "contemplated" premium financing.  *See* Ex. A at 35:1–9 ("Mr. Gosselin: It's possible that something will happen that will make the deal fall apart, but certainly premium financing is absolutely contemplated. And at that point, when the question asks do you intend to use premium financing now or in the future, the producer has to answer that question correctly and they didn't.").  The text of the question makes clear, however, that it is asking whether there *will* be premium financing for that policy.  There is no option to select "Maybe."  Thus, mere contemplation of premium financing would not render a "No" answer false.

[39]   *See* SUMF ¶ 3, Ex. 4, Section D to Application.

Imperial.[40]  It also shows that before a policy was issued, Imperial communicated only with the Producers, who approached Imperial to inquire about the potential for a premium finance loan, and Sun Life has admitted it has no evidence of any commitment by Imperial to make a premium finance loan prior to any of the Policies being placed in force.[41]

Second, the only Imperial employees who communicated with the Producers prior to the time the application was submitted were individuals in Imperial's Sales Department—i.e., account executives and their assistants.[42]  And the undisputed evidence indicates that none of these individuals had authority to make a commitment on Imperial's behalf to provide premium financing.[43]  Moreover, the Producers understood that they had no such authority.[44] Accordingly, it was impossible for Imperial to have entered into an agreement to premium finance prior to the issuance of a policy.  *See Cowan v. Travelers Ins. Co.*, 131 F.2d 410, 411 (5th Cir. 1942) (holding that where the evidence demonstrates that an individual has no authority to bind a company, the company is entitled to judgment as a matter of law on any claim based on an agreement entered into by that individual).

Third, the communications between the Sales Department and the Producers merely identify potential deals that Imperial would be willing to consider evaluating.[45]  Specifically, the email communications stating that a potential deal "looks viable" or "should work" do not commit Imperial to fund that deal and do not commit the applicant/policyowner to borrow any money.[46]  Nor are any loan terms established in such communications.  They simply indicate the Sales Department's preliminary assessment that a particular deal has potential.[47]  As the indications of interest specifically state:

> [T]his indication of interest is not a binding commitment to provide financing and Imperial makes no commitment hereby. Actual financing will only be provided following formal application and approval, execution of required loan documents and all related ancillary documents and satisfactory completion of any

---

[40] *See* SUMF ¶¶ 64, 73–74.
[41] *See* SUMF ¶ 82.
[42] *See* SUMF ¶¶ 73–80.
[43] *See* SUMF ¶ 80.
[44] *See id.*
[45] *See* SUMF ¶¶ 73, 77–78.
[46] *See* SUMF ¶ 78
[47] *See id.*

required closing due diligence.[48]

Fourth, fatal to the allegations in the SAC are Sun Life's admissions in discovery that (1) Imperial did not enter into a loan until a Policy was issued,[49] and (2) it has no evidence of any agreement, much less an agreement to premium finance, between Imperial and the Producers, let alone the policyowners.[50]

Fifth, the evidence establishes that Imperial could not agree to finance a loan at the time of the application because multiple levels of diligence took place before a potential deal could be approved and multiple individuals and entities—both within Imperial and externally—had to approve every premium finance deal before an agreement could be executed.[51]  Specifically, within Imperial, each potential deal was analyzed by the Pricing, Compliance, Legal, and Funding Departments, as well as Management, and had to be approved by all of those departments in order for Imperial to make to a loan.[52]  Additionally, each potential loan had to be approved by an external insurer—AIG (the LPIC provider)—after its review of pricing and other documents, and AIG declined to approve numerous deals for a variety of reasons (many of which were not even communicated to Imperial).[53]  Importantly, any potential loan could be disqualified by any of these departments or entities, and many were.[54]  In fact, the undisputed evidence shows that Imperial received 211 issued Sun Life policies from external Producers seeking financing, but only 63 survived the diligence and approval process.[55]  Moreover, at any point in the process, the borrower (the Trust) could decide (for any reason) that it did not wish to enter into the loan agreement.[56]

Accordingly, the undisputed evidence shows that at the time the representations were made on the application (the relevant time for a claim of fraud), the insured and Imperial had not entered into a premium finance agreement, and the "No" answer on the application was not an

---

[48] *See* SUMF ¶ 78 & Ex. 46.
[49] *See* SUMF ¶ 64.
[50] *See* SUMF ¶ 63
[51] *See* SUMF ¶¶ 73–91.
[52] *See id.*
[53] *See* SUMF ¶¶ 82–83, 87–88.
[54] *See* SUMF ¶¶ 79, 89.
[55] *See* SUMF ¶ 91.
[56] *See* SUMF ¶ 80.

inaccurate statement.[57]  *William Penn Life Ins. Co. v. Sands*, 912 F.2d 1359, 1364–65 (11th Cir. 1990) (explaining that representations in an application are "neither misstatements nor misrepresentations" if answered to the best of the applicant's knowledge and belief *when made*).

- *No Justifiable Reliance*

In any event, the evidence indicates that Sun Life did not justifiably rely on this answer. To show justifiable reliance to support a fraud claim, a plaintiff must "prove that it exercised due care to discover the fraud." *TSG Water Resources, Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.*, 260 F. App'x 191, 200 (11th Cir. 2007).  "The fundamental principle on this issue is that misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence."  *Id.* (internal quotations omitted).  Here, as demonstrated by the evidence, Sun Life did not verify the accuracy of the premium finance representation.[58]  It did not contact the insured or trustee, either prior to or after submission of the application to inquire about any agreements to premium finance the Policy.[59]  Nor did Sun Life contact its own Producer to inquire about the same.[60]  Moreover, Sun Life did not request any additional documentation to verify the financial information on the applications, such as net worth and income.[61]  Sun Life's failure to take any of these actions precludes it as a matter of law from justifiably relying on the allegedly false answer to the question in the application about premium financing.  *See PHL Variable Life Ins. Co. v. Jolly*, 800 F. Supp. 2d 1205, 1210–15 (N.D. Ga. 2011), *aff'd* 460 F. App'x 899 (11th Cir. 2012) (no justifiable reliance where an insurer never tried to contact insured, never spoke to trustee, did not attempt to verify the insured's net worth of income, and did not take any steps to determine if documents submitted were genuine).

Sun Life's failure to conduct basic diligence is especially egregious because Sun Life had previous suspicions about some of the Producers. **As early as 2007**, Sun Life became concerned about misrepresentations on applications concerning premium finance.[62]  For example, Sun Life

---

[57]  *See* SUMF ¶ 67 (Sun Life's former VP of Underwriting agreed that if an individual does not know if he is going to premium finance a policy at the time he fills out the application, the correct answer would be "No").
[58]  *See* SUMF ¶¶ 44–46, 49–51.
[59]  *See* SUMF ¶¶ 51, 58.
[60]  *See* SUMF ¶¶ 51.
[61]  *See* SUMF ¶¶ 38, 42–44.
[62]  *See* SUMF ¶¶ 40–41.

issued the Policies on the lives of Sheila Bernstein and Donna Solk, which were submitted by Producer Todd Bernstein, after Sun Life was made aware that Bernstein had previously offered to pay another insured's premiums.[63] ***Because Sun Life still failed to exercise due care***,[64] the alleged misrepresentation relating to premium financing of the Policies is not actionable as a matter of law.

### 2.    Payor of Premiums

- *No Misrepresentation*

Sun Life's life insurance application also contains a question that states: "If payor is Insured or Owner check here."[65]   Sun Life claims that the affirmative responses in the applications were false because, according to Sun Life's position when filing this lawsuit, Imperial had already agreed to provide premium financing for the Policies when the applications were being submitted.  As explained above, however, the undisputed evidence demonstrates that the payor statement is accurate because at the time it was made, Imperial had not even communicated with the insureds or trustees,[66] had not agreed to make a premium finance loan,[67] and was in no way involved with the payment of initial premiums.[68]  Indeed, as the chart below illustrates, all of the initial premium payments were made by the insured or the Trust.  Thus, the statements on the applications that the payors were the owners (i.e. Trusts) were accurate.[69]

| Insured | Payor of Initial Premium Payment to Sun Life |
|---------|----------------------------------------------|
| Berner, Sandra | Check from Melvin/Sandra Berner for $22,149.00 |
| Bernstein, Sheila | Check from personal account of Sheila Bernstein for $40,530 |
| Blakeslee, Evelyn | Wire funds transfer Blakeslee Irrevocable Trust for $37,000 |
| Blitshtein, Polya | Check from Polya Blitshtein Family Trust for $33,702.50 |
| DeBerry, James | Wire from DeBerry Irr. Ins Trust for $43,275. |
| DeGraw, Terry | Wire from Terry Degraw Family Trust for $72,285 |
| Dickler, Dale | Check from Dale Dickler  for $140,340 |

---

[63]  *See* SUMF ¶ 57.

[64]  *See* SUMF ¶¶ 57–58 (Sun Life failed to make any effort to determine whether Bernstein had also offered to pay for premiums on Policies for Bernstein and Solk, the insureds and trustees on these Policies confirmed they were not contacted by Sun Life).

[65]   *See* SUMF ¶ 3, Ex. 4 Section F to Application.

[66]  *See* SUMF ¶¶ 20, 22, 29, 66, 74.

[67]  *See* SUMF ¶¶ 64, 73–91.

[68]  *See* SUMF ¶ 47.

[69]  While Sun Life did not verify the source of the funds, the undisputed evidence is that Imperial was not involved in any way with the initial premium payments and was not aware of the source of the funds at the time they were made.  *See* SUMF ¶ 47.

| Fuhrman, June | Check from Benham and June Fuhrman for $60,000 |
|---|---|
| Geller, Elizabeth | Check from Elizabeth Geller for $97,700 |
| Good, Robert | Wire from Robert Good for $138,480 |
| Granby, Gary | Check from Gary Granby for $138,480 |
| Klein, Esta | Check from Esta Klein for $43,820. |
| Korn, Joan | Check from JK Personal Residence Trust for $18,000. |
| Miller, Helene | Wire from Helene Miller for $38,342.50 |
| Mitchel, Evelyn | Check from Evelyn Mitchel for $63,986 |
| Parnes, Hannah | Wire transfer from Trust for $16,406.67 |
| Pastore, Diane | Wire from Diane Pastore to Sun Life for $45,025 |
| Solk, Donna | Check from Donna Solk to Sun Life for $123,050 |
| Spohn, Ronald | Wire from Ronald Spohn for $107,610. |
| Talansky, Kalman | Check from Morris Talansky for $64,400. |
| Victor, George | Check from George Victor for $41,700 |
| Von Nordheim, Manfred | Check from Manfred Von Nordheim for $14,879.52 |
| Wasser, Martin | Wire from Martin Wasser for $173,100 |

- *No Justifiable Reliance*

Moreover, Sun Life did not justifiably rely on the payor response in the application. Indeed, Sun Life has admitted that, when it received the first premium payment, it did not do anything to verify the source of those funds.[70]  *See TSG Water*, 260 F. App'x at 200 (plaintiff must have exercised due care to discover the alleged fraud).  Thus, for this reason too, Sun Life's argument relating to this question is unavailing as a matter of law.

**3.  Producers' Commissions**

- *No Misrepresentation and No Materiality*

Sun Life also argues that the Producers, because they paid a fee to Imperial as part of the loan transaction, made misrepresentations in the instructions to the applications when they stated that they would be receiving 100% of the commissions for selling the Policies.  Yet, the evidence establishes that the Producers' representations were accurate at the time they were made because, among other things, there was no way a Producer could have known whether the policy would survive Imperial's diligence process, whether a loan would be approved and funded, and thus whether the Producer would pay a fee to Imperial.[71]  In any event, this was not material to Sun Life.  Charging a fee to a Producer to make a premium finance transaction is customary in the

---

[70] *See* SUMF ¶ 48.
[71] *See* SUMF ¶¶ 78–80.

industry.[72]  In fact, other premium finance entities promoted by or that worked closely with Sun Life charged fees that were based on the Producers' commissions.[73]  Thus, not only were the Producers' statements not false when made, whether or not a premium finance company charged them a fee to make a loan was not a material fact to Sun Life.

Accordingly, Sun Life cannot maintain a fraud claim based on these alleged misrepresentations as a matter of law.

## III.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON SUN LIFE'S RICO CLAIM.

Sun Life's RICO claims are equally deficient.  To assert a civil RICO claim, a plaintiff must allege: "(1) a violation of section 1962; (2) injury to business or property; and (3) that the violation caused the injury." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Here, Sun Life seeks to assert RICO violations under sections 1962(a) and 1962(c).  Section 1962(c) makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity." *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 948-949 (11th Cir. 1997).  To state a claim under section 1962(c), a plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated . . . in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity." *U.S. v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995) (footnote call number omitted); *U.S. v. Lynch*, 287 F. App'x. 66, 68 (11th Cir. 2008).  In turn, section 1962(a) states that:

> it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).  This section prohibits the investment or improper use of money obtained from racketeering activity.  *See Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co., Ltd.*, 534 F. Supp. 2d 1326, 1340 (S.D. Fla. 2008).

---

[72] *See* SUMF ¶¶ 70–71

[73] *See id.*

As discussed below, the evidence does not support the elements of a RICO claim under section 1962(a) or section 1962(c).

**A.    The evidence indicates that Imperial did not participate in the conduct of an enterprise through a pattern of racketeering activity.**

The fifth element of a 1962(c) RICO claim requires a plaintiff to allege that the defendants participated in the enterprise through a pattern of racketeering activity.  Likewise, section 1962(a) requires a plaintiff to allege the investment or improper use of money obtained from any racketeering activity.  *See* 18 U.S.C. § 1962(a).  Thus, claims under either of those sections require a plaintiff to allege sufficient facts to support a pattern of racketeering activity.  "Racketeering activity" is defined as the violation of any of the criminal statutes listed in section 1961(1).  *See* 18 U.S.C. § 1961(1).  To establish a "pattern of racketeering activity," a plaintiff must prove "at least two acts of racketeering activity" within a ten-year period, 18 U.S.C. § 1961(5), and must have evidence sufficient to support each of the statutory elements for those two predicate acts.  *Rep. of Panama,* 119 F.3d at 949.  Here, Sun Life only alleges that Imperial committed wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.  SAC ¶ 360.  But the evidence indicates that Imperial did not participate in any wire or mail fraud.

Both mail and wire fraud require that a person "(1) intentionally participate[] in a scheme or artifice to defraud another of money or property, and (2) use[] or 'cause[]' the use of the mails or wires for the purpose of executing the scheme or artifice."  *United States v. Ward*, 486 F.3d 1212, 1221 (11th Cir. 2007).  In turn, "[a] scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  *United States v. Maxwell*, 579 F.3d 1282, 1299-1300 (11th Cir. 2009).

As explained in Section II above, Imperial did not commit fraud.  Although Sun Life identifies certain allegedly false statements made on the applications by Producers, those statements are not attributable to Imperial because, as explained, the Producers were not acting on behalf of, or in concert with, Imperial.[74]  *See* Section II, *supra*.  **In fact, Sun Life has admitted that it has no evidence of Imperial encouraging anyone, including the Producers, to make misrepresentations on the applications**.[75]  Moreover, the evidence does not support any of

---

[74]  *See* SUMF ¶¶ 18–23, 27-28.
[75]  *See* SUMF ¶ 28.

the elements of fraud for any of the representations.  *See* Section II.B. *supra*.; *see Celotex Corp. v. Catrett*, 477 U.S. at 322–23 (plaintiff has burden of proof to prove the essential elements of its claims).  Accordingly, Sun Life's RICO claim fails as a matter of law.

Additionally, Imperial did not direct the affairs of any enterprise, as required by the fourth element of a section 1962(c) RICO claim.  To establish this element, Sun Life must demonstrate that Imperial "participate[d] in the operation or management of the enterprise itself." *Williams v. Mohawk Ind., Inc*., 465 F.3d 1277, 1285 (11th Cir. 2006).  "In order to 'participate . . . in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Here, Sun Life *claims* that the enterprise was "organized, managed, controlled, operated and conducted by Imperial," *but the evidence contradicts that*.  *See* SAC ¶ 357.  Specifically, the evidence establishes that Imperial had no knowledge of what statements were being made on the applications and that Imperial did not instruct or encourage anyone to make misrepresentations.[76]  Therefore, it is impossible for Imperial to have "organized, managed, controlled, operated [or] conducted" the alleged enterprise to commit fraud.  The evidence also establishes that the other alleged participants in the enterprise were not controlled or managed by *Imperial*.  *See* Section II.A., *supra*.  **In fact, Sun Life itself has acknowledged––in both interrogatory responses and deposition testimony––that there is no evidence that anyone at Imperial instructed or encouraged anyone to make a misrepresentation on an application**.[77]

**B.      Sun Life cannot establish the existence of an enterprise.**

Sun Life's RICO claims also fail because there is no evidence of an illegal enterprise. RICO defines an "enterprise" to include "any individual, partnership, corporation association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  To prove a RICO claim under either section 1962(a) or section 1962(c), the plaintiff must establish some agreement between the members of the enterprise to commit the predicate acts. *U.S. v. Valera*, 845 F.2d 923, 929–30 (11th Cir. 1988).  In its SAC, Sun Life alleges only that there was an association-in-fact between Imperial and the other members of the alleged enterprise—including the Producers, the insureds, the trustees, the Bank of Utah, and the Family Insurance Trust—despite failing to specify how each member was

---

[76] *See* SUMF ¶¶ 27–28, 30.

[77] *See* SUMF ¶ 28.

associated with Imperial or the enterprise.  However, "[a]ssociation, alone, with the enterprise is, of course, insufficient for violation of RICO."  *Valera*, 845 F.2d at 929–30.  Instead, "an individual must *agree* to participate in the affairs of the enterprise."  *Id.* (emphasis in original).

The undisputed evidence establishes that there was no agreement, explicit or otherwise, among the various members of the purported enterprise to participate in any enterprise, let alone an illegal enterprise.[78]  Indeed, the evidence establishes that there were no communications between Imperial and any insured, trustee, the Bank of Utah, or the Family Insurance Trust prior to the submission of the applications that would evidence an agreement.[79]  And, as discussed, the communications between Imperial and the Producers establish that there was no agency relationship[80] and that Imperial's sole goal was to identify those applications for premium finance loans it might entertain.[81]  *See* Section II, *supra*.  To state the obvious, and as Sun Life acknowledges, premium financing is entirely legal.[82]  Thus, Sun Life cannot establish the existence of illegal enterprise.

Defendants are entitled to summary judgment on the RICO claim as a matter of law.

## CONCLUSION

At bottom, Imperial is part of this lawsuit simply because some of its sales personnel communicated with Producers prior to the Policies being issued.  However, there is nothing inappropriate about these communications, and per Sun Life's own sworn admissions, no one at Imperial directed or even encouraged anyone (including the Producers) to make a misrepresentation.  Thus, if a misrepresentation was made, Imperial had nothing to do with it.  Because Imperial did not commit a single unlawful act, this lawsuit should never have been filed.

On the other hand, while *for years* Sun Life was keenly aware of "problems" with the Producers—and thus had every opportunity to avoid doing business with them—Sun Life preferred to continue receiving revenues from these Producers rather than terminating them.  Indeed, Sun Life continued accepting and encouraging the Producers' business, and even rewarded them for the same.  Thus, the injuries that Sun Life claims to have suffered are all self-

---

[78] *See* SUMF ¶¶ 27–31, 63.
[79] *See* SUMF ¶¶ 27–31 & Ex. 12.
[80] *See* SUMF ¶¶ 18–23, 27–28.
[81] *See* SUMF ¶¶ 72, 77–78.
[82] *See* SUMF ¶¶ 71–72.

inflicted and not traceable to any actions by Imperial.[83]

     For the foregoing reasons, Defendants are entitled to summary judgment on the two claims remaining in Sun Life's Second Amended Complaint as a matter of law.

Dated:  December 23, 2014

                                       Respectfully submitted,

                                       By:  /s/ *Jesus E. Cuza*_____
                                     George E. Schulz, Jr.
                                     Florida Bar No. 169507
                                     Email:  buddy.schulz@hklaw.com
                                     50 North Laura Street, Suite 3900
                                     Jacksonville, Florida  32202
                                     T: (904) 358-2000/ F: (904) 358-1872

                                     /s/ Jesus E. Cuza
                                     Florida Bar No. 428991
                                     Email: jesus.cuza@hklaw.com
                                     /s/ J. Raul Cosio
                                     Florida Bar No. 503630
                                     Email: raul.cosio@hklaw.com
                                     /s/ Monica Vila
                                     Florida Bar No. 22976
                                     Email: monica.vila@hklaw.com
                                     /s/ Rebecca J. Canamero
                                     Florida Bar No. 86424
                                     Email: rebecca.canamero@hklaw.com
                                     HOLLAND & KNIGHT LLP
                                   701 Brickell Avenue, Suite 3000
                                   Miami, Florida  33131
                                   Telephone:  (305) 374-8500
                                   Facsimile:   (305) 789-7799
                                   */s/* Philip E. Rothschild
                                   Florida Bar No. 0088536
                                   Email: phil.rothschild@hklaw.com
                                   515 E. Las Olas Blvd., Suite 1200
                                   Fort Lauderdale, FL 33301
                                   T.: (954) 525-1000/F: (954) 463-2030

                                   *Attorneys for Defendants*

---

[83]  It is undisputed, and the Court should not overlook, that Sun Life failed to disclose to the public—including the Policy applicants and Defendants—that Sun Life always intended to contest the Policies after expiration of the contestability period for reasons other than those stated in the Policies. Thus, *Sun Life is the one party* that made a material misrepresentation in this case—motivated by its desire to gain premiums.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of December, 2014, a true and correct copy of this Motion was served by using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record on the Service List below.

By: ___*/s/ Jesus E. Cuza*_____
Jesus E. Cuza

## SERVICE LIST

Wendy Lynn Furman
Email: wfurman@pettfurman.com
PETT FURMAN PL
2101 NE Corporate Boulevard, Suite 316
Boca Raton, Florida  33431-7343
Telephone:  (561) 994-4311

Jason P. Gosselin
Email: jason.gosselin@dbr.com
John Bloor
Email: john.bloor@dbr.com
Stephen C. Baker
Email: stephen.baker@dbr.com
Thomas S. Downie
Email: thomas.downie@dbr.com
DRINKER BIDDLE & REATH, LLP
One Logan Square
Philadelphia, PA  19103
Telephone:  (215) 988-2700

*Attorneys for Plaintiff*

#34300508_v1