**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:13-cv-80385**
**(consolidated with 13-80730)**

**IMPERIAL PREMIUM FINANCE, LLC,**

    Plaintiff,

v.

**SUN LIFE ASSURANCE COMPANY**
**OF CANADA,**

    Defendant.
_____/

## IMPERIAL PREMIUM FINANCE'S OPPOSITION TO SUN LIFE'S MOTION FOR SUMMARY JUDGMENT

Plaintiff IMPERIAL PREMIUM FINANCE, LLC ("Imperial Premium Finance"[1]), pursuant to Rule 56 of the Federal Rules of Civil Procedure, opposes Sun Life Assurance Company of Canada's ("Sun Life's") Motion for Summary Judgment ("Motion").

### INTRODUCTION

In its Motion, Sun Life raises four arguments. First, Sun Life claims that Imperial Premium Finance does not have standing to sue Sun Life for any of the claims asserted in the Complaint. Second, Sun Life claims that, even if there were a valid assignment to Imperial Premium Finance, the Imperial-related entities that assigned the causes of action did not suffer damages. Third, Sun Life argues that the breach-of-contract damages claimed by Imperial Premium Finance were not reasonably foreseeable at the time of issuance. Lastly, according to Sun Life, there is no evidence that Sun Life's actions actually caused the damages claimed by Imperial Premium Finance.[2]

---

[1] "Imperial Premium Finance" is used throughout to refer to Imperial Premium Finance and the Imperial entities that assigned their causes of action to Imperial Premium Finance, including Imperial Holdings, Inc., Imperial Life Financing II, LLC, Imperial Life Settlements, LLC, Imperial PFC Financing, LLC, Imperial PFC Financing II, LLC, OLIPP, LLC, and PSC Financial, LLC.

[2] Sun Life does not challenge in the Motion any element of the causes of action asserted by Imperial Premium Finance other than (1) standing and (2) whether Sun Life caused, and Imperial Premium

1

Imperial Premium Finance addresses these specific four arguments below, explaining that (1) there is undisputed evidence that the owners of the policies at issue, among others, assigned their causes of action to Imperial Premium Finance through a valid oral assignment, which is sufficient as a matter of law to confer standing, (2) Imperial Premium Finance itself and the assigning entities did in fact suffer damages from Sun Life's misconduct, as explained in the March 18, 2016 Supplement to Expert Report of R. Larry Johnson (the "March 18 Expert Report"), attached as Exhibit A; and (3) because Sun Life was well aware of a policy owner's right to assign, finance, and sell a policy, those damages were reasonably foreseeable *and* actually caused by Sun Life's breaches of the Policies.[3]  At a minimum, however, the issues of foreseeability and causation of damages are factual issues that are not properly resolved on summary judgment.  For these reasons, the Court should deny Sun Life's motion.

## ARGUMENT

**I.  IMPERIAL PREMIUM FINANCE HAS STANDING TO ASSERT THE CLAIMS RAISED IN THE COMPLAINT.**

In its Motion, Sun Life claims that because Imperial Premium Finance itself is not a party to the Policies and was (*allegedly*) not a recipient of the false statements made by Sun Life, it does not have standing to sue Sun Life for breach of contract and fraud.  Sun Life recognizes that the Complaint alleges that the policy owners and recipients of the false statements assigned all causes of action to Imperial Premium Finance, which—as Sun Life admits—would overcome the standing obstacle.  *See* Motion at 4.  Indeed, a party may assign almost any cause action, including breach-of-contract and fraud claims.  *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 496 (Fla. 3d DCA 1994) (citing *Selfridge v. Allstate Ins. Co.*, 219 So. 2d 127, 128 (Fla. 4th DCA 1969) ("[A]ssignability of a cause of action is the rule rather than the exception.")).  Nevertheless, Sun Life argues that (1) the allegation regarding assignment is conclusory and (2) Imperial has not produced any documentary evidence of the assignments.  Sun Life's arguments are wholly without merit.

---

Finance suffered, any recoverable damages as result of Sun Life's misconduct.  Accordingly, we address in this  Opposition only the arguments raised by Sun Life.

[3] "Policies" refers to certain life insurance policies issued by Sun Life between April 2006 and August 2010.

First, while Sun Life claims there are no "averments of fact setting forth who made the[] assignments, what was assigned, where the assignments were made, or the consideration paid" for the assignments, Sun Life fails to cite a single case requiring that assignments be pleaded with any particularity. The reason is simple: no such requirement exists. *See Ginsberg*, 645 So. 2d at 496 ("In order to pursue a cause of action, [the assignee] must allege "that by assignment, he became possessed of all rights and causes of action which the original owners possessed."). Here, the Complaint adequately alleges a valid assignment, as well as the "who" and "what" of the assignment. *See* ECF No. 1, Case No. 13-80730 ("Imp. Comp."). For instance, the Complaint alleges that Imperial Holdings, Inc., Imperial Life Financing II, LLC, Imperial Life Settlements, LLC, Imperial PFC Financing, LLC, Imperial PFC Financing II, LLC, OLIPP, LLC, and PSC Financial, LLC assigned "[a]ll causes of action belonging to [them] against Sun Life" to Imperial Premium Finance—the Plaintiff in this case. *See* Imp. Comp. at 1, n.1. Thus, the assignment was properly alleged in the Complaint.

Second, Sun Life claims that because Imperial Premium Finance has not produced any *documentary* evidence of the assignments, "no such assignments were ever made." Motion at 4. But as noted in Imperial Premium Finance's Statement of Facts in Opposition to Sun Life's Motion for Summary Judgment ("Imp.'s RSF"), the Imperial entities that owned (or had the right to own) the Policies assigned their causes of action against Sun Life to Imperial Premium Finance, LLC through a perfectly valid oral assignment. Imp. RSF ¶¶ 8-25, 27, 29-62; s*ee Stewart v. Hooters of Am., Inc*., 432 Fed. App'x 903, 905 (11th Cir. 2011) ("Under Florida law, an assignment need not be in writing.") (citing *Mangum v. Susser*, 764 So.2d 653, 655 (Fla. 1st DCA 2000) (finding no law requiring that an assignment of a claim for unpaid rent be in writing to be lawful)); *Boulevard Nat'l Bank of Miami v. Air Metal Indus., Inc.*, 176 So. 2d 94, 97–98 (Fla. 1965) (written assignment of a contract is not required)). Thus, other than the Complaint itself (which dates back to 2013),[4] there is no further written evidence of the assignments because it is simply unnecessary as a matter of law.[5]

---

[4] The assignments existed before the Complaint was filed *and the Complaint itself is evidence of this*.

[5] Sun Life failed to ask any questions during the 30(b)(6) deposition about the assignments alleged in the Complaint. Thus, Sun Life has only itself to blame for not knowing more about the assignments.

3

Because the victims of Sun Life's breaches orally assigned their causes of action against Sun Life to Imperial Premium Finance, Imperial Premium Finance itself has standing to sue Sun Life for breach of contract and fraud, as alleged in the Complaint.[6]

## II. IMPERIAL PREMIUM FINANCE WAS HARMED BY SUN LIFE'S MISCONDUCT AND SUCH DAMAGES WERE REASONABLY FORESEEABLE. CONSEQUENTLY, IMPERIAL PREMIUM FINANCE IS ENTITLED TO RECOVER ALL DAMAGES CAUSED BY SUN LIFE.

### A. Imperial Premium Finance itself (as one of the victims of Sun Life's fraud) and each of Imperial's assignors (all victims of Sun Life's breach of contract and fraud) suffered damages as a result of Sun Life's unlawful actions.

Sun Life also asserts that, even if there were an assignment, the assignors do not have causes of action to assign because they did not suffer damages resulting from Sun Life's misconduct. Sun Life argues that the November 18, 2014 expert report identifies White Eagle, and not any of the assignors, as the entity that suffered the damages caused by Sun Life's lawsuit.[7] However, while the damages discussed in the November 18, 2014 report would have indeed been recoverable,[8] Sun Life's argument is irrelevant in light of the March 18 Expert Report. Specifically, because on November 9, 2015, Imperial Premium Finance and the assignors were able to mitigate the damages from the change in credit facility terms that occurred after Sun Life filed its complaint, the previously-asserted damages relating to White Eagle are no longer at issue. *See* Ex. A at 3-4.

---

[6] As stated below, *infra*, Imperial Premium Finance itself was also a victim of Sun Life's fraud and thus has a fraud claim against Sun Life independent from the assignments.

[7] This Sun Life argument applies only to the breach-of-contract claim.

[8] Although White Eagle was the borrowing entity on the credit facility agreement, White Eagle entered into the agreement as agent for Imperial Holdings, Inc. *Nardi v. Cont'l Nat. Bank*, 559 So. 2d 307, 309 (Fla. 3d DCA 1990) ("The law in Florida is settled that 'an agent can act for an undisclosed principal who, in turn, can sue to enforce the benefits of the contract.'"). Moreover, in issuing the premium finance loans on the Policies, and in subsequently acquiring ownership of the Policies, Imperial Premium Finance and the Imperial entities were also acting on behalf of Imperial Holdings, Inc. Indeed, the press releases and SEC filings made by Imperial Holdings, Inc. consistently identify Imperial Holdings, Inc. as lender of the premium finance loans and owner of the Policies. *See, e.g.*, Excerpt of Imperial Holdings, Inc. S-1, attached as Exhibit B; Aug. 8, 2011 Press Release from Imperial Holdings, attached as Exhibit C. Thus, Imperial Premium Finance can lawfully recover from Sun Life all damages caused by Sun Life's unlawful conduct.

Nevertheless, as stated in the March 18 Expert Report, Imperial Premium Finance itself and the assignors have suffered tens of millions of dollars in damages as a result of Sun Life's repeated breaches and fraudulent conduct. *See id*. For example, as a result of Sun Life's breach of the incontestability provision in the Policies, Imperial Premium Finance and each of its assignors incurred millions of dollars in attorneys' fees and also incurred significant borrowing costs relating to the attorneys' fees. *Id*. In addition, because Sun Life contested the validity of the Policies and refused to honor its contractual obligation to immediately change ownership and beneficiaries for the Policies free and clear of any claim, the policy owners (all assignors) were unable to sell and assign the Policies they owned. *Id*. Consequently, the assignors have been (1) unable to sell the Policies and thus receive any sales proceeds from the Policies and (2) forced to continue to pay Sun Life millions of dollars in premiums for policies they would have long ago sold. *Id*. As a result of the loss of sales proceeds, and the expenses associated with the legal fees and continued premium payments, the assignors have also been forced to (3) borrow funds to, among other things, satisfy these expenses. *Id*. Without question, Sun Life's breaches of the Policies have caused Imperial Premium Finance, including the assignors, over forty million dollars in damages, which Imperial Premium Finance is entitled to recover. *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009) (explaining that the injured party in a breach-of-contract action is entitled to recover monetary damages that will put it in the same position it would have been had the other party not breached the contract).[9]

As the March 18 Expert Report also explains, Imperial Premium Finance itself and the assignors suffered damages as a result of Sun Life's intentional misrepresentations and fraudulent conduct, which, initially, induced Imperial Premium Finance itself to make premium finance loans on the Policies and then, subsequently, induced the assignors to obtain beneficial ownership or ownership of the Policies. But for Sun Life's intentionally deceitful statements, Imperial Premium Finance would not have entered into any transactions involving the Policies.[10] By entering into

---

[9] Because Sun Life's Motion does not challenge the first two elements of a breach-of-contract action—i.e., the existence of a contract and a breach of that contract—those two elements are not specifically discussed herein.

[10] As the Complaint alleges, Sun Life knowingly made the following misrepresentations: that "(i) it considers the Policies to be in force, (ii) it considers the Policies to be active, (iii) it considers the Policies to be valid, and (iv) it will not contest the Policies beyond the two-year contestability period except for non-payment of premiums." Imp. Comp. ¶ 112. However, at the time that Sun

these transactions, Imperial Premium Finance incurred significant expenses, including premium payments and the cost of borrowing funds to cover these expenses—*all recoverable as a matter of law*. *Ashland Oil, Inc. v. Pickard*, 269 So. 2d 714, 723 (Fla. Dist. Ct. App. 1972) ("In tort actions, the measure of damages seeks to restore the victim to the position he would be in had the wrong not been committed.") (internal quotations omitted). Thus, because both Imperial Premium Finance itself and its assignors were victims of Sun Life's fraud, Imperial Premium Finance is entitled to recover all damages suffered by itself and its assignors.

### B. The damages suffered were reasonably foreseeable and actually caused by Sun Life. Moreover, foreseeability and causation are issues of fact that must be left to the jury.

Sun Life claims that even if the assignors suffered damages from Sun Life's breach of contract and fraud, those damages were not reasonably foreseeable. Specifically, Sun Life argues that at the time it issued the Policies, it could not foresee that the Policies would become part of a portfolio used to secure a $300 million credit facility. Motion at 8. However, Sun Life's argument is based entirely on the damages claimed from the change in the credit facility terms—damages that have been mitigated and are no longer relevant. *See* Ex. A. Nevertheless, the damages that the Imperial-related entities have continued to suffer, as set forth in the March 18 Expert Report, were entirely foreseeable at the time Sun Life issued the Policies and made the fraudulent statements.

Indeed, Sun Life recognizes that, under Florida law, the injured party is entitled to recover "***all*** damages that are causally related to the breach of contract so long as the damages were reasonably foreseeable at the time the parties entered into the contract." *Capitol Envtl. Servs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009) (emphasis added). "It is not necessary that the parties have contemplated the exact injury which occurred as long as the actual consequences could have been reasonably expected to flow from the breach." *Id.* (internal quotations omitted).

In attempting to persuade the Court that the damages suffered were not reasonably foreseeable, Sun Life provides an example of what *it* considers to be reasonably foreseeable

---

Life made each of the statements, Sun Life actually considered the Policies to be void *ab initio* and actually intended to contest the validity of the Policies. *Id.* ¶ 114-15. Thus, Sun Life knowingly made fraudulent statements.

6

damages "involving a life insurance policy," and then claims that "the facts of this case are so far afield" from the example. *See* Motion at 8. But Sun Life's example is entirely misplaced. Sun Life submits that, if a life insurer breaches a policy *by failing to pay a death claim*, the reasonably foreseeable damages would include the loss of the death benefits. *Id*. But as Sun Life then notes, the breach *in this case* is *not* (yet) the failure to pay a death benefit.[11] Instead, the breach here involves not complying with other (also binding and material) promises made by Sun Life in the Policies, including the assignability provisions in the Policies and the two-year contestability provision in the Policies.

It was entirely foreseeable, at the time of issuance, that if Sun Life challenged the validity of the Policy after two years, whether by lawsuit or otherwise, the policy owner (or its assignee) would defend the validity of the Policy and would incur costs related to that defense. Such costs to defend the Policies naturally would include attorneys' fees, as well as the cost of borrowing money necessary to pay such attorneys' fees. *See, e.g., Gregoire v. Lucent Techs. Inc.*, No. 6:03CV251ORL31KRS, 2005 WL 1863429, at *4 (M.D. Fla. Aug. 5, 2005) (noting that seeking attorney's fees as a consequence of a breach of contract "is appropriate where, as . . . here, the suit complained of was filed in breach of a covenant not to sue") (citing *Anchor Motor Freight, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union No. 377*, 700 F.2d 1067, 1072 (6th Cir. 1983) (defendant who filed counterclaim seeking attorney's fees as measure of damages incurred in defending lawsuit instituted purportedly in violation of covenant not to sue was not precluded by American rule from seeking such a measure of damages); *Paper, Allied, Chem. & Energy Workers Int'l Union, Local 5-508, AFL-CIO v. Slurry Explosive Corp.*, 107 F. Supp. 2d 1311, 1331 (D. Kans. 2000) (defendant could pursue counterclaim seeking attorney's fees incurred in conjunction with claim filed in breach of agreement which defendant asserted that it entered specifically to avoid cost of litigation); *Riveredge Assocs. v. Metro. Life Ins. Co.*, 774 F. Supp. 897, 901-902 (D.N.J. 1991) (where defendant asserted counterclaim that plaintiff instituted lawsuit in bad faith and, in doing so, breached implied covenant of good faith and fair dealing, attorney's fees were proper measure of damages; "[i]f the covenant breached is a promise not to file suit in bad faith, then the logical measure of damages is the direct consequence of breach of that right: the costs of defending the wrongful suit."); *see also Capitol,* 25 So. 3d at

---

[11] None of the insureds of the Policies have passed away.

596-97 ("With respect to the attorney's fees and costs incurred in the declaratory judgment action, the record establishes that but for the breach by CES, Earth Tech would not have been required to pursue the declaratory judgment action in an effort to obtain the coverage that should have been provided under the contract. Moreover, because the declaratory judgment action filed by Earth Tech is a common response to an insurance carrier's refusal to provide coverage, . . . the action (and the resulting attorney's fees and costs) could have been reasonably expected to flow from the breach.").[12]

Additionally, at the time of issuance, Sun Life was well aware that a life insurance policy is an asset that **can be freely assigned, transferred, sold, or even used as collateral for a loan**. *See Grigsby v. Russell*, 222 U.S. 149, 156 (1911) (recognizing that a life insurance policy is an acceptable form of investment with "the ordinary characteristics of property."); Lawrence Dep. at 289-290 (Q. It says, "During the lifetime of the insured, you may assign all or some of your rights under this Certificate. "Do you see that? A. I do. . . . Q. What do you understand the phrase – the word assign to mean? A. Transfer one's interest in. Q. ***Do you agree that pursuant to this provision . . . Sun Life agreed that a policy owner could use this policy as security for a loan? A Yes, I believe so***."). Indeed, there is a thriving and highly-regulated secondary market for life insurance policies that allows a policy owner to use the policy as an investment tool for financial gain. And each Sun Life policy contains an assignment provision that states "[d]uring the lifetime of the insured, you may assign all or some of your rights under this Certificate." *See, e.g.,* ECF No. 358-1 at 16. Significantly, Sun Life also sends policy owners a "Policyholder Notification" explaining that there is a secondary market to buy and sell life insurance policies, the policy may be resold several times, and there are alternatives to selling the policy that include taking policy loans from Sun Life or using the policy to secure a loan from a financial institution. *See* Policyholder Notification, attached as Exhibit D. Thus, it was reasonably foreseeable to Sun Life

---

[12] *See also In re W.B. Care Ctr., LLC,* 419 B.R. 62, 73 (Bankr. S.D. Fla. 2009) (noting that breach of a covenant not to sue gives rise to a counterclaim for damages); *Foliar Nutrients, Inc. v. Plant Food Sys., Inc.*, No. 6:13-CV-748-ORL, 2014 WL 3510594, at *4 n.6 (M.D. Fla. July 14, 2014) (patentee who brings an infringement claim in contravention of a covenant not to sue opens itself up to a breach of contract claim); *Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A.*, No. 2:04-CV-494, 2009 WL 818997, at *8 (S.D. Ohio Mar. 27, 2009) (where there is a breach of a covenant not to sue, the damages are measured by the attorney fees incurred as a result of the breach)

that a policy owner could assign or sell its policy at some point during the life of the insured, or use the policy as collateral for a loan.

Because Sun Life has always known that a policy (including each Policy at issue here) can be freely sold, it is indisputable that Sun Life has also known that refusing to honor the Policies' assignability provisions and/or contesting the validity of the Policies would cloud title of the Policies and diminish and interfere with their marketability and salability. Thus, Sun Life is responsible for all damages resulting from the policy owners' inability to market and sell the Policies because of Sun Life's breaches. Such recoverable damages include: (1) loss of sales proceeds, (2) the premium expenses that would not have been incurred had the Policies been sold, and (3) the related cost of capital (e.g., the interests rates paid on the amounts borrowed to pay premiums from the moment the Policies would have been sold).[13] All of the damages at issue naturally flow from Sun Life's breaches of promises it made in the Policies, and Sun Life is therefore liable for those damages.[14]

In any event, foreseeability and causation are questions of fact that are not properly resolved on summary judgment. *Paterson v. Deeb*, 472 So. 2d 1210, 1219 (Fla. 1st DCA 1985) ("It is well established that foreseeability is ordinarily a question of fact. . . . It may be decided as a question of law only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.'"); *CSX Transp., Inc. v. Pasco Cnty.*, 660 So. 2d 757, 759 (Fla. 2d DCA 1995) ("[F]oreseeability as it relates to proximate cause, are generally not appropriate for determination by summary judgment. These are factual issues which must be resolved by the trier of fact."). Sun Life's request for summary judgment must be denied.

---

[13] To be certain, Sun Life itself acknowledges that where a policy owner's access to funds is restricted as a result of a breach, the policy owner may recover damages resulting from that restriction. Motion at 8.

[14] In the Motion, Sun Life states in a footnote that damages suffered as a result of a fraud must also be foreseeable. Here, the damages caused by Sun Life's fraudulent statements, as set forth in the March 18 Expert Report, were indeed reasonably foreseeable and are thus recoverable. *See Ashland Oil, Inc. v. Pickard*, 269 So. 2d 714, 723 (Fla. 3d DCA 1972) ("In tort actions, the measure of damages seeks to restore the victim to the position he would be in had the wrong not been committed."); *State Farm Mut. Auto. Ins. Co. v. Smoot,* 381 F.2d 331, 338–40 (5th Cir. 1967) (affirming jury verdict awarding damages for plaintiff's inability to sell house because outstanding judgment operated as lien and for destruction of credit as a result of foreclosure; in tort action, "[i]t is the prerogative of the jury to award [general] damages in an amount consistent with the evidence").

## CONCLUSION

For the foregoing reasons, the Court should deny Sun Life's Motion for Summary Judgment.

Dated: March 22, 2015                                    **HOLLAND & KNIGHT LLP**

*/s/ Jesus E. Cuza*
Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
*/s/ J. Raul Cosio*
Florida Bar No. 503630
Email: raul.cosio@hklaw.com
*/s/ Monica Vila Castro*
Florida Bar No. 22976
Email: monica.vila@hklaw.com
*/s/ Rebecca Canamero*
Florida Bar No. 86424
Email: rebecca.canamero@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
T: (305) 374-8500/F: (305) 789-7799

*/s/ Philip E. Rothschild*
Florida Bar No. 0088536
Email: phil.rothschild@hklaw.com
515 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
T.: (954) 525-1000/F: (954) 463-2030
*Attorneys for Imperial Premium Finance*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of March, 2016, a true and correct copy of this Response in Opposition to Motion for Summary Judgment was served by electronic notice made by the CM/ECF filing system to all counsel of record on the Service List below.

By:   */s/ Philip E. Rothschild*
         Philip E. Rothschild

**SERVICE LIST**

Wendy Lynn Furman
Email: wfurman@pettfurman.com
PETT FURMAN PL
2101 NE Corporate Boulevard, Suite 316
Boca Raton, Florida  33431-7343
Telephone:  (561) 994-4311

Jason P. Gosselin
Email: jason.gosselin@dbr.com
John Bloor
Email: john.bloor@dbr.com
Thomas S. Downie
Email: thomas.downie@dbr.com
John Moore
Email: john.moore@dbr.com
Joseph Kelleher
Email:  joseph.kelleher@dbr.com
Christopher Petillo
Email:  christopher.petillo@dbr.com
DRINKER BIDDLE & REATH, LLP
One Logan Square
Philadelphia, PA  19103
Telephone:  (215) 988-2700

*Attorneys for Sun Life*